## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARYANN ANDERSON,                    )
                                     )
              Plaintiff,             )          Case No.  1:07-cv-111-SJM
        v.                           )
                                     )
BOARD OF SCHOOL DIRECTORS            )
OF THE MILLCREEK TOWNSHIP            )
SCHOOL DISTRICT, et al.,             )
                                     )
              Defendants.            )

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

        This civil action was commenced on May 11, 2007 by Plaintiff Maryann

Anderson, a former administrator with the Millcreek Township School District, who

claims that she was terminated from her employment as a result of whistleblower

activity.  She has filed claims under 42 U.S.C. §1983 and the Pennsylvania

Whistleblower Law[1] against Defendants Rebecca Mancini (a former fellow

administrator), Susan Sullivan (a former member of the school board), and Dean

Maynard (the former Superintendent of Millcreek Township School District).[2]  This Court

---

[1] Anderson originally asserted additional claims against the Defendants, but these have since been either dismissed or withdrawn.  As to Count IV of the Second Amended Complaint (intentional interference with an employment contract), Anderson concedes that she cannot establish a viable claim under this theory and Defendants' motion for summary judgment will therefore be granted as to this claim.  Consequently, the only remaining causes of action that we need address for present purposes are Plaintiff's claims under § 1983 and the Pennsylvania Whistleblower Law as set forth in Counts 1 and 3 of the Second Amended Complaint [26], the operative pleading in this case.

[2] Anderson's original complaint also named the MTSD Board of School Directors as a Defendant, but the Board has since been dismissed from the case.

has subject matter jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

Presently pending before this Court are motions for summary judgment filed on behalf of the Defendants.  For the reasons that follow, these motions will be granted.

## I.      STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir.2009) (citation omitted), and a factual dispute is "genuine," and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49, 252 (1986).  Accordingly, in order for a claim to survive summary judgment, "there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff."  *Id.*

For purposes of Rule 56, we view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *Jones v. Hashagen*, No. 12-2220, 2013 WL 363444 at *1 (3d Cir. Jan. 31, 2013).  In order to prevail against a motion for summary judgment, however, the nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue."  *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir.2005).

2

## II.    BACKGROUND FACTS[3]

The Parties

Anderson was employed by the Millcreek Township School District (hereinafter "MTSD" or the "District") from 1998 until July 2009, when she became the Superintendent of the Kane School District in Pennsylvania.  (D 1, 5.)  From 1996 to July 2006, Anderson served as the Supervisor of Special Education and Student Services for MTSD.  From 2006 to July of 2009, she served as the Director of Personnel.  (D 2.)

In July of 2006, Defendant Mancini was hired by MTSD as the Supervisor of Special Education and Student Services, thus replacing Anderson in that position when Anderson became Director of Personnel.  Mancini's first day on the job at MTSD was Monday, August 14, 2006.  (D 6.)  At all times relevant to this lawsuit, Maynard served as the Superintendent of MTSD and had supervisory authority over Anderson and Mancini (D 7, D 21), while Sullivan served as a member of the District's School Board of Directors.  (D 8.)

The ACCESS Program

Since 1996, MTSD has been receiving funds under the Pennsylvania Department of Education's ("PDE's") School-Based ACCESS Program ("SBAP").  SBAP is a medical assistance ("MA") program that provides partial reimbursement to school

---

[3] Throughout this Memorandum Opinion, reference will be made to the parties' respective appendices as well as their respective statements of undisputed facts and responses thereto.  Reference to "D ___" indicates the corresponding paragraph in Plaintiff's Response to Defendants' Joint Concise Statement of Facts [Doc. No. 276].  Reference to "P ___" indicates the corresponding paragraph in Defendants' Response to Plaintiff's Counterstatement of Facts [Doc. No. 282].  Reference to "D.A. ___" denotes the relevant page number(s) in the Defendants' Appendix, while "P.A. ___" denotes the relevant page(s) in the Plaintiff's Appendix.

entities with federal money for direct eligible health related services provided by the school to Medicaid-eligible special education students as part of their Individualized Education Plan.  (D 43.)

SBAP is a cooperative effort between the PDE, the Pennsylvania Department of Public Welfare ("DPW"), the Federal Centers for Medicare and Medicaid Services, and PDE's contractor, Leader Services ("Leader").  (D 41, D 42.)  Leader is a government contractor that administers ACCESS on PDE's behalf, working with the School District to train participants, verify eligibility, process claims for reimbursement from school districts, and submit claims to DPW for reimbursement.  (D 44.)  The School District submits claims for reimbursement for eligible services to DPW through Leader. Payment for approved claims is sent by DPW to PDE and resides in the District's restricted account at PDE.  (D 45.)

Reimbursements received by school districts must be used to enhance existing special education services within the school district, such as purchasing assistive technology or computers and funding new special education staff positions.  (D 46.) Services billed by MTSD through the ACCESS Program must be needed as related to the student's medical diagnosis, must be outlined in the student's IEP annually, and must be approved by the parent signing the IEP at the annual meeting.  (D 47.) Pursuant to Medical Assistance regulations, MTSD was responsible for verifying the accuracy of all claims information involved in submissions for reimbursement.  (D 48.)

As Supervisor of Special Services, Anderson was responsible for the administration of MTSD's School-Based ACCESS Program for a period of time including the period from January 1, 1995 through June 30, 2006.  (D 55, 62.)  Among

4

her job duties as Supervisor of Special Services was Anderson's responsibility to ensure the District's compliance with SBAP procedures and regulations.  (D 63.)

### Mancini Takes Over as Supervisor of Special Education/Student Services

Mancini assumed the position of Supervisor of Special Education/ Student Services on or about August 14, 2006.  (D 64.)  In taking that position, Mancini assumed the same job duties and responsibilities relative to administration of the ACCESS Program as were previously held by Anderson, including direct communication with top officials at PDE and DPW as well as with Leader so as to ensure the District's compliance with applicable federal and state SBAP regulations.  (D 30, 65.)

Within the first two weeks of her employment, Mancini developed concerns which she then related to Maynard about what she perceived as improper billing practices being carried out under the ACCESS program.  In particular, Mancini became concerned about:  (a) bills which had been submitted relative to learning support students who had no medical diagnosis, (b) personal care assistants who had been billing for instructional and educational time in the classroom (as opposed to time spent rendering health-related services), and (c) certain providers who had been billing for services in which they lacked proper certification.  (D.A. 224-225.)

In addition, during her first week occupying Anderson's former office, Mancini discovered various gift cards in her desk which, she was told, had been used as incentives and for teacher recognition.  (D.A. 996, 1014.)  This discovery prompted Mancini to email Anderson on August 25, 2006 requesting that Anderson turn over any remaining gift cards and demonstrate to Mancini how she (Anderson) had "track[ed] or document[ed] their distribution."  (D.A. 1014.)

5

Anderson replied:

> You can have and do whatever you want.  I ordered them under
> student/staff incentives through ACCESS and sent them out for peer
> mediators, gave to teachers when they volunteered for meetings, gave to
> teachers when they asked for them for students.  I gave quite a bit to
> student services at MIHS for various things.  I did not track each card,
> when people asked for them and needed them, I provided.  The cards
> were used to purchase food for meetings.  It was not only special
> education/services, when other people needed incentives, if I had any I
> gave them what I have.  I do have some left and will leave them for you to
> do as you wish.  I did not give them to staff when they were already being
> compensated.  For example, if they were getting paid, I did not give
> incentives.  This was for times above and beyond … It was very much
> appreciated.

(D.A. 1014.)

Believing this response to be insufficient and also inaccurate based on what she had heard from other MTSD employees concerning Anderson's use of gift cards, Mancini reported her concerns to Maynard and turned the remaining gift cards over to him.  (D.A. 241-243.)  From September 2006 onward, gift cards were no longer used in the Special Education Department.  (Id.)

According to a chronology of events prepared by Anderson, Mancini reportedly told fellow staff members during a September 2006 Special Services staff meeting that Anderson had improperly given out gift cards to staff.  (D 76.)  That same month, during the first Student Service Committee meeting she attended, Mancini expressed to Defendant Sullivan her concerns about whether the District had been properly billing ACCESS in the past.  (D 77.)

It is undisputed that Mancini had discussions with Sullivan during the fall of 2006 about Mancini's concerns relative to the billing, receipt, and expenditure of ACCESS

6

funds within MTSD, including billings for personal care assistants.  (D 80.)  Mancini also discussed these issues with Maynard, who was her supervisor.  (D 79.)

On September 8, 2006 Mancini sent an email to Anderson stating that Mancini was working on ACCESS billing – specifically, the verification of credentials and certifications of providers for which the District had billed ACCESS.  (D 81.)  On September 11, 2006, Mancini sent another email to Anderson regarding the certifications and credentials of a Chris DeFillipo and the District's ability to bill ACCESS solely for his interpreting time.  Mancini further requested that Anderson help her locate a prior comprehensive ACCESS audit referenced by Anderson in a prior email.  (D. 82.)  Anderson does not contend that these inquiries by Mancini regarding ACCESS certification and gift cards were retaliatory.  (D 74, 83.)

Nonetheless, on November 6, 2006, Anderson discussed with her attorney a situation that she saw developing with Mancini and Maynard's apparent support for what Anderson perceived as Mancini's negative attitude and actions toward Anderson.  (D 85.)  Anderson's attorney advised her to put her concerns in writing and send them to Maynard.  (D 86.)  Following this advice, Anderson wrote a formal letter to Maynard, dated November 6, 2006, in which she asked Maynard to instruct Mancini to refrain from making derogatory remarks and comments about previous practices to others.  (D 87.)  The comments which Anderson found objectionable had to do with Mancini suggesting that IEPs and re-evaluations were out of compliance and that the use of gift cards as incentive awards had been improper.  (D 88.)

On December 12, 2006, Anderson again raised concerns to Maynard about her relationship with Mancini.  (D 89.)  Two days later, Mancini sent an email to Maynard, stating in part:

> I respectfully request mentorship reassignment. I am working very hard to maintain constructive interactions with Dr. Anderson about the administrative issues.  Given the fact that she has categorized my behavior as "unprofessional" twice in meetings with you, I am not confident that she and I can interact constructively on this level.  I don't see the situation improving as information about ACCESS billing comes to light.  Dr. Anderson has been largely absent in the transition process in changing leadership in the special education office; she scheduled two meetings for mentorship purposes in November and did not attend either. I would be grateful if an alternative arrangement might be possible.

(D.A. 1463.)

### ACCESS Review by IU5

On February 14, 2007, Sandy Schulz, ACCESS Coordinator for MTSD, began a medical leave of absence.  (D 95.)  The leave stemmed from stress that Schulz was experiencing relative to concerns over improprieties with ACCESS billing.  (D.A. 770.) As the District's ACCESS Coordinator, Schulz had worked under Anderson prior to the 2006-2007 school year while Anderson was the Supervisor of Special Services.  (D 117.)

Two days later, Mancini began a series of meetings with various representatives of the Northwest Tri-county Intermediate Unit ("IU5") regarding MTSD's ACCESS billing. (D 97, 99, 100.)  The parties disagree as to the purpose of these meetings.  Defendants contend that Mancini's purpose in contacting IU5 was to engage an expert and experienced billing agent to serve as an impartial third party biller in light of Mancini's belief that MTSD had been billing ACCESS improperly.  (D 98.)  Anderson, on the other

hand, maintains that Mancini's interaction with IU5 was intended only to address the

problems that Mancini and her staff were having keeping 2006-2007 ACCESS billing

organized and up to date, due to the absence of Schulz.  (D 98, 99.)

On March 5, 2007 Mancini emailed Anderson concerning her belief that her

department was understaffed in light of current needs.  Mancini wrote that:

> [m]uch of the ACCESS billing that has been done here in the past is not
> compliant with state guidelines so it [sic] there is no question about continuing it
> as is even if we had the staff to do it, which we don't.  Additionally, the system
> Sandy [Schulz] used is dysfunctional and irreparable.  The IU will take it over at
> great expense to us, or we can hire another full time secretary/clerical worker to
> do ACCESS after it's [sic] rebuilt here while Sandy is assigned to some of what
> MaryLou used to do when and if she returns.

(D.A. 1054.)

At Mancini's request, five staff members from IU5 came to MTSD on March 7

and 8, 2007 to perform an ACCESS review prior to contracting with the District to assist

in ACCESS billing.  (D 103.)  Among other things, the IU5 personnel found "[i]nactive

ACCESS child files mixed in with active files," "[b]illing for services without a parent

letter," and "[s]ervices not approved on Medical Authorization."  (D.A. 913.)

On March 8, 2007, Mancini emailed Maynard regarding the status of the IU5's

review and reported that:  the IU had made progress but was unable to reconcile the

ACCESS files in the two day review; the IU was laying the framework for reliable,

compliant management of the billing process by cleaning up the files; most of the

inappropriate students (about 100) for which the District had been billing had previously

been removed but many still remained; the IU had discovered components for which the

District had not been billing but could have been (such that the recovery of revenues for

improperly billed and reimbursed services might be offset to some degree); and Mancini

9

would like to continue with the plan to turn billing over to the IU as soon as possible.  (D

105.)  Maynard notified Mancini the following day that he supported the IU's continued

involvement in completing their ACCESS review.  (D 106.)

Accordingly, on March 13, 2007 two staff members from IU5 returned to MTSD to

complete their review of the District's ACCESS billing.  (D 107.)  Subsequently, on April

23, 2007, IU5 entered into a 2007-2008 ACCESS Project Billing Agreement with MTSD

whereby IU5 agreed to function as administrator for MTSD's ACCESS billing.  (D 108.)

Attorney Perhacs' Investigation

On March 12, 2007, Maynard met with Richard Perhacs, an attorney with the law

firm Knox, McLaughlin, Gornall & Sennett, P.C. (the "Knox Firm") and one of MTSD's

solicitors.  Among the matters discussed were Maynard's concerns about the ACCESS

Program, including the use of ACCESS funds to purchase gift cards that were given out

as staff incentives.  (D 112, 114, 115, 116.)  Maynard asked Perhacs to investigate the

District's ACCESS Program and do "what was prudent to determine if something

inappropriate was done relative to the accounting of the ACCESS program."  (D 119,

120.)

That same day, Mancini and Schulz met with Perhacs as part of Perhacs'

investigation.  (D 123.)  During this meeting, Schulz raised several issues concerning

Anderson's administration of the program.  (D 124.)  Both Schulz and Mancini

expressed concerns regarding the billing for ACCESS services as well as the spending

of ACCESS funds.  (D 126.)

In a March 19, 2007 memorandum addressed to the School Board President,

Perhacs reported that, from the information presented to him, "it appears clear that

10

almost from the inception of the Access Program approximately seven years ago, the District has been submitting for credit to its Access account various expenditures which were not appropriate." (D 128, D.A. 856.) According to Perhacs, "[a] significant amount of money [was] involved." Perhacs further reported that "when applications have been made for reimbursement of specific expenses from the credited account, likewise items were included which appear to have been inappropriate." (Id.)

Leader Services' QAR

On March 21, 2007, Mancini and Maynard met with Gloria Grego of Leader to discuss the District's ACCESS Program. (D 133.) Grego's memorandum summarizing the meeting confirms that she had concerns regarding the District's billing for Personal Care Assistant services and further notes that MTSD had historically been among the state's top ten school districts for receiving the most ACCESS revenue. (D 138.) In addition to Grego recommending that MTSD perform annual self-audits to ensure compliance, it was determined that Leader would schedule a Quality Assurance Review ("QAR") of MTSD's ACCESS Program. (D 138, 139.)

Eventually, it was agreed that Barbara Henry of Leader would perform the QAR on Tuesday, May 1, 2007. (D 140, 141, 142.) As part of her review, Henry examined 43 randomly selected records for 12 students for the school years 2005-2006 and 2006-2007. (D 144, D.A. 972-980.)

Leader subsequently issued a written report of the QAR, copies of which were sent to officials at the PDE and DPW. (D 147.) The Leader QAR report identified 10 of 32 program requirements and 28 overall records that were not in compliance with SBAP requirements. (D 150.) The report was accompanied by a July 2, 2007 cover letter

11

authored by Grego and addressed to Mancini, wherein Grego states "it is imperative for the district to conduct self-audits to ensure compliance with the [SBAP] regulations."  (D 149.)

A copy of the QAR, as noted, was sent to the DPE.  This prompted a letter from John Tommasini, Director of PDE's Bureau of Special Education, to Mancini advising that, based on Leader's QAR, it was "evident" that Mancini's staff required additional training relative to SBAP billing and asking Mancini to involve Leader so as to ensure that the training would be "appropriate."  (D 154, D.A. 967.)

### Sullivan's Correspondence to the DPW and Auditor General

On May 3, 2007, Sullivan obtained a computer generated list of ACCESS billing for her son relative to the dates July 2000 through October 2006.  (D 156.)  The following day, Sullivan generated a letter (mailed on or about May 7) to the Pennsylvania DPW and the Department of Auditor General indicating that the School District may have billed medical assistance for services which Sullivan's son "did not receive and/or did not need."  (D.A. 998.)  In her letter, Sullivan represented that, over the previous five-year period, the District had billed some 592 hours for her son's personal care assistant at a cost of $16,197.50 – services which Sullivan claimed were not required.  (Id.)  During three of the previous five years, Sullivan wrote, her son had had a Therapeutic Support Staff person provided to him by the Dr. Gertrude Barber National Institute and funded by medical assistance through the Barber Institute.  (Id.)

MTSD's Referral to the Pennsylvania Auditor General

On May 8, 2007, the MTSD Board decided to halt Perhacs' internal investigation of the District's ACCESS Program and instead refer the matter to Commonwealth agencies. (D 160, 161.) The following day, Timothy Sennett, another Knox Firm attorney and MTSD solicitor, sent a letter to Pennsylvania Auditor General Jack Wagner indicating the School Board's concerns about MTSD's billing, reimbursement, and expenditure of ACCESS Funding for special education services from 2002 through 2006 and requesting that the Office of Auditor General undertake an audit and investigation of the ACCESS Program. (D 162.)

The May 14 CORE Team Meeting

On May 14, 2007, Mancini spoke with Grego and George Schneider, Executive Vice President of Leader Services. Grego advised Mancini that she had been in contact with DPW's Bureau of Program Integrity and that BPI would communicate directly with MTSD to set up an audit of the District's ACCESS billing. (D 163, 164.) Grego further advised that Leader was finalizing the amount that it would back out of MTSD's ACCESS account as a result of the past improper billing of three unlicensed speech therapists and one or two personal care assistants who had been working as interpreters – discrepancies which had been identified during the May 1 QAR. (D 165.)

Meanwhile, members of the District's top-level administration were planning their weekly meeting (known as "CORE" Team" meetings) in which they would discuss issues of concern to the District. (D 166.) At the request of Maynard, the agenda for the May 14, 2007 CORE Team meeting included the following item: "MTSD ACCESS Billing by Department of Public Welfare Fraud Investigation Division." (D 167.)

13

During the course of this May 14 CORE meeting, and in response to questions asked by Anderson, Mancini provided the team with several basic pieces of information regarding the ongoing ACCESS billing issues, i.e.:  (a) Leader's QAR had revealed improprieties, deficiencies or improper practices, (b) the QAR would be sent to PDE and DPW; (c) depending on the outcome, MTSD could be required to refund a significant amount of money; (d) DPW could prohibit the withdrawal of funds currently in MTSD's ACCESS account pending the outcome; and (e) further investigation would be forthcoming.  (D 180.)

Defendants maintain that the phraseology of the CORE meeting agenda item, including reference to the word "fraud," was chosen because Mancini had recalled reference being made to DPW's "fraud investigation unit or division" during prior conversations with Grego and she understood that to be the division responsible for handling fraud, abuse or waste.  (D 168.)  Defendants further maintain that the purpose of placing the "MTSD ACCESS Billing" on the agenda was to convey that:  (i) the QAR conducted by Leader on May 1 had revealed irregularities, (ii) Mancini had been informed that the results of the QAR would be forwarded to PDE and DPW's BPI, and (iii) further action was pending which could potentially have budget implications for the District.  (D 169.)  Anderson maintains that the agenda item falsely suggested that MTSD's ACCESS program was the subject of a state fraud investigation due to fund improprieties and that Anderson was personally being investigated.  (P 80.)

Immediately after the May 14, 2007 CORE Team meeting, Anderson contacted Leader Services to inquire whether anyone there had stated that there were concerns regarding fraud involving MTSD's ACCESS program under her oversight.  George

Schneider from Leader informed Anderson that no one at Leader had suggested fraud in connection with the District's ACCESS Program, and Anderson so advised Maynard. After learning about Anderson's phone call to Leader, Mancini spoke with Schneider and informed him that the only individuals from MTSD with whom he should communicate in the future regarding ACCES were herself or Sennett.  (Anderson Affid. ¶¶ 33-36.)

Mancini's Communications With DPW

On May 15, 2007, Grego sent an email to Mancini advising that she had spoken to Cherie Dininni of DPW's Bureau of Program Integrity and "explained the situation" at MTSD and that Dininni recommended MTSD follow DPW's procedures for a self-audit. (D 181.)  Mancini subsequently spoke with Dininni and reported that, based upon the QAR results, as well as ongoing concerns about MTSD's ACCESS billing, Leader intended to back out the claims paid for speech therapy services that had been provided by unqualified individuals as well as claims for interpreter services that were in fact not interpreter services.  (D 182.)

On May 18, 2007, Mancini sent a letter to DPW's Bureau of Program Integrity, with copies to Maynard and Board President Terry Scutella, requesting BPI's assistance to "review what we believe may be irregularities in the billing procedures that have been utilized by the district [regarding ACCESS] for perhaps as long as the past ten years." (D 187.)  Specific concerns raised by Mancini in the May 18 letter included the misapplication of Personal Care Assistant guidelines, inaccurate reporting for the use of draw down expenditures, the use of ACCESS funds to purchase gift cards that were used as rewards for billing staff, lack of documentation regarding gift card accountability

and distribution, and provider qualifications for billing.  (D 188.)  Mancini's letter was reviewed and approved by Maynard before it was sent.  (D 189.)

    <u>Mancini's Communications With PDE</u>

    On June 4, 2007, Mancini sent an email to Roni Russell, Educational Consultant for the Pennsylvania Department of Eduction's PA Training and Technical Assistance Network, inquiring whether the District could draw down approximately $220,000 from the District's ACCESS account for two special education-related projects in light of the inquiry into the District's ACCESS billing procedures.  (D 190.)  Russell emailed Mancini on June 13, stating that Mancini needed to put the District's request in writing to John Tommasini, Director of PDE's Bureau of Special Education.  (D 191.)

    Mancini did so on June 18.  In her letter requesting permission to draw down $220,000 from the District's ACCESS account, Mancini stated, "[t]here is a substantial amount of money accumulated in [the account], which is currently the subject of an inquiry as to past billing procedures."  (D 192, 193.)

    Tommasini responded by letter dated June 20, 2007, in which he stated, "At this time, it is not prudent to allow the [District] to withdraw the school-based ACCESS monies for the above-mentioned use due to the current audit inquiry of past billing procedures.  Once the audit is complete, you may re-submit the request for withdrawing those funds."  (D 196.)  Mancini understood this response to mean that MTSD would not be permitted to withdraw funds from its ACCESS account until the audit of MTSD's past billing procedures was completed.  (D 197.)

Investigations by DPW and Auditor General

Beginning in the summer of 2007, the District's ACCESS Program was under review by several outside agencies.  According to a June 14, 2007 memorandum generated by Attorney Sennett, George Schneider of Leader Services had indicated to Sennett following a "spot check" of MTSD's ACCESS documentation that there may be issues concerning the certification of speech therapists and additional issues regarding personal care assistance.  (D 203, D.A. 1023.)  Schneider had also advised Sennett that there was some concern about "cookie cutter IEPS" and allegations that District representatives had told parents to "just sign the document otherwise the child does not receive the services."  (D 204, D.A. 1023.)

According to Sennett's memorandum, Schneider had been advised by a representative of DPW's Bureau of Program Integrity that BPI had opened a file as a result of Sullivan's complaint.  (D 205, D.A. 1023.)  On June 5, 2007, Mancini complied with a request for documents made by a BPI representative.  (D 201.)  Among the documents requested by BPI and provided by Mancini were a sample letter dated November 22, 2004 providing gift cards to district Special Education teachers and an email regarding the purchase and dissemination of gift cards purchased with ACCESS funds.  (D.A. 981.)

By letter dated July 27, 2007 Sennett was advised by Jeffrey H. Gribb, Director of the Office of Special Investigations, Pennsylvania Department of the Auditor General that the District's May 9, 2007 letter to Auditor General Jack Wagner had been received, the Bureau of School Audits would expand its current audit to include travel expenses, and the Office of Special Investigations would be investigating "allegations into the use

of ACCESS funds that are not subject to the examination currently being conducted by [DPW's] Bureau of Program Integrity."  (D 206.)  Beginning in the summer of 2007 and continuing into June of 2008, investigators from the Pennsylvania Auditor General's Office of Special Investigation made regular visits to MTSD in order to examine records and interview witnesses.  (D 207.)

On August 7, 2007, the Director of DPW's Bureau of Program Integrity wrote Maynard to advise that BPI was "currently reviewing paid claims" for SBAP services that were billed to the Medical Assistance Program by MTSD.  (D 208.)  The letter directed the District to turn over complete ACCESS records for 226 Medical Assistance recipients for dates of service from August 1, 2005 through June 30, 2007.  (D 209.)

These outside agencies continued their activities into 2008, prompting Sennett to send letters to the BPI, the Pennsylvania Department of Auditor General, and the OSI inquiring of the status of their investigations.  (D 215, 216, 217.)  On June 23, 2008, Sennett was advised by Gribb that OSI was working with the U.S. Department of Education Inspector General's Office in regard to ACCESS funds and gift cards, that several people were being investigated for wrongdoing, that he hoped the investigation would be concluded within six months, but that a report would not be issued until the U.S. Department of Education approved doing so.  (D 218.)

During the fall of 2008 and into early 2009, Connie Murray, Special Agent with the U.S. Department of Health and Human Services, interviewed several employees of MTSD relative to ACCESS, including Mancini and Anderson.  (D 219.)  On February 24, 2009, Anderson was interviewed for over five hours by agents from the PA Department

of Auditor General, the U.S. Department of Health and Human Services, and the U.S.

Department of Education.  (D 220.)

### The Response From the Department of Justice

On April 6, 2009, Sennett received correspondence from the U.S. Department of

Justice concerning the joint federal and state investigation into MTSD's handling of the

ACCESS program.  (D 221.)  In this correspondence, the Assistant U.S. Attorney

handling the matter found that "the results [of the investigation were], to say the least,

troubling."  (D 222, D.A. 1500.)  The AUSA advised that the ACCESS claims under

examination "fail[ed] for a variety of reasons, including (but not limited to) claiming

reimbursement for services provided to absent students, claiming reimbursement for

services provided on holidays, claiming reimbursement for services provided over

lengths of time above and beyond authorized time frames, and claiming reimbursement

for services that are not entitled to reimbursement."  (D 223, D.A. 1500.)  He invited the

District to discuss the matter with an eye toward settlement, as the District's potential

exposure in any civil action stemming from the investigation would be "substantial."  (D

224, D.A. 1500-1501.)

### The Auditor General's May 18, 2012 Report

On May 18, 2012, the Pennsylvania Department of the Auditor General published

its report concerning its investigation into MTSD's use of SBAP funds.  As set forth in

the report, the AG's Office of Special Investigation found the following:

- The Millcreek Township School District's former Supervisor of Special Services [i.e., Anderson] diverted $91,873 from the District's special education program by purchasing gift cards with special education funds and using the gift cards for non-program purposes.

- Millcreek Township School District is unable to account for $341,140 of School-Based ACCESS Program funds that it received during the three-year period ending June 30, 2006.

- Two Millcreek Township School District employees removed approximately $2,100 worth of gift cards from an unlocked file cabinet drawn in the Supervisor's office without her knowledge.

(D.A at 1640.)  The report characterized the foregoing as "serious findings involving taxpayer monies."  (Id. at 1641.)  Copies of the report were forwarded to the U.S. Attorneys for the Middle and Western Districts of Pennsylvania, the Pennsylvania Office of Attorney General, and various other state and federal officers "for their review and whatever further action they may deem appropriate."  (Id.)

The Anonymous Letter Investigation

Meanwhile, in 2007 the District found itself involved in an investigation of a different matter.  This episode began in January of 2007, when a personal email authored by Maynard came into the possession of an MTSD teacher, Jon Cacchione, who was not an intended recipient.  (P 1, D 225.)  The email contained information about a cruise which Maynard was planning to take with two individuals, Debbie Sturm and Jeff Costello.  (P 2.)

Maynard was friends with Sturm and had recommended her for a position within the District.  Despite being friends with Sturm, Maynard had not disclosed their friendship at the time of her hiring.  (P 2, 3, 7.)

Maynard also acknowledges Costello as a friend and, at one time, the beneficiary of his life insurance policy.  (P 3, 4.)  Maynard had also recommended Costello for work within the District.  (P 2.)

20

As Director of Personnel, Anderson fielded Maynard's requests to hire various people, including Costello and Sturm.  (P. 6.)  Anderson contends that her work computer contained information and emails pertaining to Maynard's involvement in recommending certain individuals for MTSD employment positions without disclosing his personal relationships with those individuals.  (P 10.)

Subsequent to the January email incident, Maynard received an anonymous letter regarding the contents of the email which threatened to accuse Maynard of various things if he did not resign as Superintendent.  (D 226, P 14.)

On or about March 12, 2007, Maynard attended an executive session of the MTSD School Board to discuss the anonymous letter.  (P 15.)  During this executive session, a list of suspects was created and arrangements were made to have the hard drives of those suspects examined.  (P 16.)  The Board, the District's solicitor, and Maynard decided which of the suspects' computers were to be examined as part of the investigation of the anonymous letter.  (P 17.)  Among those whose computers were to be examined were Anderson, Cacchione, and Maynard.[4]  (P 18, 19.)

Maynard confronted Anderson at one point about whether she sent the letter, but Anderson denied having sent it.  (D 233, 234, P 21.)

On Friday, March 16, 2007, Maynard instructed Tom DelFratte, MTSD's Supervisor of Technology, to procure Anderson's MTSD laptop before the weekend.  (P 27.)  DelFratte went to Anderson's office to procure the computer, but the computer was not there and Anderson was not in the office that day.  (P 28.)  DelFratte therefore

---

[4] Maynard's computer was added to the list after one school board member suggested that Maynard may have sent the letter to himself.

reported to Maynard that he would procure Anderson's laptop on the following Monday (March 19, 2007).  (P 29.)

Anderson's First Alleged Whistleblower Report and Ensuing Acts of Alleged Retaliation

Rather than wait for DelFratte to collect Anderson's computer upon her return to work, Maynard proceeded to contact Anderson at home on March 16 and stated that he wanted to secure her MTSD laptop computer the following morning (Saturday) due to the MTSD's investigation concerning the anonymous letter he had received.  (D 236, 239.)

Later that day, Anderson met with Sennett for the purpose of handing her MTSD laptop computer over to him rather than to Maynard.  (D 238.)  Anderson gave her computer to Sennett because she believed that Maynard would "mess with the information that was on the computer and would try to change it."  (D 241, 242.)  In particular, Anderson believed that Maynard was going to remove an email from her computer and was going to plant the anonymous letter on her computer.  (D 243.)  She arranged for Sennett to take her laptop so that she "would not be insubordinate in conjunction with Maynard's request."  (D 244.)

The following morning, Maynard and Perhacs met with Sennett at the MTSD administration building, at which time Sennett handed over Anderson's computer to Perhacs.  (P 37.)  Maynard and Perhacs then entered Anderson's office at MTSD in search of "anything suspicious."  (P 39.)

Among the items found were documents which led Maynard to conclude that Anderson was having an extramarital affair.  Defendants claim that this information[5] suggested Anderson was planning to use a trip to an upcoming Penn State job fair as an opportunity to spend the weekend with the other individual.  (P 42.)

Although attending the Penn State job fair would have been a normal professional activity for Anderson, she was instructed by Maynard at some point on or after March 19, 2007 that she would not be permitted to attend the job fair.  (P 44, 45.) Anderson further claims that, later in the day on March 19, Maynard informed her that she was not permitted to attend a scheduled CORE meeting -- an allegation which Maynard denies.  (P 52, P 70, D 166.)

That afternoon, Anderson's legal counsel wrote Sennett a letter expressing "concern, on behalf of Dr. Anderson, regarding the conduct and motives of [Maynard] as it relates to Dr. Anderson" and accusing Maynard of engaging "in an untoward course of conduct aimed at inaccurately casting Dr. Anderson's work performance in a negative light."  (P.A. 1873-1874.)  Concerning the events of March 16, counsel stated his belief that Maynard may have "attempted to seize Dr. Anderson's computer to create and/or destroy evidence relevant to his defense" concerning the misdirected email under investigation.  (Id.)

During the week of March 19, 2007, Anderson began gathering documents in the MTSD business office relative to a whistleblower report which she intended to file. Among the issues which Anderson intended to raise were Maynard's alleged actions in

---

[5] There is a dispute between the parties as to whether certain of Anderson's personal effects were actually taken and never returned.  Defendants maintain that certain documents were merely copied, not taken.  Plaintiff maintains that certain effects were actually confiscated by Perhacs and Maynard and were never returned.  For present purposes, we deem this dispute to be immaterial.

recommending the hiring of personal friends over other applicants for MTSD job openings and failing to disclose his personal relationships with the candidates he was supporting.  (P 58.)  One of the documents which Anderson copied was the back-up life insurance beneficiary card for Maynard, which apparently indicated Costello as a beneficiary.  (P 59.)  Anderson maintains she had made this copy because she had found that the original was missing from the insurance files while assembling information relative to her anticipated whistleblower report, and tracking and updating benefit documentation was part of her job responsibilities.  (Anderson Affid. [285-1] at ¶¶ 20, 21.)  Anderson states that she believed the information to be pertinent to her whistleblower report because Maynard had recommended Costello for hire within the District.  (Id. at ¶ 22.)

On March 26, 2007, while Anderson was attending a CORE Team meeting, she was directed, in front of the other administrators, to leave the meeting in order to be interviewed by Mark Kuhar, another Knox firm lawyer representing MTSD.  (Anderson Affid. [285-1] at ¶ 18.)  Kuhar proceeded to question Anderson about making a copy of Maynard's back-up life insurance beneficiary card.  (Id. at ¶19.)

Anderson also contends that Maynard, without giving any reason, told her that she was not permitted to attend the District's Board retreat scheduled for March 27.  All members of the central office were invited to this retreat, and Anderson had attended it for the previous 19 years, as it was an opportunity to discuss administrative goal development and achievement with the District's School Board.  (P 61, Anderson Affid. at ¶¶ 11-12.)

Plaintiff's Report of March 28, 2007 and Alleged Retaliation

On March 28, 2007, Anderson's attorney wrote a letter to Perhacs advising that Anderson was consulting him for the purpose of preparing a report of waste and wrongdoing under the Pennsylvania Whistleblower Law. (D 247.) As set forth in this letter, "[t]he essence of Dr. Anderson's Whistleblower Report includes, *but is not limited to*, the following concerns":

- Dr. Maynard's failure to disclose personal and business relationships with persons he recommends for employment at the District, the result being that the District has hired persons who are not as qualified as other applicants who applied for open positions.

- Dr. Maynard's failure to prudently supervise or remove himself from the supervision of persons with whom he has undisclosed personal relationships.

- Dr. Maynard's failure to prudently supervise his personal friends (employees) attending an excessive number of conferences and the Board's failure to provide prudent oversight of the conferences attendance [sic] by Dr. Maynard's personal friends.

- Dr. Maynard's cover up of his misdirection of a personal email to a District employee in which he referenced a person he recommended for employment without disclosing his personal/business relationship with that person.

- Dr. Maynard's attempt to procure Dr. Anderson's computer to destroy incriminating evidence relating to his direction to her to hire a person with whom he has an undisclosed personal/business relationship.

- Dr. Maynard's apparent involvement in the disappearance of evidence of his undisclosed personal/business relationship with a person he recommended for employment.

- Dr. Dean Maynard's continued pattern of harassment of Dr. Anderson, which is motivated by his disapproval of Dr. Anderson insisting upon standard operating procedures in her administration of the personnel function of the District.

- Dr. Maynard's initiation of an ill conceived and pernicious investigation of Dr. Anderson's performance in her previous sphere of special services despite her exemplary past performance rating and her offer to assist the new special services supervisor in the transition to her new job. This investigation resulted in a waste of personnel resources and the casting [of] Dr. Anderson in a false and negative light without a scintilla of justification.

25

(D.A. 871-872 (emphasis in the original).)

The following day, March 29, 2007, Maynard denied Anderson the opportunity to attend a leadership program offered by the U.S. Marine Corps on Parris Island, South Carolina.  (P 63.)  Defendants acknowledge that Anderson had scheduled herself to attend the leadership program and had received travel schedules, accommodation information, and other various items about the workshop as of March 15, 2007.  (P 64, P 65.)  Maynard's stated reason for denying Anderson's request to attend the program was that Anderson had made comments which he believed to be insubordinate.  Among other things, Maynard claims he was told by another school administrator that Anderson had professed her intention to use the Parris Island trip as an opportunity to get the School Board President "wrapped around her little finger" and thereby effectuate Maynard's dismissal.  (D.A. 365-66.)

At around this same time, Anderson requested to meet with District officials to fully explain her whistleblower report.  (Anderson Affid. at ¶ 23.)  In response, Anderson was invited to attend a meeting with Kuhar on April 19, 2007 at the MTSD Education Center.  (Id. at ¶ 24.)  In the interim, Anderson set about collecting financial records of travel expenses as well as records of expenses charged on the MTSD procurement cards which she intended to use in support of her whistleblower claims.  (Id at ¶ 25.)

On April 11, 2007, she received an email from Frank Szallay, the District's business manager, advising that, per Maynard's instructions, various documents requested by Anderson could not be released without the approval of Maynard or the Board President.  (P.A. 1882, Anderson Affid. ¶ 26.)  This restriction on travel and credit

card records was apparently lifted after Anderson's attorney complained about it. (Anderson Affid. ¶ 30.)

Two days later, Anderson sent Maynard an email seeking permission to attend a job fair at Edinboro University on April 16, 2007.  (P 75.)  Maynard did not respond to the request.  (P 76.)  Anderson considers this refusal to grant permission for the Edinboro job fair to be an act of retaliation for her attorney's letter of March 28, 2007. Similarly, Anderson contends that the refusal to allow her to attend the Parris Island conference and the restrictions temporarily placed on the release of financial information were acts of retaliation stemming from her March 28 speech.

<u>Plaintiff's Report of April 19, 2007 and Alleged Retaliation</u>

On April 19, 2007, Anderson met with Perhacs to supplement the information that she had previously given.  (D 251.)  By way of a written document entitled "Supplemental Whistleblower Report," Anderson stated the following concerns:

1. The Board approved expenses for travel and conferences do not match what was actually spent on travel and conferences.  Actual expenses are much higher than what the Board approves.  …

2. The Board does not engage in any oversight of in-state conferences.  Employees attend in-state conferences sans specific Board approval.  …

3. Incomplete conference request forms are signed by the Superintendent and approved by the Board, giving employees the apparent authority to spend what they want.

4. There are an excessive number of attendees at various conferences, resulting in unnecessary expenses being paid by the District.

5. There are an excessive number of conferences attended.  Both in-state and out-of-state conferences are attended by numerous folks.  …

6. Employees ring up excessive costs on trips. …

7.  Use of the District's credit card occurs without meaningful Board oversight. …

8.  Dr. Maynard has orchestrated the hiring of personal friends without disclosing his personal relationships to the Board, …

9.  Susan Sullivan has been on a campaign to oust Dr. Anderson from the District.  As a result, she has attempted to report the District's special education operations to the Department of Education and the Department of Welfare in an attempt to embattle Dr. Anderson.

    Sullivan's vendetta against Dr. Anders[on] has also resulted in waste of District resources in conjunction with the Access Investigation.  The Solicitor's involvement in the Access Investigation is an example of the waste, in addition to the hours of time spent by District personnel.

    Upon information and belief, Becky Mancini has acted in concert with Sullivan in attacking me in furtherance of Sullivan's vendetta. …

(D.A. 873-874 (internal ellipses added).)

<u>The Lawsuit and Plaintiff's Second Amended Complaint</u>

On May 11, 2007, Anderson commenced this civil action.  The operative pleading in this case is Anderson's Second Amended Complaint, which asserts claims for the alleged violation of Anderson's First Amendment rights as well as violations of the Pennsylvania Whistleblower Law.  Anderson's federal and state claims both stem from acts which Anderson claims were undertaken by the Defendants in response to her speech on March 16, March 28, and April 19, 2007.

With respect to her speech on March 16, 2007, Anderson claims that Maynard retaliated against her by, among other things, directing Perhacs to investigate her administration of the ACCESS Program, prohibiting her from attending the Penn State job fair, directing her not to attend the March 19, 2007 CORE meeting, imploring Leader to conduct an audit of the ACCESS Program, directing her not to attend a Board retreat,

refusing to direct school psychologists to meet with her concerning official business, and directing Kuhar to pull her out of a meeting so as to question her about copying Maynard's back-up life insurance beneficiary card.

With regard to Anderson's speech on March 28, 2007, it is alleged that Maynard retaliated against Anderson by refusing to permit her attendance at the Parris Island leadership conference, restricting her access to travel and billing information, refusing to permit her attendance at the Edinboro University job fair, and preventing her involvement in developing the job description for the position of Assistant Superintendent.

Insofar as Anderson's speech on April 19, 2007 is concerned, Anderson claims the Defendants retaliated by engaging in conduct aimed at perpetuating a "sham" investigation into her prior administration of the District's ACCESS Program.  Anderson points specifically to Sullivan's May 4, 2007 correspondence to the DPW and the Pennsylvania Auditor General's Office inviting scrutiny of the ACCESS Program under Anderson's administration, Mancini's and Maynard's conduct in connection with the May 14, 2007 CORE meeting, Mancini's May 18, 2007 correspondence to the BPI petitioning an audit, and Mancini's alleged representation that ACCESS funds had been "frozen."

### III.    DISCUSSION

A. <u>Plaintiff's Claim Under 42 U.S.C. § 1983</u>

We first consider Anderson's claim under 42 U.S.C. § 1983, which provides a private right of action as against:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of

the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the [U.S.] Constitution and laws.

42 U.S.C. § 1983.  This statute does not create substantive rights but instead "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws."  *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

To prevail under § 1983, a plaintiff must prove that he suffered the deprivation of a right secured by the United States Constitution or federal law by a person acting under color of state law.  *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995).  Because it is not disputed that the named Defendants were acting under color of state law at all relevant times, we need inquire only whether Anderson has produced sufficient evidence to establish the violation of her federal rights -- specifically, her free speech rights under the First Amendment.

In this case, Anderson is alleging that the Defendants violated her First Amendment rights by retaliating against her on account of her constitutionally protected speech.  To prevail on such a claim, Anderson must demonstrate that:  (1) the activity in which she engaged is protected by the First Amendment, and (2) the protected activity was a substantial factor in the alleged retaliatory action.  *Hill v. Borough of Kutztown,* 455 F.3d 225, 241 (3d Cir. 2006).  Even where this showing is made, a defendant may still defeat the plaintiff's claim by demonstrating that the defendant would have taken the same adverse action in the absence of plaintiff's protected conduct.  *Id.* at 241 n. 23.

A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the

statement he made.  *Hill*, 455 F.3d at 241-42 (*quoting Garcetti v. Ceballos*, 547 U.S.

410, ----, 126 S. Ct. 1951, 1958 (2006)).

Defendants contend that Anderson's First Amendment claim fails as a matter of

law because, among other things, she was not speaking as a private citizen when she

made her alleged whistleblower complaints and, therefore, she was not engaging in

constitutionally protected speech.[6]  Whether or not a public employee's speech is

protected by the First Amendment is a question of law.  *Hill*, 455 F.3d at 241; *Curinga v.*

*City of Clairton,* 357 F.2d 305, 310 (3d Cir. 2004).

As we have noted, Anderson alleges three instances of alleged protected

speech:

- her March 16, 2007 statements to Sennett and her act of turning her
  computer over to him;

- her attorney's March 28, 2007 correspondence to MTSD's counsel setting
  forth various purported whistleblower complaints; and

- an additional document, presented to MTSD's counsel on April 19, 2007,
  entitled "Supplemental Whistleblower Report."

(SAC ¶¶ 24, 25, 29, 46-47, 55.)  We will consider each of these individually.

In doing so, we are guided by the rule of *Garcetti v. Ceballos*, 547 U.S. 410

(2006), which holds that "when public employees make statements pursuant to their

official duties, the employees are not speaking as citizens for First Amendment

purposes, and the Constitution does not insulate their communications from employer

discipline."  547 U.S. at 421.  In *Garcetti*, the Supreme Court held that a prosecutor's

---

[6] Defendants also contend that Anderson cannot show that her speech was a substantial motivating
factor relative to the alleged acts of retaliation, that Defendants are protected from liability under the
Noerr-Pennington doctrine, and that the Defendants' alleged misconduct was not sufficiently severe for
purposes of establishing a First Amendment retaliation claim.  In light of our disposition of Anderson's
§1983 claim, we need not reach these alternative arguments.

memorandum in which the prosecutor opined to his supervisor about the deficiency of a search warrant affidavit was not constitutionally protected speech. The Court explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 421-22. The Court elaborated on the distinction between speech made in the capacity of a private citizen versus speech made in one's capacity as a public employee:

> Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper … or discussing politics with a co-worker … When a public employee speaks pursuant to employer responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.

Id. at 423-24 (internal citations omitted).

The Third Circuit Court of Appeals has expanded upon the rule of *Garcetti* to hold that statements relate to an employee's official duties (and are therefore not constitutionally protected speech) when they derive from "special knowledge" or "experience" acquired on the job. *See Foraker v. Chaffinch,* 501 F.3d 231, 240 (3d Cir. 2007) (*citing, with approval, Williams v. Dallas Independent School District,* 480 F.3d 689 (5th Cir. 2007)), *abrogated in non-relevant part by Duryea Borough v. Guarnieri*, --- U.S. ---, 131 S. Ct. 2488 (2011); *Gorum v. Sessoms,* 561 F.3d 179, 185 (3d Cir. 2009) ("We have held as well that a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job.")

(citing *Foraker, supra*).  *See also Morris v. Philadelphia Housing Auth.,* No. 11-3334, 487 Fed. Appx. 37, 40 (3d Cir. July 6, 2012) (public employee's reporting of embezzlement by fellow employees was part of his job duties, and therefore unprotected speech, because it related to information acquired through his employment); *Brown v. Montgomery County,* No. 11-2130, 470 Fed. Appx. 87, 89 (3d Cir. Mar. 21, 2012) (plaintiff's reports concerning computer-aided dispatch system were made in In his capacity as platoon supervisor and were not protected by the First Amendment where they were based on "intimate knowledge of and experience with the [system]"); *Cindrich v. Fisher,* 341 Fed. Appx. 780, 788 (3d Cir. 2009) (emails from plaintiff attorney to her supervisors complaining about wrongdoing in the handling of cases in Attorney General's Office were speech pursuant to plaintiff's official job duties where, among other things, they were based on special knowledge and experience plaintiff had acquired through her job).

1. *Plaintiff's Speech on March 16, 2007*

Applying these principles, we first consider Anderson's speech on March 16, 2007 when she turned over her MTSD-issued laptop computer to Sennett rather than to Maynard, fearing that Maynard might tamper with her computer.[7]  Specifically, Anderson states she believed that Maynard was going to remove an email from her computer (pertaining to the hiring of Jeff Costello) and that he was also going to plant the anonymous letter (which Anderson theorizes Maynard sent to himself) on her computer. (D.A. 132.)

---

[7] The record contains conflicting evidence as to whether Anderson engaged in any speech at all at the time she turned her computer over to Sennett.  For present purposes, however, we will credit the version of the evidence most favorable to Anderson and assume such speech did occur.

During a separate court proceeding in this case, Anderson offered the following

testimony concerning the incident, which occurred at a Country Fair:

> … I – we parked the car, my husband got out of the car.  And I was
> standing there, he came over to the car, and I said, Tim, I just don't – I –
> you've got to protect the integrity of my computer.  I said, for – because I
> don't – I don't know what Dr. Maynard will do.  And he at that point said to
> me, well, I really don't know what's going on in the District, and I don't know
> why there's this issue going on, but I'll take your computer.  And I said, okay.
> And at that point my husband said to him, who are you going to turn this
> computer over to?  And he said, I will give it to Rich Perhacs.

(P.A. 1724.)  When asked whether she made any other comments, Anderson testified

that, prior to meeting Sennett at Country Fair:

> … I did tell him on the phone about the – that I felt that Dr. Maynard might
> do something to my computer.  That there were all kinds of crazy things
> going on in the District and I didn't – I didn't trust my computer with Dr.
> Maynard.  I said, this is wrong.  This should not happen.

(Id.)  Anderson's husband described the incident thusly at his deposition:

> Well, it was a bad day, snowy, we drove over to the Country Fair,
> we waited for Mr. Sennett, and he showed up, my wife handed him her
> computer and she said she didn't want him to give it to Dean Maynard,
> and that she was afraid that he would mess with the information that was
> on it, he would try to change it.  And that is about it.

(D.A. 560.)  Dan Anderson also claims that he told Sennett "we wanted to protect the

integrity of the computer."  (Id.)[8]

Defendants contend, and this Court agrees, that Anderson's actions and speech

in turning her computer over to Sennett on March 16, 2007 were undertaken in her

capacity as a public employee of MTSD, not as a private citizen.  Although the

---

[8] Citing to this same evidence, Anderson now asserts that she reported to Sennett her belief that Maynard "had the motive, plan, and ability to both alter and destroy evidence on her computer."  (See Pl.'s Counterstatement of Fact [276] ¶ 34.  See also Pl.'s Br. in Opp. to Mot. to Summ. Judg. [277] at p. 10 and Pl.'s Sur-Reply Br. [285] at p. 2.)  Because this assertion is not an accurate recitation of the evidence, we will disregard it and analyze Anderson's whistleblower claim based on the best evidence as to what Anderson claims to have actually said.

exchange between Anderson and Sennett took place away from school property and outside of normal school hours, those facts are not dispositive.  Also non-dispositive is Anderson's assertion that the events of March 16, 2007 did not fall within the scope of her daily job duties as Director of Personnel or require her to utilize any of her job skills. That is because our inquiry concerning whether Anderson spoke "pursuant to" her official duties is "a practical one."  *Garcetti*, 547 U.S. at 424.

Here, the speech in question concerned conduct on the part of Anderson's direct supervisor bearing on an official investigation by the School District.  The underlying investigation – sanctioned by an Executive Session of the School Board – concerned an anonymous letter which threatened to accuse Maynard of various things if he did not resign his position as Superintendent of MTSD.  The anonymous letter appeared to have its basis in an internal MTSD email authored by Maynard and inadvertently received by a school district employee who was not the intended recipient.  Anderson acknowledges that the subject matter of this misdirected email became a topic of discussion and gossip among MTSD employees and the ensuing investigation focused not only on the recipient of the email but also on other current or prior employees of MTSD (including Anderson) who might theoretically have a vendetta against Maynard. In addition, the email which Anderson feared Maynard might erase from her computer pertained to a questionable hiring decision (the employment of Jeff Costello) bearing directly on Anderson's responsibilities as Personal Director.  Based on these facts, it seems clear that Anderson's speech on March 16, 2007 derived from and concerned "special knowledge" that Anderson was privy to only as a result of her employment with MTSD.

35

Moreover, there is no dispute that the computer in question was the property of MTSD and that Anderson surrendered it pursuant to the District's lawful directive.[9] Rather than relinquishing her laptop to her direct supervisor, whom she did not trust, Anderson chose to surrender it instead to Sennett, who was acting in his capacity as the District's solicitor.[10]  Viewed pragmatically, the totality of these circumstances establishes, as a matter of law, that Anderson's statements to Sennett have "no relevant analogue to speech by citizens who are not government employees." Garcetti, 547 U.S. at 424.

Anderson maintains that, even though her speech related in part to an internal MTSD matter and was made to the District's solicitor, the interest that the public would have in Maynard's potential misconduct, as Superintendent of the District, is great. Anderson further points out that, by the time she spoke to Sennett on March 16, 2007, the District had already referred the matter of the anonymous letter to the police.  Again, these facts are not dispositive of our inquiry.  As our Circuit Court of Appeals has observed, "[E]ven if an employee's speech touches on a matter of public concern, it is not protected speech 'as a citizen' if it was made pursuant to the employee's official

---

[9] It appears the parties dispute whether Maynard was personally authorized to collect Anderson's computer; Anderson takes the position that Maynard was not so authorized and that it was Thomas DelFratte, the District's Supervisor of Technology, who was authorized to take possession of her computer on the Monday when she was due to return to work.  I do not view this dispute as material, however, because, in any event, it is uncontroverted that the District had authorized the collection of Anderson's computer, which was District property.

[10] Anderson insists that her willingness to disobey Maynard's directive (by refusing to turn her computer over to him personally) shows that she was not acting within the scope of her job duties or as Maynard's subordinate.  However, Anderson clearly chose to comply with the directive to the extent she surrendered her computer to the District's solicitor, and there can be little question that any refusal on Anderson's part to relinquish the District's laptop would have been viewed as an act of insubordination toward MTSD.

duties." *Cindrich v. Fisher,* Nos. 06–2615, 07–2969, 2009 WL 1950073 at *3 (3d Cir.

July 8, 2009) (citing *Garcetti*, 547 U.S. at 421).   Because Anderson was not speaking as

a private citizen when she communicated with Sennett on March 16, 2007, this aspect

of her First Amendment claim fails as a matter of law.

  *2.  Plaintiff's Speech on March 28, 2007*

  Anderson's next incident of alleged protected speech occurred on March 28,

2007.  On that date, Anderson's attorney wrote to Perhacs to advise that Anderson was

in the process of preparing a report under Pennsylvania's Whistleblower Law.

  According to this letter, the "essence of Dr. Anderson's Whistleblower Reports"

included the following:  (1) Maynard's alleged failure to disclose personal and business

relationships with individuals whom he had recommended for employment over more

qualified candidates; (2) Maynard's alleged failure to prudently supervise or remove

himself from the supervision of such individuals; (3) the alleged failure of the School

Board to prudently supervise Maynard's employee/friends, who were supposedly

attending an excessive number of conferences;[11] (4) Maynard's alleged cover up of his

misdirected personal email in which he referenced one of his friends whom he had

recommended for hire; (5) Maynard's "apparent involvement in the disappearance of

evidence of his undisclosed personal/business relationship with a person he

recommended for employment"; (6) Maynard's "continued pattern of harassment" of

---

[11] Anderson subsequently reasserted these allegations in her April 19, 2007 "Supplemental Whistleblower
Report," which is discussed in more detail below.  Because we address the allegations concerning
Maynard's alleged improper hiring practices and supervision of his friends in connection with Anderson's
March 28, 2007 speech, we will not readdress them in discussing Anderson's statements of April 19,
2007.

Anderson, which was allegedly motivated by "his disapproval of Dr. Anderson insisting upon standard operating procedures in her administration of the personnel function of the District"; and (7) Maynard's alleged initiation of an "ill conceived and pernicious investigation of Dr. Anderson's performance" relative to the ACCESS program which, Anderson claimed, resulted in a "waste of personnel resources and the casting [of] Dr. Anderson in a false and negative light without a scintilla of justification."  (D.A. 871-872.)[12]

Anderson agrees that her job duties as Director of Personnel included, among other things:  interviewing and recommending applicants to the Superintendent for appointment and presentation to the School Board and articulating personnel related issues with the Superintendent and appropriate board committees.   (D 4.)  Anderson further acknowledges in her brief that she came to know of Maynard's alleged involvement in hiring close friends (without full disclosure of same to the Board) as a result of her position as Personnel Director.  (See Pl.'s Br. in Opp. to Defs.' Mot. for Summ. Judg. [277] at p. 22.)  Thus, all of Anderson's reports pertaining to Maynard's alleged questionable hiring practices and alleged failure to properly supervise his friends after they were hired relate directly to Anderson's job duties as Director of Personnel.  Although she insists that the filing of her March 28, 2007 report was not something she was required to do as part of her job and was motivated solely by a

---

[12] The letter also referenced "Dr. Maynard's attempt to procure Dr. Anderson's computer to destroy incriminating evidence relating to his direction to her to hire a person with whom he has an undisclosed personal/business relationship."  (D.A. 872.)  Because we have already concluded that this particular complaint derives from and concerns "special knowledge" obtained by Anderson by virtue of her employment, we reiterate that Anderson's communication of this concern was not made in her capacity as a private citizen.  Thus, although it is restated as part of her second whistleblower claim, this aspect of Anderson's March 28, 2007 speech is not constitutionally protected.

desire to serve the community, it is clear that these reports were based on special information known to Anderson through her job as Personnel Director.  Because she did not speak of these matters as a private citizen, her speech in that regard does not receive First Amendment protection.

Similarly unprotected is Anderson's report about Maynard's "apparent involvement in the disappearance of evidence of his undisclosed personal/ business relationship with a person he recommended for employment."  (D.A. 872.)  Here, Anderson appears to have been referencing the disappearance of Maynard's back up life insurance beneficiary card, which at one point had designated Costello as a beneficiary.  Anderson states in her affidavit that, while gathering documentation in support of her whistleblower report, she found the original beneficiary card to be missing from the District's insurance files.  She wound up making a copy of the card because "tracking, updating and ensuring [that] benefit documentation is accurate was part of the Personnel Office responsibilities."  (Anderson Affid. ¶ 21, P.A. 1953; *see also* D 4 (Plaintiff admitting that her job duties included "supervising a comprehensive system of personnel records for all school employees in order to provide and retrieve accurate employee information for data driven decision-making").)  Accordingly, Anderson's report about the disappearance of Maynard's back-up life insurance beneficiary card derives from special knowledge to which Anderson was privy because of her job responsibilities.   As such it is not constitutionally protected speech.

Anderson's report of March 28, 2007 also accused Maynard of a "continued pattern of harassment" stemming from Anderson's "insist[ance] upon standard operating procedures in her administration of the personnel function of the District."  By its very

terms, this complaint alleges harassment on account of Anderson allegedly just doing

her job.  Similarly, Anderson's complaint of the "ill conceived and pernicious

investigation" of her prior administration of the ACCESS Program expressly relates to

her prior job performance as Director of Student Services and Special Education.

These reports of alleged misconduct were clearly based on special knowledge and

experience Anderson acquired through her various jobs at MTSD and, as such, they are

deemed to have been made pursuant to her official job duties.  *Cindrich, supra,* at 788.

Because the reports were not made in Anderson's capacity as a private citizen, they are

not constitutionally protected speech.

Anderson insists that, even if some of her complaints about Maynard were based

on information gained through her job, the same cannot be said with respect to her

complaint about Maynard's alleged cover up of the misdirected email which, she claims,

did not relate to her position and duties as Personnel Director.  Although almost no

elaboration is provided on this point, it appears Anderson is referencing attempts by

Maynard to sequester the computer of the employee to whom the misdirected email

was inadvertently sent.  Anderson alleges that, despite this employee's efforts to report

the misdirected email only to relevant MTSD authorities, word of the incident became

the common knowledge and gossip of MTSD.  (P 12.)  Anderson further claims that

several MTSD employees were aware that two employees' computers had been

confiscated as a result of the misdirected email.  (P 13.)

Assuming all the foregoing is true, we nevertheless conclude that Andersons'

report of the alleged "cover-up" is not constitutionally protected speech.  Based on

Anderson's own averments, her awareness of this incident stemmed from special

40

knowledge she acquired as a result of her employment at MTSD.  Thus, although it was not strictly within Anderson's job duties to report on the alleged "cover-up" of the misdirected email, her speech on this matter was nevertheless undertaken in her capacity as a public employee rather than as a private citizen.

In sum, all of the matters referenced by Anderson in her report of March 28, 2007 were either central to Anderson's job duties or were premised upon special knowledge she acquired as a result of her employment.  Consequently, Andersons' speech was not constitutionally protected, and her First Amendment claim cannot survive to the extent it is premise on the March 28, 2007 communications by her lawyer.

### 3.  Plaintiff's Speech on April 19, 2007

On April 19, 2007, Anderson presented additional complaints to MTSD's solicitor via her "Supplemental Whistleblower Report."  In this report, Anderson lodged numerous complaints regarding what she considered to be excessive expenditures of District funds in connection with employee travel and attendance at conferences and the School Board's lack of meaningful oversight relative to these expenditures.  Here again, Defendants maintain that Anderson's reports of these matters were made in her capacity as a public employee and not as a private citizen.  We agree.

There is no dispute that Anderson's job responsibilities as Personnel Director included "maintaining contact with all departments and schools in planning and anticipating professional and non-professional personal needs" of the District and "articulating personnel related issues" with the Superintended and appropriate board committees.  (D 4.)  Anderson was also responsible to supervise and monitor budget preparations for the Office of Personnel and Pupil Services.  (D.A. 1027.)  Her own

chronology of events indicates that she based her complaints of excessive expenditures on information gleaned from board meetings and approved personnel conference request forms which she maintained in her office.  (D.A. 1125.)  According to this same chronology, Anderson advised Attorney Kuhar during their April 19, 2007 meeting that it was "now her responsibility to oversee attendance" at conferences and "personnel issues."  (Id.)  The chronology goes on to state that Anderson "was collecting more information, but Maynard and Scutella prohibited the business office from giving [her] anything, which also prohibits Anderson from performing aspects of her job."  (Id.)  Kuhar reportedly replied that she could have the information from the business office but that "it may be more efficient if she just looks at the information available to her through the district as part of her job."  (Id.)

In light of the foregoing, this Court concludes that Anderson's complaints of excessive expenditures and lack of Board oversight were made pursuant to her job duties.  Even if monitoring and reporting on these expenditures was not strictly within her daily responsibilities as Personnel Director (and it appears they may have been), it is clear that Anderson became possessed of special knowledge concerning these alleged excesses by virtue of her position as Personnel Director.  Although Anderson contends that the underlying business records could have been obtained by any member of the public pursuant to right-to-know laws, we are not persuaded that this theoretical possibility brings Anderson's speech within the protective ambit of the First Amendment.  Anderson was clearly tipped off to the alleged abuses only by virtue of her professional experience and knowledge obtained through her position at MTSD.  As Personnel Director, she had particular insight into the alleged expenditure problem and

42

knew how to go about documenting it through access to records which were not readily available to the public. Accordingly, Anderson cannot premise her §1983 claim on this speech.

In addition to the foregoing complaints, the April 19 "Supplemental Whistleblower Report" alleged that Sullivan, in conjunction with Mancini, had been on "a campaign" to "oust" Anderson from the District and to "embattle" her by "attempting to report" the District's ACCESS Program to the PDE and DPW. (D.A. 874.) The report further alleged that the ACCESS investigation had resulted in a waste of MTSD resources, including the unnecessary actions undertaken by Perhacs as part of MTSD's internal investigation. (Id.)

The Court has previously addressed Anderson's statements about the ACCESS investigation in connection with her counsel's letter of March 28, 2007, and we need not revisit that point in depth. As we previously noted, the investigation directly concerned Anderson's prior administration of the ACCESS Program while employed as Director of Student Services and Special Education. Anderson's defense of her own prior job performance and her complaints about the allegedly unfounded investigation all derive from special knowledge and experience Anderson acquired through her work. Because these statements were not made in Anderson's capacity as a private citizen, the speech is not constitutionally protected.

All of this is not to say that public employees are without First Amendment protection. As the Supreme Court noted in *Garcetti,* public employees retain some degree of constitutional protection when engaging in speech for which there is a "relevant analogue to speech by [private] citizens," such as "writing a letter to a local

43

newspaper" or "discussing politics with a co-worker."  547 U.S. at 423-24 (citations omitted).  But "while the First Amendment invests public employees with certain rights, it does not empower them to "constitutionalize the employee grievance."  *Garcetti, supra*, at 420 (*citing to Connick v. Myers*, 461 U.S. 138, 154 (1983)).  Because all of Anderson's statements occurred in the context of her official job duties, they are not constitutionally protected and cannot support her claim under §1983.  Accordingly, Defendants are entitled to summary judgment relative to Anderson's First Amendment §1983 claim.

B.  Plaintiff's Claim under The Pennsylvania Whistleblower Law

   1.  *The Court's Jurisdictional Inquiry*

Anderson's only remaining claims are asserted under the Pennsylvania Whistleblower Law, 43 Pa. C.S.A. § 1421.  Because there are no remaining claims which could support this Court's original jurisdiction, I must consider whether it is proper to continue to exercise supplemental jurisdiction over Anderson's Pennsylvania Whistleblower Law claim.  See 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction where district court has dismissed all claims over which it has original jurisdiction).  Our Circuit Court of Appeals has said that "(w)here the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Bright v. Westmoreland County*, 443 F.3d 276, 286 (3d Cir. 2006) (*quoting Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995)).

44

This case presents the unusual situation where the relevant factors counsel in favor of this Court continuing to exercise its supplemental jurisdiction.  Given the age of this case, its mature procedural posture, the amount of discovery which has been completed, the expansiveness of the record, this Court's familiarity with the case, the substantial judicial resources which have been invested in adjudicating this action, and the fact that there are still motions pending in this case in which Plaintiff seeks sanctions for alleged Rule 11 violations and alleged spoliation of electronically stored evidence, I find that considerations of judicial economy, convenience, and fairness to the parties weigh in favor of my continued jurisdiction over the case.  In their totality, these factors outweigh any competing consideration of comity vis-à-vis the state courts, which undoubtedly have an interest in deciding issues of Pennsylvania law.  Accordingly, I will proceed to address the merits of Defendants' motion as it pertains to Anderson's remaining state law claim.

### 2.  The Court's Rule 56 Analysis

The Whistleblower Law, Act of December 12, 1986, P.L. 1559, 43 P.S. §§ 1421–1428, prohibits an employer from discriminating or retaliating against an employee regarding the employee's "compensation, terms, conditions, location or privileges of employment" because of the employee's good faith report of wrongdoing or waste.  43 P.S. § 1423(a).  The Law imposes upon the plaintiff the burden of showing, by a preponderance of the evidence that, prior to the alleged reprisal, the plaintiff had made, or was about to make, a good faith report of wrongdoing or waste.  Id. at §1424(b).  This showing encompasses a requirement that the plaintiff "come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory

45

acts." *O'Rourke v. Commonwealth,* 778 A.2d 1194, 1200 (Pa. 2001).  The defendant

may then offer the affirmative defense that the alleged retaliatory act occurred for

reasons that were separate and legitimate and were not merely pretextual.  Id. at

§1424(c).  As to this defense, the defendant bears the burden of proof.  *Id.*

> a) *Plaintiff's First Two Reports Did Not Constitute Valid Reports of Wrongdoing Under the Pennsylvania Whistleblower Law.*

Defendants first argue that Anderson has failed to demonstrate that she made a

good faith report of "wrongdoing" or "waste" prior to any alleged reprisal by the

Defendants.  This Court is in agreement with Defendants that Anderson's first two

reports did not constitute reports of "wrongdoing" or "waste" within the meaning of the

Whistleblower Law.

"The Whistleblower law does not protect every critical or damaging report that an

employee may make to or about her employer – only those reports of a wrongdoing or

waste within the narrower meaning of the statute are protected." *Johnson v. Resources*

*for Human Development, Inc.,* 789 F. Supp. 2d 595, 601 (E.D. Pa. 2011).  "Waste" is

defined under the Law as "[a]n employer's conduct or omissions which result in

substantial abuse, misuse, destruction or loss of funds or resources belonging to or

derived from Commonwealth or political subdivision sources."  43 P.S. §1422.  The term

"wrongdoing" is defined to mean "[a] violation which is not of a merely technical or

minimal nature of a Federal or State statute or regulation, of a political subdivision

ordinance or regulation or of a code of conduct or ethics designed to protect the interest

of the public or the employer."  *Id.*

(i)

46

Anderson's March 16, 2007 report concerned her statement, while turning her laptop over to Sennett, that she wanted him to "protect the integrity" of her computer because she "[didn't] know what Dr. Mayard [would] do."  (P.A. 1724.)  She recalls telling Sennett that she "felt that Dr. Maynard might do something to [her] computer," that "there were all kinds of crazy things going on in the District" and that she "didn't trust [her] computer with Dr. Maynard."  (Id.)   Anderson's husband recalls his wife telling Sennett essentially the same thing – that "she was afraid that [Maynard] would mess with the information that was on [the computer], he would try to change it."  (D.A. 560.)

These statements to Sennett do not qualify as reports of "wrongdoing" because they do not purport to disclose any non-technical violation of a "Federal or State statute or regulation, … political subdivision ordinance or regulation or … code of conduct or ethics designed to protect the interest of the public or the employer."  43 P.S. § 1422. At most, Anderson's statements express her fear about what Maynard *might possibly do* to her computer if given the opportunity, but a disclosure of mere possible wrongdoing is not sufficient under the Law.  *See, e.g., Rodriguez v. Sullivan County Victim Services,* Civil No. 4:CV-05-cv-358, 2006 WL 952404 at *6 (M.D. Pa. April 12, 2006) (plaintiff did not establish wrongdoing by reporting officials' unsuccessful attempts to extract confidential information from her in violation of the Pennsylvania Protection From Abuse Act where no statutory violation occurred and, at most, only attempted wrongdoing occurred); *Morgan v. Rossi,* No. Civ. A. 96-1536, 1998 WL 175604 at *8 (E.D. Pa. April 15. 1998) (the Whistleblower Law's definition of wrongdoing "does not include potential violations of statutes or regulations.  It includes only actual violations.").

47

Anderson posits two theories as to why she made a valid report of "wrongdoing." First, she characterizes her statements to Sennett as a communication that Maynard had actually interfered with an MTSD Board investigation by breaching protocol and tipping her off to the fact that the District wanted her computer.  Had Maynard not interfered in this manner, Anderson argues, DelFratte would have been able to follow through with the surreptitious collection of her computer upon her return to work the following Monday, as he had planned to do.

We find this theory to be untenable.  First, Anderson did not report to Sennett any concern about Maynard supposedly breaching protocol by tipping her off to the Board's investigation, nor was this something that Sennett was in a position to infer from Anderson's comments.  The record does not suggest that either Anderson or Sennett were informed as of March 16, 2007 concerning the details of the Board's investigation or, more particularly, its protocol for collecting computers.  In fact, it is counterintuitive to infer that Anderson would have been complaining about having been informed of the Board's interest in her computer, since Maynard's communication in this regard potentially advantaged Anderson.  Simply stated, the evidence of record does not support a finding that Anderson's communication to Sennett involved a report that Maynard had breached the Board's protocol for procuring her computer.

Second, Anderson does not specify what statute, ordinance, regulation or code provision was violated by virtue of Maynard's actions in supposedly tipping her off (accidentally) to the Board's investigation.  Even if she could identify such a provision, Maynard's act of inadvertently "tipping her off" would be at most a technical violation, and this would be insufficient to establish "wrongdoing" within the meaning of the Law.

48

See 43 P.S. § 1422 (defining "wrongdoing" as a "violation nwhich is not of a merely technical or minimal nature").

Anderson's second theory is that her statements to Sennett constituted a report that Maynard was attempting to further obstruct the MTSD Board investigation by engaging in the spoliation of electronically stored information.  As to this theory, Anderson claims there is a material dispute concerning Maynard's actual intent which, if resolved in her favor, would establish "wrongdoing" under the Whistleblower Law.

This theory is equally untenable.  As Defendants correctly point out, the critical inquiry for present purposes is the content of Anderson's report, not Maynard's actual intent.  The content of Anderson's report, as we have previously observed, was her concern that Maynard might try to tamper with her computer if she left it in his possession.  Because this did not come to pass, no actual tampering ever occurred and Anderson's report was, at most, a report of unsuccessful attempted tampering.  As *Rodriguez* and *Morgan* hold, attempted or potential wrongdoing is not sufficient to establish "wrongdoing" within the meaning of the Whistleblower Law.[13]

---

[13] Anderson argues that *Rodriguez* and *Morgan* can be distinguished on the basis that those cases involved no wrongdoing at all whereas, here, the attempted wrongdoing of which Anderson complained (i.e, Maynard's unsuccessful attempt to spoliate evidence on her computer) actually occurred just ten days later when, she avers, Maynard engaged in actual spoliation of ESI from his own MTSD computer. Anderson reasons that, because no wrongdoing ever occurred in *Rodriguez* and *Morgan,* those cases did not involve the same level of evidence as exists here to suggest that Maynard's attempt at wrongdoing truly was an attempt.  We find this attempt to distinguish *Rodriguez* and *Morgan* to be unpersuasive.

Anderson's alternative argument is that we should simply disregard these cases as erroneously decided.  Anderson insists that following the holdings of *Rodriguez* and *Morgan* would lead to absurd results under the facts of this case, to wit:  "[the Law] will fall short of offering protection in a situation where a plaintiff reports an attempted wrongdoing, that plaintiff is actually retaliated against immediately after making her report, and the same wrongdoing that was reported by the plaintiff is actually committed soon after the report."  (Pl.'s Br. in Opp. [277] at p. 16.)  However, we think the Law's intention of exposing *actual* wrongdoing is sufficiently clear, and to the extent broader protection is necessary or desirable, we must defer to the judgment of the Pennsylvania Legislature, which is fully capable of enacting those types of changes if it sees fit to do so.

Apart from this deficiency, Anderson's statements to Sennett do not make out a valid whistleblower report because they do not indicate the violation of a statute, regulation, ordinance, or code provision as contemplated by the Law.  Anderson claims to satisfy this requirement by referring in her brief to the Pennsylvania Public School Code which states, in relevant part, that the superintendent of a school district may be removed from office, after a hearing and a by majority vote of the school board, on grounds of (among other things) "immorality."  24 P.S. §10-1080.  The Public School Code does not define the term "immorality" but, according to the Commonwealth Court, the term has been interpreted to mean "[a] course of conduct as offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and elevate."  *Lesley v. Oxford Area School District,* 420 A.2d 764, 766 (Pa. Commw. Ct. 1980) (upholding the termination of a teacher on grounds of "immorality" where the teacher was observed shoplifting and admitted to same) (citing *Horosko v. School District of Mt. Pleasant Township,* 6 A.2d 866, 868 (Pa. 1939)).  Anderson insists that, if a jury were to find that Maynard engaged in attempted spoliation of evidence and attempted obstruction of a school board investigation, this would "clearly amount" to immorality.  (See Pl.'s Br. in Opp. [277] at p. 14.)

Again, however, the relevant focus for our purposes is not on Maynard's subjective intent but on the content of Anderson's communication to Sennett, which did not reference any concern about immorality or violation of the Public School Code.  Even if it had, however, the deficiency would not be cured.  The provision of the Public School Code in question merely states the grounds upon which Maynard could be removed from his employment (after a hearing and a vote); it does not create any

50

affirmative duty nor expressly prohibit the conduct of which Anderson complained.

Thus, it cannot serve as the basis for a finding that Maynard violated a "Federal or State

statute or regulation."  In addition, the provision is too vague and subjective to serve as

the basis for a valid whistleblower complaint under the circumstances involved here.

*Riggio v. Burns,* 711 A.2d 497, 501 (Pa. Super. 1998) (regulatory statutes cited by

plaintiff were too general and vague to serve as basis for establishing "wrongdoing"

under Whistleblower Law where statutory standards were subject to interpretation and

did not specifically define prohibited conduct).

In sum, Anderson's statements to Sennett on March 16, 2007 did not constitute a

valid report of "wrongdoing" for purposes of her Whistleblower Law claim.

(ii)

Anderson's report of March 28, 2007 is similarly deficient.  In that report

Anderson, through her counsel, expressed concerns regarding:  (i) Maynard's failure to

disclose his personal relationships with certain individuals whom he had recommended

for hire; (ii) Maynard's failure to prudently supervise these individuals; (iii) Maynard's

various attempts to hide or destroy evidence pertaining to these relationships;  (iv)

Maynard's alleged pattern of harassing Anderson merely for doing her job in

accordance with "standard operating procedures";  and (v) Maynard's allegedly "ill

conceived and pernicious" investigation of the ACCESS Program.  (D.A. 871-72.)[14]

---

[14] This correspondence also repeated Anderson's concerns about Maynard's actions on March 16, 2007 in "attempt[ing] to procure Dr. Anderson's computer to destroy incriminating evidence relating to his direction to her to hire a person with whom he has an undisclosed personal/business relationship."  (D.A. 872.)  For the reasons previously discussed, this report does not involve the violation of any statute, regulation, ordinance, or code provision; rather, it merely states (at most) an unsuccessful attempt at wrongdoing which does not satisfy the provisions of the Whistleblower Law.

Absent from Anderson's March 28, 2007 report is any reference to a statute, regulation, ordinance, ethical provision, or school policy which could serve as a basis for Maynard's "wrongdoing" within the meaning of the Whistleblower Law.  *See McClain v. Munn,* C.A. No. 06-278, 2008 WL 975059 at *4 (W.D. Pa.  April 9, 2008) (plaintiff's allegation that fellow police officers were engaged in internet gambling during work hours with department computers failed to establish "wrongdoing" under Whistleblower Law where plaintiff had not pointed to any federal or state statute, regulation or ordinance which made the alleged misconduct unlawful).

In her brief in opposition to the pending summary judgment motions, Anderson again attempts to cure this deficiency by referencing the provision of the Public School Code pertaining to removal of a school district superintendent.  24 P.S. §10-1080.  For the reasons previously discussed, this statute cannot serve as the basis for a valid whistleblower complaint.

To reiterate, the provision outlines various grounds (including "immorality") upon which a superintendent may be removed from his position, following certain due process procedures (including a majority vote of the school board).  However, the provision does not establish any affirmative duties on the part of the superintendent, nor does it prohibit specific acts such that it could be said that Maynard's reported conduct "violated" this statute.  *See Riggio v. Burns, supra,* at 503 (regulation concerning Medicare surgical reimbursement could not serve as the basis for whistleblower "wrongdoing" based on surgeons' alleged failure to supervise residents during surgery; because regulation neither created a duty to supervise residents nor prohibited surgery in the absence of such supervision, it "simply could not be *violated* as contemplated by

the Whistleblower Law.") (emphasis in the original).  Thus, Anderson has failed to establish that she made a report of "wrongdoing" in connection with this incident.[15]

For the foregoing reasons, Anderson's communications of March 16 and 28, 2007 do not constitute valid whistleblower reports within the meaning of the Law. Accordingly, Anderson's Whistleblower claim cannot succeed to the extent it is premised upon those communications.

> b)   *Plaintiff's Report of April 19, 2007 Did Not Result in Retaliation
>       Actionable Under the Pennsylvania Whistleblower Law.*

The foregoing conclusion leads us to consider the extent to which Anderson's Whistleblower claim can survive based upon her April 19, 2007 report.  Defendants have not challenged the status of this particular communication as a valid whistleblower report.  However, since the Whistleblower Law requires the plaintiff to show that she made a good faith report of wrongdoing "*prior to* the alleged reprisal," 43 P.S. § 1424(b), it follows that any alleged acts of retaliation on the part of Defendants which occurred *before* her April 19 report are not actionable.

The focus of our inquiry must therefore be on alleged acts of retaliation which post-dated Anderson's Supplemental Whistleblower Report.  Anderson's brief in opposition to the pending summary judgment motion posits the following retaliatory acts:

---

[15] Anderson has not alleged that she made any report of waste in connection with her counsel's March 28, 2007 correspondence and, therefore, we need not consider this point.  In addition, given the Court's conclusion that the March 28 correspondence did not constitute a report of "wrongdoing," we need not address Defendants' alternative argument that Anderson cannot show she made this report in good faith.

- Sullivan's May 4, 2007 correspondence to the DPW;
- the actions of Mancini and Maynard relative to the May 14, 2007 CORE meeting;
- Mancini's May 18, 2007 letter to the DPW's Bureau of Program Integrity; and
- Mancini's remark that MTSD's ACCESS funds were "frozen."

We address below Anderson's Whistleblower claim as it pertains to each of the Defendants based upon the foregoing acts of alleged retaliation.

(i)

Anderson's only allegation of retaliation against Sullivan involves Sullivan's actions in sending her May 4, 2007 correspondence to the DPW. As we have previously noted, the Whistleblower Law requires Anderson to establish that she made a good faith report of wrongdoing or waste prior to this alleged act of reprisal. 43 P.S. §1424(b).

Anderson's *prima facie* evidentiary burden encompasses a requirement that she produce some evidence of a causal connection between her report and the alleged reprisal. *O'Rourke,* 778 A.2d at 171 (citing *Golaschevsky v. Department of Environmental Protection,* 720 A.2d 757, 759 (Pa. 1998)). *See also Callaghan v. Haverford Township,* 345 Fed. Appx. 767, 771 (3d Cir. Sept. 21, 2009). This connection "may not be predicated upon 'vague and inconclusive circumstantial evidence.'" *Sea v. Seif*, 831 A.2d 1288, 1293 n. 5 (Pa. Commw. 2003) (*quoting Golaschevsky*, 720 A.2d at 759). Rather, "a plaintiff must show by concrete facts or surrounding circumstances that the report (of wrongdoing or waste) led to [the adverse employment action], such as that there was specific direction or information received not to file the report or (that) there would be adverse consequences because the report was filed." *Golaschevsky, supra,* at 759 (quoting *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994)) (second

54

alteration added).  Here, the record cannot reasonably support a causal connection between Sullivan's May 4 letter and Anderson's April 19 report.

Anderson's primary evidence in support of the requisite causal connection is the temporal proximity between her Supplemental Whistleblower Report and Sullivan's May 4 correspondence.  However, no reasonable inference of retaliatory animus can be drawn from this temporal proximity given the uncontrovertible fact that Sullivan's professional conflicts with Anderson and the concerns articulated in her May 4 letter relative to the ACCESS program clearly preceded Anderson's April 19 report.

This fact is borne out by the April 19 report itself, wherein Anderson complained that Sullivan "ha[d] been on a campaign to oust" her and had "attempted to report the District's special education operations to the Department of Education and the Department of Welfare."  (D.A. 874.)  Since Sullivan had presumably not yet drafted her May 4 letter at this point, it is not entirely clear what Anderson was purporting to reference when she spoke of Sullivan's attempted reports to the Departments of Education and Welfare.  It may be that Anderson was referencing Sullivan's unsuccessful attempt to place the matter on the Board's agenda during a March 13, 2007 Executive Session (D.A. 1628, 1633), or Sullivan's decision in March of 2007 to take these concerns to the Board at large.  (D.A.1628.)  What is clear, however, is that the same conduct which Anderson claims was motivated by her April 19 report *had already been pursued* by Sullivan *prior to* that report as indicated *in that report*.

Anderson's claim that Sullivan "ha[d] been on a campaign to oust" her has multiple manifestations in the record.  In the first two complaints filed in this action, Anderson alleged that Sullivan's vendetta against her dates back as far as 2003, when

55

Sullivan supposedly ran for a seat on the school board with the stated objective of ousting Anderson from her job.  (Initial Complaint [1] ¶ 147; First Amended Complaint [6] ¶188, D.A. 1275, 1300.)  In her own chronology documenting her poor treatment at the hands of Defendants, Anderson records an October 17, 2006 incident in which Sullivan allegedly made statements about Anderson during a televised meeting which were not true and which were designed "to cast [Anderson] in a bad light [and] discredit her reputation."  (D.A. 1193.)  Elsewhere in her chronology, Anderson documents being told by the School Board President on December 14, 2006 "everyone knows that Susan Sullivan hates me and would do whatever she could to hurt me."  (D.A. 1197.)  In short, whatever the extent and origin of the animus between Sullivan and Anderson, it clearly predated Anderson's Supplemental Whistleblower Report.

It is equally clear from the record that Sullivan's subjective concerns about potential improprieties in the District's ACCESS program, including those which she wrote about in her May 4 letter, also preceded Anderson's April 19 report.  In September of 2006, at the first meeting of the Student Service Committee which Mancini attended, she expressed to Sullivan that she had concerns about whether the District had been properly billing ACCESS in the past.  (D 77.)  Mancini had discussions with Sullivan that fall about her concerns relative to the District's billing, receipt and expenditure of ACCESS funds, including the billing related to personal care assistants.  (D 80, D.A. 1628.)  In early March of 2007, Sullivan presented Mancini's concerns regarding the ACCESS Program's administration to the School Board after trying

unsuccessfully to place it on the agenda of an Executive Session.  (D 109, D.A. 1628.)[16]

According to Plaintiff's Second Amended Complaint, Sullivan and Maynard directed

Perhacs to undertake an internal investigation of ACCESS in March of 2007.  (SAC

¶32.)  These facts also belie any inference that Sullivan's letter of May 4, 2007 was

motivated by Anderson's Supplemental Whistleblower Report.

   Apart from the foregoing, other undisputed facts tend to further refute Plaintiff's

theory of whistleblower animus.  For example, Sullivan's May 4 letter reported concerns

that the "*School District* ha[d] billed Medical Assistance for services [her] son did not

receive and/or did not need" (D.A. 998 (emphasis added)) and, thus, the letter did not

identify Anderson as being personally responsible for the improper billing.  Although the

letter clearly implicated payments which had occurred on Anderson's watch, it would not

necessarily follow that Anderson would be personally responsible for these potential

billing errors, as the record is clear that many individuals worked under Anderson

relative to ACCESS matters and were ultimately questioned during the course of the

various ACCESS investigations.  Moreover, inasmuch as Anderson has claimed that the

provision of a personal care assistant was identified in Sullivan's son's IEP as an

authorized "related service" (P.A. 1955-1956), this suggests that any billing error which

occurred in the case of Sullivan's son may have originated in the preparation of the IEP

itself (possibly implicating Sullivan, who had to approve the IEP) or perhaps in the

medical authorization form which authorized the provision of a personal care assistant.

_____

[16] Anderson denies that Sullivan presented the issue to the entire Board on the ground that "there is no record evidence to substantiate this contention apart from Sullivan's affidavit."  (Pl.'s Resp. to D 109.) Notably, however, Anderson has not presented any evidence contradicting Sullivan's averment.

Again, this information cuts against a causal connection between Anderson's Supplemental Whistleblower Report and Sullivan's May 4 letter.

In an attempt to demonstrate triable issues of fact, Anderson points to what she terms the "unexplained delay" Sullivan exhibited in waiting until May 4, 2007 to write her letter complaining about services which her son had been receiving for years.  We are not persuaded that the record evinces an unexplained delay.  Although Anderson portrays Sullivan as a sophisticated parent who was involved in her son's IEP meetings, there is nothing in the record to suggest that Sullivan was tuned into the issue of ACCESS billing improprieties prior to speaking with Mancini in the fall of 2006.  The record is clear, though, that, once she was specifically apprised of Mancini's concerns, Sullivan became increasingly vocal about this issue, culminating in her May 4 correspondence to the PA DPW and Auditor General.

Anderson elsewhere makes the charge that Sullivan was uneducated in matters concerning the ACCESS Program, that she had never reviewed the ACCESS manual, and that she lacked the requisite knowledge to determine whether billing was appropriate or not.  Assuming this is true, however, it does not support a finding of retaliatory intent stemming from Anderson's April 19 report.

Anderson also directs the Court to an email which Sullivan's attorney sent to MTSD's counsel just prior to Sullivan's mailing of her May 4 letter.  In the email, Sullivan's counsel acknowledges that Anderson's attorney had professed a desire for an open audit of the ACCESS Program; Sullivan's counsel further states that Sullivan would hold off sending the letter if it would help MTSD in leveraging Anderson in the context of this lawsuit.  (D.A. 1548.)  Anderson maintains that this email demonstrates

Sullivan's "less than pure heart" in submitting her May 4 letter.  Anderson's argument

misses the point, however.  While the letter demonstrates Sullivan's willingness to

accommodate the other Defendants' litigation posturing, it does not logically support the

conclusion that Sullivan was sending the letter in order to punish Anderson for her April

19 report.  In sum, we conclude that the uncontradicted evidence of record viewed in its

entirety cannot support a rational inference that Sullivan sent her May 4 letter as a result

of Anderson's Supplemental Whistleblower Report.

Alternatively, even if we were to find that Anderson has satisfied her *prima facie*

burden, we would nevertheless conclude (for essentially the same reasons) that

Anderson's whistleblower claim against Sullivan cannot survive summary judgment

inasmuch as the evidence establishes, as a matter of law, that Sullivan's May 4

correspondence was undertaken for separate and legitimate reasons that were not a

pretextual for retaliation.  43 P.S. § 1424(c).

We reiterate, in addition to the other facts discussed above, that Mancini and

Sullivan had discussions in the Fall of 2006 about Mancini's concerns relative to various

potential improprieties in the District's ACCESS Program, which included concerns

about the manner in which the District was billing for services rendered by personal care

assistants.  (Notably, Gloria Grego of Leader had voiced similar concerns during a

meeting on March 21, 2007 with Mancini and Maynard.)  Sullivan took steps in March of

2007 to bring these matters to the attention of the School Board.  As a member of the

School Board with fiduciary responsibilities to the District and as the holder of a Medical

Assistance card, Sullivan had a duty to report known or suspected abuses to the

relevant governmental authorities.  In submitting her concerns, Sullivan did not name

Anderson personally but placed responsibility on "the School District," which potentially implicated a number of District personnel involved in the ACCESS Program. The fact that the IEP for Sullivan's son may have included a personal care assistant as a "related service" does not necessarily mean that spending ACCESS funds for those services was appropriate if Sullivan had reason to believe such services were not needed. Even if the act of billing through ACCESS was not erroneous, Sullivan's complaints could have implicated errors in the IEP itself or in the relevant medical authorization form (neither of which would necessarily have reflected wrongdoing on Anderson's part). Moreover, Sullivan also lodged the alternative concern that ACCESS had been billed for PCA services that her son did not actually receive, even if such services had been authorized by his IEP. Either way, it was incumbent upon Sullivan to report her concerns. Accordingly, even when the evidence is viewed in the light most favorable to Anderson, the record as a whole compels the conclusion that Sullivan would have submitted her May 4 letter even in the absence of Anderson's Supplemental Whistleblower Report for separate and legitimate reasons that were not pretextual.

(ii)

Anderson's Whistleblower claim against Mancini boils down to Mancini's involvement in setting the agenda for the May 14, 2007 CORE meeting, inviting an audit by the DPW's Bureau of Program Integrity, and allegedly making reference to the District's ACCESS funds being "frozen." As is the case with Sullivan, Anderson's whistleblower claims against Mancini cannot survive summary judgment because Anderson cannot establish a causal connection between her April 19 Supplemental Whistleblower Report and Mancini's conduct.

60

To the extent Anderson can demonstrate personal or professional animosity on the part of Mancini, the record conclusively shows that it developed long before Anderson's April 19 report. Notably, Anderson's own chronology of events is replete with references to her contentious exchanges with Mancini, which began almost immediately after Mancini starting working at MTSD. (See generally D.A. 1191-1198.)[17]

Even more to the point, the record is clear that Mancini developed concerns very early on with regard to the manner in which the ACCESS Program had been administered under Anderson's supervision. According to a memorandum prepared by Perhacs, Mancini found $1,200 worth of gift cards in her desk when she took over Anderson's job. (D.A. 996.) After inquiring into the matter with Anderson and learning that the gift cards had been acquired with ACCESS monies, Mancini turned the cards over to Maynard. (D.A. 1014, 241-43.) According to Anderson's chronology, Mancini told fellow staff members during a September 2006 meeting that Anderson had improperly given out gift cards to staff and asked that any outstanding gift cards be returned. (D 76, D.A. 1193.) On September 11, 2006, Mancini emailed Anderson

---

[17] By way of example, Anderson documents that she made an offer early on to help Mancini transition to her new job responsibilities. According to Anderson's chronology, this offer was rebuffed by Mancini with the comment that the scope of Mancini's prior job duties was "much greater than the scope of [her new] responsibilities" at MTSD. (D.A.1191.) Anderson further documents that, on August 18, 2006, Mancini entered her office with two other staff members and stated in front of them that Anderson had inappropriately assigned staff to teach subject matter for which they are not qualified (D.A. 1192.) On August 24, 2006, Mancini reportedly left a sticky note on Anderson's computer and indicating "if you are not out of the office by this afternoon, I will move in anyway." (D.A.1192.) On September 7, 2006 Mancini is said to have interrogated Anderson in front of others regarding whether Anderson had properly followed PDE guidelines for staff to meet HQT status. (D.A. 1192-93.) On November 3, Mancini emailed Anderson, criticizing her for a personnel change of teachers which was supposedly undertaken without administrative communication. (D.A.1194.) In December of 2006, Mancini reportedly informed Anderson in front of other staff members that Anderson had erroneously failed to pay her staff for activities at kindergarten registration, which turned out to be untrue. (D.A.1996.) In January 2007 Anderson writes that she had a contentious phone exchange with Mancini concerning a Report of Students with Extraordinary Expenses which resulted in Mancini hanging up on Anderson. (D.A. 1198.)

expressing concern about the District's past practice of billing for an interpreter who lacked proper credentials under MA guidelines.  (D.A. 1050.)  In another meeting that same month with the Student Services Committee, Mancini expressed to Sulllivan her concerns about whether the District had been properly billing ACCESS in the past.  (D 77.)  As we have noted, Mancini also had discussions with Sullivan regarding the billing of services rendered by personal care assistants.  (D 80.)  These issues were discussed with Maynard as well.  (D 79.)

By November of 2006 Anderson had contacted her attorney to address "the situation that she [saw] developing with Mrs. Mancini and Dr. Maynard's apparent support for [Mancini's] negative actions/behavior toward Anderson."  (D.A. 1194.)  Anderson followed up with a formal letter to Maynard asking him to instruct Mancini to refrain from making derogatory remarks.  (Id.; D 87.)  The comments which Anderson found objectionable had to do with Mancini suggesting that IEPs and re-evaluations were out of compliance and that the use of gift cards as incentive awards had been improper.  (D 88.)  Anderson made a similar request of Mancini in a follow-up meeting that she "stop with the negativity" and use of words like "improper" and "inappropriate."  (D.A. 1195.)

The professional relationship between Anderson and Mancini continued to break down and, by December 14, 2006, Mancini was asking for mentor reassignment.  In making this request, Mancini expressed doubt that she and Anderson could interact constructively, and she felt that the situation was unlikely to improve "as information about ACCESS billing [came] to light."  (D.A. 1463.)

That prediction appears to have proved prescient.  In February of 2007, as Anderson notes in her chronology, Mancini reported at a Special Staff Meeting that "all IEPs are ERs were out of compliance and had been for years."  (D.A. 1198.)  That same month at a CORE meeting, Mancini expressed dissatisfaction with Schulz's method of organizing the ACCESS files.  (D.A. 1199.)  In an email to Anderson on March 5, 2007, Mancini requested additional staffing for her department, commenting that "[m]uch of the ACCESS billing that has been done here in the past is not compliant with state guidelines so … there is no question about continuing it as is even if we had the staff to do it, which we don't."  (D.A. 1054.)

In the Spring of 2007, Mancini obtained approval for IU5 to take over the ACCESS billing for MTSD.  A March 7-8 review of the program by IU5 revealed "[i]nactive ACCESS child files mixed in with active files," "[b]illing for services without a parent letter," and [s]ervices not approved on Medical Authorization."  (D.A. 913.) Mancini's concerns, which she shared with Maynard, gave rise to an internal MTSD investigation, which involved Perhacs conducting off-site interviews of Mancini and Schulz on March 12, 2007 and, subsequently, other District employees including Anderson.

Meanwhile, on March 21, 2007, Mancini and Maynard had met with Gloria Grego of Leader Services to discuss the District's ACCESS Program.  One of the determinations made at the meeting was that Leader would schedule a QAR of the District's ACCESS Program.  Anderson alleges in her Second Amended Complaint that this meeting was designed to initiate a bad faith investigation of her by inviting an audit of the District's ACCESS spending.  (SAC ¶¶ 37-38.)  Notably, however, Grego's

memorandum of the March 21 meeting documents her own personal concerns with the District's billing for personal care assistants' services and the fact that MTSD was among top ten school districts in the Commonwealth in terms of receiving the most ACCESS revenue.  (D.A. 826.)

Significantly, all of these undisputed events occurred prior to Anderson's April 19 report.  In this Court's view, this evidence unequivocally establishes Mancini's concern, prior to April 2007, that there were significant improprieties in the manner in which the ACCESS Program had been administered under Anderson's supervision which needed to be remedied.

Moreover, prior to the time Mancini engaged in her challenged conduct, Leader had completed its QAR based on 43 randomly selected records for school years 2005-2006 and 2006-2007.  A subsequent written report identified 10 out of 32 program requirements and 28 overall records that were out of compliance with SBAP regulations. (D 150.)  The cover letter accompanying this report indicates that Leader's auditor had discussed most of the issues with Maynard and Mancini during the May 1 exit interview, which was prior to the date of Mancini's alleged retaliatory acts. (D.A. 962.) Collectively, the evidence of record precludes any reasonable inference that Mancini's challenged actions relative to the ACCESS Program were motivated by Anderson's Supplemental Whistleblower Report.

Anderson attempts to circumvent this problem by arguing that, notwithstanding Mancini's persistent concerns about improprieties in the ACCESS Program, the "clear discrimination" began on May 14 when Mancini engaged in an "obvious ramp up" of activity against Anderson.  (Pl.'s Br. in Opp. [277] at p. 32.)  Anderson posits that, when

Mancini's actions relative to the CORE meeting, the DPW letter, and her alleged reports about "frozen" funds are considered in their entirety, these three instances can reasonably be viewed as being part of a continuous pattern of conduct aimed at portraying Anderson as a fraud.  We do not agree that such a theory is tenable on this record when Mancini's May 2007 actions are viewed, as they must be, in the context of the record as a whole.

Moreover, even if the record would support a finding that Mancini undertook to portray Anderson as a fraud, this would not be sufficient to support Anderson's whistleblower claim because Anderson must still establish the requisite causal connection to her whistleblower activity.  That is to say, mere animus on the part of Mancini is not enough; rather, Anderson must show that Mancini's animus stemmed from Anderson's April 19 report.  Here, the record offers little support for such a causal connection aside from the temporal proximity between Anderson's Supplemental Whistleblower Report and Mancini's May 2007 conduct.

With regard to Mancini's conduct in setting the May 14 CORE meeting agenda, Anderson has pointed to factors which, she believes, show that Mancini had no basis for believing that a fraud investigation had begun or was imminent.  Anderson argues, for example, that Mancini's understanding of the ACCESS Program was limited, that Mancini had difficulty managing the Program due to her own lack of expertise, and that she possessed no information as of May 14 which suggested that fraud had occurred in connection with Anderson's administration of the Program.

Similarly, Anderson refers us to aspects of the record which, she claims, demonstrate that there was no reason for Mancini to request a retrospective audit by

the DPW or to believe that the District's ACCESS funds were "frozen."  Anderson

contends, for instance, that, despite Mancini's professed concerns about the ACCESS

Program, Mancini never reviewed the District's protocol for the Program.  Anderson

further insists that Mancini's advocacy of a retroactive audit finds no support in the

findings made by IU5 or Leader.

These assertions by Anderson, although disputed by the Defendants, fail to

establish a genuinely disputed issue of fact relative to the issue of causation.  To the

extent Anderson has shown the existence of disputed issues, these disputes establish,

at most, an argument for mistaken business judgment on the part of Mancini.  Yet at

issue is not the business judgment of Mancini or whether she had a strong case to

suspect fraud or to seek review by the BPI but, rather, whether Mancini acted with the

specific intent to retaliate against Anderson *because of Anderson's April 19 report*.

Even if a jury were to believe that Mancini's understanding of the ACCESS Program

was not fully informed and that she exaggerated concerns about the Program by

invoking the concepts of "fraud" or "frozen" ACCESS funds, this would not make it more

likely that Mancini's actions on May 14 were undertaken *because of* Anderson's

Supplemental Whistleblower Report.  To reiterate, the requisite causal connection for

purposes of the Whistleblower Law "may not be predicated upon 'vague and

inconclusive circumstantial evidence.'"  *Sea,* 831 A.2d at 1293 n. 5.  Here, Anderson

has not demonstrated the kind of implausibility or incoherence in Mancini's decisions as

would support a finding of retaliation that is causally related to whistleblower activity.

The inference of retaliation which Anderson seeks to draw is particularly weak in

light of the other countervailing evidence which remains undisputed.  We consider it

noteworthy, for example, that Mancini's letter to the BPI did not personally identify Anderson – or anyone else -- as a wrongdoer but simply asked for assistance from the BPI in reviewing what were believed to be "irregularities in the billing procedures" utilized by the District in the past.  (D.A. 1026.)  In addition, it is relevant to consider that the inquiry which Mancini invited implicated many District employees in addition to Anderson (including, potentially, Mancini herself) and, indeed, many District employees were interviewed as part of ensuing governmental investigation.

Thus, when viewing the record as a whole, Anderson cannot establish a *prima facie* case under the Pennsylvania Whistleblower Law because a jury could not reasonably find a causal connection between her April 19 report and Mancini's alleged retaliatory acts.  Because there is no genuine dispute on this record as to the material issue of causation – an essential element of Anderson's whistleblower claim, Mancini is entitled to summary judgment.

Alternatively, and for essentially the same reasons, we conclude that Mancini has established, as a matter of law, that she would have undertaken the same course of conduct for separate and legitimate reasons even in the absence of Anderson's April 19 report.  The legitimacy of Mancini's actions is buttressed by the fact that MTSD, with the approval of the School Board, independently sought intervention by an outside agency (the PA Auditor General's Office) based on issues uncovered in the ACCESS Investigation; the Auditor General's Office ultimately found improprieties relative to Anderson's use of gift cards obtained with ACCESS monies and also faulted the District for its inability to account for significant sums of ACCESS funds; and the Department of Justice found the results of the joint federal-state investigation into MTSD's ACCESS

Program to be "very troubling," having revealed numerous types of improprieties in claims submitted by the District.  When the undisputed evidence is viewed in totality, the record cannot support a reasonable inference that Mancini's conduct in May of 2007 was a pretext for whistleblower retaliation.

Based on the foregoing conclusions, Anderson's Whistleblower claim against Mancini cannot withstand summary judgment.

(iii)

Anderson's only remaining Whistleblower claim against Maynard concerns his involvement in directing Mancini to place the item "MTSD ACCESS Billing by Department of Public Welfare Fraud Investigation Division" on the May 14 CORE meeting agenda.

Regarding the May 14 CORE meeting, Anderson admits that, as of that date the District was engaged in preparation of its proposed budget for the 2007-2008 fiscal year.  (D 170.)  Anderson further admits that it was within Mancini's job responsibilities to report on the operation and status of the District's ACCESS program at the CORE meeting, since the availability of ACCESS funds and projected revenues from ACCESS billing are important budgetary matters and could impact the budget preparations.  (D 171, 175.)  Further, the possibility that the District would have to pay back funds from its ACCESS account was relevant to the District's budget preparations.  (D 174.)

Nevertheless, Anderson maintains that the CORE meeting was not the proper venue in which to raise this issue.  She further claims that Maynard and Mancini placed this item on the agenda to perpetuate the idea that she was a "fraud."

We need not dwell at length on this claim because, as a matter of law, Maynard's actions with regard to setting the May 14 CORE agenda are not actionable under the Pennsylvania Whistleblower Law.  In defending against the pending summary judgment motions, Anderson has asserted that her employment was materially affected by the collective actions of the Defendants in that her image was tarnished, she became "embattled" at work, others disassociated with her, and she eventually took a job elsewhere because of the stress she was experiencing.  Whatever the truth of this assertion, the record cannot support a finding that Maynard's limited actions relative to the May 14 CORE meeting materially affected the terms and conditions of Anderson's employment.  Because Maynard's sole remaining act of alleged retaliation is not actionable under the Whistleblower Law, Anderson's claim against Maynard cannot survive summary judgment.[18]

## C. Pending Motion for Sanctions

Having concluded that none of Anderson's federal or state claims are viable, we must acknowledge two pending matters, that being (i) Anderson's motion for Rule 11 sanctions [Doc. # 183] based on Defense Counsels' conduct in connection with a document filed on October 5, 2009; and (ii) Anderson's motion for spoliation sanctions against Maynard and/or his counsel and motion for sanctions against Defendants for concealment of evidence and/or discovery violations.

---

[18] Were this not the case, this Court would be inclined to conclude that Anderson's claim against Maynard fails on separate grounds essentially for the reasons discussed with respect to Sullivan and Mancini  – namely, Anderson cannot establish that Maynard's conduct relative to the May 14 CORE meeting was causally related to Anderson's April 19 report and/or Maynard has shown that he would have undertaken the same course of action for separate and legitimate reasons that are nonpretextual.

At issue in the first motion is Anderson's request for sanctions under Rule 11 based on the actions of Defense Counsel in connection with the filing of the "Joint Supplement to Motion for Dismissal of the Action Pursuant to F.R.C.P. 41(b) or, in the Alternative, Motion for Sanctions Pursuant to F.R.C.P. 37(b) and 37(c)(1)" (the "Joint Supplement") [Doc. # 109].  As the name suggests, the "Joint Supplement" was filed as an addendum to Defendants' original sanctions motion, which was filed on August 29, 2009 [Doc. # 87].  Defendants have withdrawn their underlying motion for Rule 41 and/or Rule 37 sanctions and that particular request for relief is therefore moot. However, Anderson subsequently filed on August 23, 2010 her own Rule 11 motion [Doc. # 183] requesting sanctions because of Defense Counsels' conduct in making various assertions about her in connection with the Joint Supplement.  By way of relief, Anderson has requested that Defense Counsel be required to pay the attorney fees and costs which Plaintiff incurred in connection with litigating the Defendants' underlying sanctions motion and Joint Supplement as well as Anderson's own Rule 11 motion.[19]

At issue in the second pending motion is Anderson's request for sanctions based on her allegations that Maynard directed the destruction of his original hard drive (known as "Seagate 1") as well as the hard drive of a replacement Hitachi computer.  As redress for these alleged discovery violations, Anderson requests a variety of sanctions, including:  (i) the opportunity to reopen discovery aimed at "explor[ing] critical issues of fact relating to the destruction of Seagate 1" (Pl.'s Proposed Findings of Fact and Conclusions of Law [265] at p. 60 ¶40); (ii) fees and costs, including expert fees

---

[19] The Court has implicitly denied Anderson's request that Defense Counsel be disqualified from this case because, regardless of the outcome of Anderson's Rule 11 motion, the Court does not view the disqualification of defense counsel as a suitable sanction in light of the age of this case, its convoluted procedural history, and the considerable size of the record.

associated with the preparation and litigation of her sanctions motion; (iii) an adverse inference that Maynard (a) possessed the anonymous letters on his Seagate 1 hard drive, (b) accessed pornography while using his MTSD laptop, and (c) sought to destroy evidence of his accessing pornography; (iv) exclusion of any use of email evidence by Maynard and (v) an adverse inference that Maynard did retaliate against Anderson.

Although this Memorandum Opinion and Order will close the pending case, this does not mean Anderson's two motions for sanctions are thereby rendered moot or will be terminated.  Rather, this Court retains ancillary jurisdiction to entertain Anderson's pending sanctions motions and will adjudicate each of them by way of separate findings of fact and conclusions of law in due course.  *See Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 395 (1990) (district court may award costs and attorney's fees and impose sanctions for contempt and under Rule 11 of the Federal Rules of Civil Procedure, even though action is no longer pending); *Katt v. Titan Acquisitions, Inc*., 244 F. Supp. 2d 841, 862 (M.D. Tenn. 2003) (court may exercise ancillary jurisdiction over sanctions motion after underlying case is terminated) (citing authority).  Consequently, we need not, and do not, express any opinion here as to the merits of Anderson's two sanctions motions.  It is enough for now simply to note that neither the issues raised in those sanctions motions, nor the type of relief requested, could logically impact our summary judgment ruling in light of the manner in which Anderson's claims have been resolved.[20]

---

[20] We further note that, whatever the Court may decide relative to Anderson's second motion for sanctions, a reopening of discovery will not be among the possible outcomes this Court would consider. In light of the exhaustive record development which has already occurred with respect to the spoliation issue, this Court can see no benefit to any further discovery on the matter.  We therefore consider the very extensive evidentiary record in this case to be closed.

## IV.     CONCLUSION

Based upon the foregoing reasons, Defendants' motions for summary judgment will be granted.   An appropriate order follows.

s/     <u>SEAN J. McLAUGHLIN</u>

Sean J. McLaughlin
United States District Judge

March 26, 2013

cm:     All counsel of record.