## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARYANN ANDERSON,                    )
                                     )
              Plaintiff,             )        Case No.  1:07-cv-111-SJM
      v.                             )
                                     )
BOARD OF SCHOOL DIRECTORS            )
OF THE MILLCREEK TOWNSHIP            )
SCHOOL DISTRICT, *et al.,*           )
                                     )
              Defendants.            )


## FINDINGS OF FACT AND CONCLUSIONS OF LAW

McLAUGHLIN, SEAN J., Chief District J.,

        This civil action was commenced in May of 2007 by Plaintiff MaryAnn Anderson,

formerly the Director of Personnel for the Millcreek Township School District ("MTSD" or

the "District").  The named Defendants originally included:  (i) the MTSD Board of

School Directors; (ii) Susan Sullivan, then a member of MTSD's Board; (iii) Rebecca

Mancini, who was at that time serving as MTSD's Director of Special Education/Student

Services; and (iv) Dean Maynard, then MTSD's Superintendent.  In her complaint,

Plaintiff asserted, among other things, that the Defendants violated her rights under the

First Amendment and the Pennsylvania Whistleblower Law by allegedly retaliating

against her after she submitted whistleblower reports to MTSD.[1]

        On March 26, 2013, this Court entered a Memorandum Opinion and Order of

Judgment granting summary judgment in favor of Defendants and terminating the

litigation.  The Court did not rule upon the Plaintiff's motion for sanctions pursuant to

---

[1] The Court's subject matter jurisdiction was premised upon 28 U.S.C. §§ 1331 and 1367.

Rule 11 of the Federal Rules of Civil Procedure [Doc. No. 183], which is still pending. Plaintiff's sanctions motion arises from a series of events involving prior sanctions motions filed by Defendants – namely, their "Joint Supplement to Motion for Dismissal of the Action Pursuant to F.R.C.P. 41(b) or, in the Alternative, Motion for Sanctions Pursuant to F.R.C.P. 37(b) and 37(c)(1)" [Doc. No. 109] (hereafter, "Joint Supplement").

Although the underlying litigation has since been terminated, this Court retains ancillary jurisdiction to decide the Plaintiff's pending Rule 11 motion.[2]  Based upon the Court's findings of fact and conclusions of law, which are set forth below, the Plaintiff's motion will be denied.

## I.    STANDARD OF REVIEW

Rule 11 of the Federal Rules of Civil Procedure provides, in relevant part, that an attorney who presents to the court "a pleading, written motion, or other paper" is thereby certifying to the court that, "to the best of [the attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances":

> **(1)** it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> **(2)** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> **(3)** the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> **(4)** the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

---

[2] *See In re Schaeffer Salt Recovery, Inc.*, 542 F.3d 90, 98 (3d Cir. 2008) ("It is well established … that a district court, after the entry of final judgment and the filing of a notice of appeal, retains the power to adjudicate collateral matters such as sanctions under Rule 11.").

Fed. R. Civ. P. 11(b).

Rule 11 thus imposes upon attorneys an affirmative duty to conduct a reasonable investigation into the facts of a claim to ensure that the assertions contained in each paper submission are made with reasonable belief that they are well-grounded in fact. *See Bradgate Associates, Inc. v. Fellows, Read & Associates, Inc.*, 999 F.2d 745, 751 (3d Cir.1993) ("Rule 11 imposes on any party who signs a document submitted to the court an affirmative duty to conduct a reasonable inquiry into the facts and law before filing."). Attorneys who fail to make a reasonable inquiry into the legal legitimacy of a pleading under the foregoing standards may be sanctioned. Fed. R. Civ. P. 11(c).

In adjudicating a request for Rule 11 sanctions, a district court must determine whether the attorney's conduct was "objectively reasonable under the circumstances." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account,* 618 F.3d 277, 297 (3d Cir. 2010) (*quoting Simmerman v. Corino*, 27 F.3d 58, 62 (3d Cir. 1994)). Sanctions are to be applied only "in the 'exceptional circumstance' where a claim or motion is patently unmeritorious or frivolous." *Id.* (*quoting Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (3d Cir.1988)) (citation omitted). That is because the Rule's "primary purpose is not 'wholesale fee shifting but [rather] correction of litigation abuse.'" *Id.* (alteration in original) (citation omitted). It "must not be used as an automatic penalty against an attorney or party advocating the losing side of a dispute," and it "should not be applied to adventuresome, though responsible, lawyering which advocates creative legal theories." *Id.* (*quoting Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 94 (3d Cir.1988) (citation omitted)).

3

In determining whether a document was submitted in violation of Rule 11, the adjudicating court "is expected to avoid the wisdom of hindsight and should test the signer's conduct by [asking] what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *CTC Imports & Exports v. Nigerian Petroleum Corp.*, 951 F.2d 573, 578 (3d Cir.1991) (citing Notes of Advisory Committee on Rules, 1983 Amendment, Fed.R.Civ.P. 11).  *See also Ellis v. Beemiller, Inc.,* 287 F.R.D. 326, 329 (W.D. Pa. 2012).  In making this determination, the court does not consider whether an attorney filed the document in good-faith; instead, the court must apply an objective standard and consider all of the material circumstances surrounding the submission. *See Bradgate*, 999 F.2d at 752; *Ellis,* 287 F.R.D. at 329.  Among the relevant considerations is the amount of time the attorney had to conduct an independent investigation prior to filing the document.  *See Bradgate,* 999 F.2d at 752 (citing Advisory Committee Note, 97 F.R.D. 165, 199); *Ellis,* 287 F.R.D. at 329.  "Although Rule 11 does not preclude an attorney from relying on information provided by others, the reasonableness of this reliance depends on the nature of the claim, the time to investigate, and whether the circumstances are such that he cannot reasonably be expected to attain the salient information independently through other means." *Ellis,* 287 F.R.D. at 329 (*citing Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278–79 (3d Cir. 1994)).

The burden of proving a Rule 11 violation falls on the party moving for sanctions under the Rule.  *See Gary v. Braddock Cemetary and Consol Energy,* 334 Fed. Appx. 465, 467 (3d Cir. June 8, 2009) ("[A] review of Third Circuit case law reveals that a court should refuse to impose sanctions unless, as here, the moving party can show a

4

complete lack of factual or legal support for a claim."); *National Business Adjusters, Inc.*

*v. NuEnergy Group, Inc.,* Civil Action No. 06-698(PGS), 2007 WL 2893376 at *4 (D.N.J.

Sept. 28, 2007) (acknowledging that defendants would bear the burden of proving that

the plaintiffs' motion for summary judgment violated Rule 11); *TEGG Corp. v.*

*Beckstrom Elec. Co.*, Civil Action No. 08-435*,* 2008 WL 5216169 at *3 (W.D. Pa. Dec.

10, 2008 ) ("[T]he burden of proof and persuasion rests on the party moving for

sanctions.") (citing *Rich Art Sign Co. v. Ring*, 122 F.R.D. 472, 474 (E.D. Pa.1988) and

G. Joseph, Sanctions: The Federal Law Of Litigation Abuse, § 17(A)(5) (2008)).

## II.    FINDINGS REGARDING FACTUAL AND PROCEDURAL HISTORY

### A. <u>Plaintiff's February 2007 Pittsburgh Trip</u>

The underlying litigation in this case involved claims by Plaintiff that the

Defendants retaliated against her, in violation of her rights under the First Amendment

and Pennsylvania law, because she made various whistleblower reports.  One of these

reports occurred on April 19, 2007.  On that date, Plaintiff avers that she disclosed to

MTSD concerns that school district funds were being misspent in connection with

abusive travel practices -- specifically, that:

    a.  The Defendant Board approved unverified expenses for travel and
conferences.  Actual expenses are much higher than what the Defendant
Board approves.

    b.  The Defendant Board did not engage in any oversight of instate conferences.
Employees attend in-state conferences sans specific Defendant Board
approval.  Therefore, there is not Defendant Board oversight of in-state
expenses or use of employee resources for such conferences;

    c.  Incomplete conference request forms are signed by Defendant Maynard and
approved by the Defendant Board, giving employees the apparent authority to
spend what they want;

    d.  There were an excessive number of attendees at various conferences, resulting in unnecessary expenses being paid by the District;

    e.  Employees ring up excessive costs on trips; and

    f.  Use of the District's credit card occurs without meaningful Defendant Board oversight.

(Doc. No. 26 at ¶ 55.)[3]

Anderson met with Mark Kuhar, Esq., one of MTSD's solicitors, who investigated her claims of travel abuse.  On April 30, 2007, Kuhar met with MTSD's Business Manager, Frank Szallay, regarding Plaintiff's whistleblower reports.  Kuhar's notes from that meeting suggest that he raised some questions concerning an overnight trip to Pittsburgh which Anderson took on February 8, 2007 -- specifically whether she had unnecessarily incurred expenses for overnight lodging and whether such expenses had been approved.  (Doc. No. 180-12 at pp. 20, 23, 28-29.)[4]

During the discovery process, Defendants investigated Anderson's February 2007 trip to Pittsburgh and came to the view that Anderson had used MTSD funds in order to orchestrate a personal rendezvous with an individual named Robert Buganski that was unrelated to MTSD business.  The incident in question concerned a conference originally scheduled to be hosted by the American Association of School Personnel Administrators ("AASPA") on February 8-9, 2007.  Both Anderson and Buganski were members of AASPA.

---

[3] Due to inadvertent mis-lettering in the Second Amended Complaint, subparagraphs (d)-(f) are enumerated therein as subparagraphs (c)-(e).

[4] All pagination will refer to the Court's official CM/ECF pagination located in the header of the referenced document rather than to the document's internal pagination.

As part of the discovery process in this case, MTSD on March 21, 2007 performed a "mail merge," through which it obtained copies of emails sent and received by Anderson through her MTSD email account.  Various emails between Anderson and Buganski that were obtained by Defendants from MTSD support a reasonable inference that Anderson and Buganski had a personal relationship.  (Doc. No. 87-32 at p. 7-8; Doc. No. 127-15 at pp. 1-135.)  The emails also show that Buganski arranged to become Plaintiff's AASPA "E-Mentor."  (Doc. No. 127-15 at pp. 11, 68.)

On January 8, 2007 Anderson submitted an absence request form to MTSD seeking permission to attend the February 2007 AASPA conference in Pittsburgh. Defendant Maynard approved this request on January 10, 2007.  (Doc. No. 87-31 at pp. 1-2.)

Through discovery, Defendants learned that, on January 9, 2007 – one day after Anderson had submitted her absence request form and one day before Maynard had approved it – Buganski emailed Plaintiff to advise her that the Pittsburgh AASPA conference, which they had both planned to attend, had been cancelled due to low attendance.  Anderson acknowledged in a return email that same date that she also had received notice of the AASPA cancellation.  (Doc. No. 87-32 at pp. 12-13.)

Despite the cancellation of the AASPA conference, Anderson and Buganski agreed to keep their travel plans and meet in Pittsburgh.  A January 11, 2007 email exchange between Anderson and Buganski indicates they were planning to meet in Pittsburgh on either February 7-8 (Wednesday and Thursday) or February 8-9 (Thursday and Friday).  (Doc. No. 87-32 at pp. 1-3, 7-9.)

7

Ultimately, Anderson travelled to Pittsburgh on Thursday, February 8, 2007, spent the night at the Omni William Penn Hotel, and returned to Erie on Friday, February 9, 2007.  (Doc. No. 87-31 at pp. 3-6; Doc. No. 127-15 at p. 107-08.)  Buganski traveled to Pittsburgh on Wednesday, February 7, 2007, spent two nights at the William Penn Hotel, and returned to Connecticut on Friday, February 9, 2007.  (Doc. No. 87-32 at p. 1.)  Based upon emails exchanged by Anderson and Buganski following their Pittsburgh trip, Defendants came to the view that the purpose for their meeting was personal and unrelated to MTSD business.  (Doc. No. 127-15 at pp. 109-35.)  This view, although not compelled by the record, was objectively reasonable.

On February 15, 2007, Anderson submitted a Travel Expense Voucher to MTSD claiming reimbursement from MTSD for certain expenses incurred as a result of her trip to Pittsburgh on February 8-9, 2007.  The Travel Expense Voucher was signed by Plaintiff, signifying that, "The above is a true and accurate account of the expenses incurred while attending an approved event for Millcreek Twp. School District."  Anderson represented on the voucher that the name of the event attended was "AASPA," and the dates of travel were February 8 and 9, 2007.  The voucher further indicated that Anderson was seeking mileage reimbursement in the amount of $138.40, which was later paid to her by MTSD on February 19, 2007.  (Doc. No. 87-31 at p. 5.)

Anderson also charged to her MTSD-issued Visa card $136.68 for the overnight accommodations at the Omni William Penn Hotel and $25.84 for a meal at Lone Star restaurant.  (Doc. No. 87-31 at pp. 6-7.)  Defendants viewed Anderson's time away from work and her requested reimbursements as expenses to MTSD which resulted from

8

Anderson claiming to have attended a business-related conference that she did not actually attend.

At her deposition on July 30, 2009, Anderson was questioned about whether she attended the AASPA conference in Pittsburgh in February 2007.  Anderson responded that she did attend one day of the AASPA seminar and the other day she attended a seminar on pedophilia hosted by the Tri-State Study Council ("Tri-State"), which had been rescheduled from the previous November or December.  Specifically, Anderson testified that she attended the Tri-State conference on Friday, February 9, 2007, meaning that she would have attended the AASPA seminar on Thursday, February 8.  Anderson also acknowledged that Buganski had also attended the AASPA seminar. (Doc. No. 189-6 at p. 3.)

During her deposition, Anderson made no mention of the fact that the AASPA seminar had been cancelled, nor did she make any mention of mentoring sessions between herself and Buganski.  Defense Counsel did not confront Anderson at that time regarding their awareness that the AASPA conference had been cancelled.

Following Anderson's July 30, 2009 deposition in which she referenced her attendance at the Tri-State conference, Defense Counsel contacted Tri-State to verify Anderson's attendance.  On August 5, 2009, Tri-State provided defense counsel documentation indicating that:  (a) the conference on pedophilia which Anderson had claimed she attended was originally scheduled for December 12, 2006 but was rescheduled for Wednesday, February 7, 2007 and did in fact occur on that date (not February 9, 2007); (b) Anderson was not registered to attend the Tri-State conference on either date; and (c) Anderson did not attend the Tri-State conference on Wednesday

February 7, 2007.  (Doc. No. 132-20 at pp. 10-13.)  Based upon this information, Defense Counsel concluded that, although Plaintiff had testified under oath that she had attended two different conferences during her February 2007 trip to Pittsburgh, in fact she had not attended either conference.

Meanwhile, on August 4, 2009, Anderson attended the continued deposition of MTSD Board President William Cobert.  During this deposition, Cobert was asked several questions bearing on Anderson's alleged attendance at the AASPA conference which had in fact been cancelled and the fact that Anderson had requested and received reimbursement for expenses allegedly incurred in attending the cancelled AASPA conference.  (Doc. No. 87-34 at pp. 2-18.)  This appears to have been the first instance in which Defense Counsel revealed, in Anderson's presence, their awareness that the AASPA conference scheduled for February 8, 2007 had actually been cancelled.

The following day, August 5, 2009, Anderson's attorney forwarded an e-mail to Defense Counsel with an attached flier, in "pdf" format, pertaining to the Tri-State conference that had been rescheduled from December 12, 2006.  The attached flier indicated that the rescheduled Tri-State conference was to be held "Wednesday, February 8, 2007."  This date was not a valid date, as February 8, 2007 actually fell on a Thursday.  (Doc. No. 109-6 at p. 2.)  The email to Defense Counsel included no explanation concerning the erroneous date or any confusion that may have resulted from it.  No mention or correction was made in the email concerning Anderson's prior testimony that she had attended the Tri-State conference on the Friday in question

10

(February 9, 2007).   Thereafter, Defense Counsel began to further scrutinize the conference and absence request forms submitted to MTSD by Anderson.

During the course of discovery, Defendants acquired two different versions of Anderson's MTSD Employee Absence Request Form for the Tri-State conference.   The first version ("Form 1"), which was subpoenaed by the Defendants from MTSD, bears a stamp indicating receipt of the document by the MTSD Superintendent's Office.   At the top of the form, the original absence date of "Dec 12, 2006" is indicated and, directly above that, the date "2-8-07" appears.  (Doc. No. 127-18 at p. 17.)

The second version ("Form 2") was produced by Anderson via her attorney's August 5, 2009 email, along with the Tri-State flier bearing the erroneous date.   Form 2 differs in various respects from Form 1.   For starters, it does not bear a stamp indicating receipt by the Superintendent's Office.   Also, at the top of Form 2, the original absence date of "Dec 12, 2006" is crossed out and "Feb 8-9" is written above it.   In section I of the document, the original request date of "12/4/06" is crossed out and replaced with "2/1/07," suggesting that Anderson submitted a revised request to Maynard on February 1, 2007 to attend the rescheduled Tri-State conference.   However, there is no indication on the form that it was ever received and re-approved by Maynard.   Finally, in section II of the document, the phrase "canceled weather – rescheduled Feb 8, 2007" is written in. (Doc. No. 109-6 at p. 3; Doc. No. 127-18 at p. 16.)

Defense Counsel maintain that Anderson's production of Form 2 of the MTSD Employee Absence Request Form relative to the Tri-State conference raised further questions -- specifically:  (a) why the copy that was provided by Anderson shortly after the Pittsburgh trip had become an issue was materially different from Form 1 of the

11

Employee Absence Request form that had been previously produced by MTSD; (b) why Anderson's absence request form was revised on February 1, 2007; (c) why the dates "February 8-9" were written on the Form 2 when the Tri-State seminar was a one-day event; and (d) why the form indicated that the December seminar had been canceled "because of weather" when there was nothing indicating that to be the case and in fact the December seminar had been cancelled at least eight days in advance.

On August 14, 2009, the last day of discovery, Plaintiff sent Defense Counsel an affidavit from Chester Kent, Ph.D, J.D., the individual responsible for organizing and presenting the Tri-State seminar held on February 7, 2007.  Mr. Kent's affidavit, dated August 13, 2009, stated (in relevant part) that Anderson had been registered to attend the December 12, 2006 seminar entitled "Encouraging Professionalism:  Teaching Teachers to Eliminate Unprofessional Behaviors With Students That Cross Professional Boundaries and Generally Result in Teacher/Student Involvement and Sexual Molestation," but that workshop was cancelled and moved to February of 2007.  (See Doc. No. 122-16 at pp. 1-2, ¶¶ 5-8, 10.)  Mr. Kent's affidavit further provided the following:

   9. Dr. Anderson learned the conference was rescheduled for Wednesday, February 8, 2007.

   10. That was a mistake and the conference was actually held on Wednesday, February 7, 2007.

   11. Dr. Anderson came to the workshop at William Pitt Student Union on Thursday, February 8, 2007 and realized she had the wrong day.

   12. Dr. Anderson called and met with me whereby I provided her with the workshop information.

(Id. at p. 2, ¶¶ 9-12.)  Accompanying this affidavit was a copy of the Tri-State flier with the errant date of Wednesday, February 8, 2007.  (See id. and Doc. No. 122 at p. 19, n. 26 and p. 22, ¶¶ (l)-(m).)

Five days later, on August 19, 2009, Anderson submitted an errata sheet relative to her July 30, 2009 deposition.  Therein, she changed her testimony, on the basis of refreshed recollection, to indicate that she had attended the Tri-State conference on Thursday, February 8 -- not Friday, February 9 as she had originally testified.  Anderson made no other relevant changes to her testimony.  She did not allege any confusion about the Tri-State seminar date, nor did she mention the fact that the AASPA conference had been cancelled.  (See Doc. No. 122-4 at p. 6.)

B.  Defendants' Joint Motion for Dismissal

On August 29, 2009, Defense Counsel filed a motion for dismissal of the action and/or for sanctions, asserting that Plaintiff, by and through her counsel, "ha[d] deliberately abused the discovery rules by withholding critical discoverable documents that should have been supplied" and "by making misrepresentations about such documents… thereby[ ] tainting the discovery process."  (Defs.' Jt. Motion for Dismissal of the Action Pursuant to F.R.C.P. 41(b) or, in the Alternative, Motion for Sanctions Pursuant to F.R.C.P. 37(b) and 37(c)(1) ("Joint Motion for Dismissal and/or Sanctions") [Doc. No. 87].)  The Defendants' motion was based primarily on their contention that Plaintiff had possessed, but wrongly failed to produce in connection with her initial disclosures, two items – namely, a document known as the Weichler Report and a

chronology which Plaintiff had generated concerning events she deemed important to her whistleblower claims.

### 1. The Weichler Report

The Weichler Report was authored by William Weichler, Esq., an attorney retained by MTSD as special counsel to investigate Anderson's claim that certain individuals had made defamatory statements about her and Dr. William Cobert, then the President of MTSD's School Board.

On July 18, 2008, the Weichler Report was sent to MTSD's solicitor.  (Doc. No. 87-7 at p. 1.)  Cobert subsequently inquired as to whether Anderson could receive a copy of the report but was advised by the District's solicitor that Anderson would have to obtain a copy in discovery, as the report was considered confidential.  (Doc. No. 87-8 at pp. 3-5; Doc. No. 87-10 at p. 1.)  Anderson personally made a verbal request for the report in October of 2008 which was denied by MTSD's solicitor.  (Doc. No. 87-20 at pp. 2-3.)

Pursuant to the Court's discovery schedule, Plaintiff made her initial disclosures on October 15, 2008.  The Weichler Report was not among the documents produced by Plaintiff at that time.  (Doc. Nos. 87-2, 87-3, 87-4.)

While subsequently attending depositions held on November 11, 2008, Anderson's counsel represented to Defense Counsel that Anderson had received a copy of the Weichler Report anonymously by mail about two weeks prior.  (Doc. No. 87-14 at pp. 3, 5-10, 15.)  Anderson would later confirm in her own deposition testimony that she received the Report anonymously by mail in November of 2008.  (Doc. No. 87-

16 at p. 2.)  However, Defense Counsel eventually came to the view that Anderson or her counsel had obtained copies of the Report on two prior occasions, both well in advance of the October 2008 Initial Disclosures.  This was inferentially supported by:  (i) Anderson's production of a copy of the envelope in which she received the anonymous copy of the Weichler Report, which bore a postmark date of September 20, 2008 (Doc. No. 107 at p. 6, ¶¶ 22-24; Doc. 107-1, 107-2, and 107-3); and (ii) Anderson's attorney's production, in a related civil action, of a copy of the Weichler Report which bore a facsimile header denoting that the Report had been faxed from Building Number 6, Room 512 at GE at 5:03 pm on July 21, 2008.  (Doc. No. 87-11 at p. 1; Doc. No. 87-12 at pp. 1-53.)  Through deposition testimony it was established that Anderson's husband, Dan, was employed at GE in July of 2008 and worked in Building Number 6 on the fifth floor, where he had access to fax machines.  (Doc. No. 87-13 at pp. 2-4.)  No other individual has been identified in connection with this litigation who would have had similar access to the fax machine at that particular location.

Both Anderson and her husband had been questioned about their receipt of the Weichler Report during depositions.  Anderson testified that she had first received the Weichler Report in November of 2008 when it came in the mail.  (Doc. No. 87-16 at p. 2; Doc. No. 107 at p. 6, ¶¶ 23-27.)  Dan Anderson testified that he never had the Weichler Report and never sent it to anyone.  (Doc. No. 87-13 at pp. 5-6.)  This testimony was seemingly contradicted by the September 2008 post-mark date and the fax header described above and, consequently, Defendants viewed the testimony of Anderson and her husband as inaccurate.

In addition, Defense Counsel later discovered on an April 7, 2009 hard-drive image of Anderson's MTSD-issued laptop two versions of a document named "contradictions.doc."  This document incorporated information derived from the Weichler Report, and its metadata showed that the document had been created on July 24, 2008. (Doc. Nos. 127-6, 127-7, 127-8.)  Because this predated the parties' October 2008 initial disclosure date, the "contradictions.doc" item further convinced Defense Counsel that Plaintiff had possessed, but not produced, the Weichler Report at the time of her initial disclosures.

Defense Counsel's conclusion that Plaintiff had possessed (but not produced) the Weichler Report at the time of her initial disclosures was objectively reasonable under the circumstances.  Defense Counsel's conclusion that Plaintiff and her husband had given inaccurate testimony concerning their pre-October 2008 access to the Weichler Report was likewise objectively reasonable under the circumstances.

### 2.  Plaintiff's Chronology

On March 12, 2009, Anderson produced to Defense Counsel a lengthy letter dated February 25, 2009, and 55 exhibits referenced therein, that Anderson had previously sent to federal officials who were conducting an investigation into MTSD's School Based ACCESS Program.  Among the exhibits sent to the investigators was Exhibit 29, an excerpt (pages 22 and 23) of a chronology of events maintained by Anderson.  (Doc. No. 87 at p. 9, ¶¶ 28-31; Doc. No. 87-21 at p. 1; Doc. No. 87-22 at  pp. 1-27; Doc. No. 87-23 at pp. 1-4.)  Upon receipt of these documents, Defense Counsel

attempted to obtain the entire chronology.  (Doc. No. 87 at p. 10, ¶¶ 33-37; Doc. No. 87-25 at p. 3; Doc. No. 87-26; Doc. No. 87-27; Doc. No. 87-29.)

On August 14, 2009 at 4:57 pm – the last day of discovery – Anderson produced a 43-page documented entitled "Chronology of Incidents Regarding Maynard's Treatment of Anderson."  (Doc. No. 87-6; Doc. No. 87-30 at p. 1.)  Defense Counsel then compared the contents of pages 22 and 23 of the full chronology to the contents of pages 22 and 23 that had previously  been produced (on March 12, 2009).  Based upon the discrepancies in these two documents, they deduced that:  (1) Anderson had made additional entries to the chronology concerning events dated prior to May 11, 2007 (the date this litigation was commenced), and (2) these changes had been made at some point after the original March 12, 2009 production.

### 3.  Defendants' Joint Motion for Dismissal

In their Joint Motion for Dismissal and/or Sanctions, Defendants argued that Anderson had failed to produce the Weichler Report in a timely fashion and that her production of the "chronology" had likewise been untimely as well as incomplete, to the detriment of the discovery process.  (Id. at pp. 1-14.)  With regard to the chronology, Defendants argued that, if the entire chronology had been produced in a timely fashion, they would have used it to question witnesses differently.  They also maintained that they would have performed a forensic analysis of the document in an effort to determine when entries pertaining to Plaintiff's February 2007 trip to Pittsburgh had been made. (Id. at pp. 12-14.)

Although this Court refused to grant Defendants' request to dismiss the action, it found that some sanctions were appropriate based on Plaintiff's failure to produce the entire chronology in a timely manner.  Accordingly, the Court granted Defendants leave to redepose Plaintiff concerning that document and assigned the cost of the deposition to Plaintiff's counsel.  (Doc. No. 113 at pp. 20-22.) [5]

C.  Events Relating to the Alleged Spoliation of Plaintiff's Laptop

While employed by MTSD, Anderson had utilized a laptop computer issued by the School District.  The laptop's hard drive was imaged by Defendants' computer forensics expert, Gregory Cancilla, on April 7, 2009.  (Doc. No. 109-3 at p. 6, ¶ 29.)

Following this imaging, Anderson's laptop was returned to her by MTSD.  She remained in possession of the laptop until August 21, 2009, when she turned it back over to the District at the District's request.

Subsequent to Anderson's return of the laptop in August of 2009, Defense Counsel asked Cancilla to obtain a second image of the hard drive.  Cancilla re-imaged Anderson's MTSD laptop on September 4, 2009 but did not immediately examine or analyze this image.  (Doc. No. 199 at pp. 103-04, 203-04.)

In the meantime, argument on Defendants' Joint Motion for Dismissal and/or Sanctions had been scheduled for October 6, 2009.  In preparation for this argument, Defense Counsel asked Cancilla to look at the re-imaged hard drive of Anderson's

---

[5] As for the Weichler Report, the Court noted the questionable relevance of the document and the lack of any prejudice to the defense resulting from their failure to receive it earlier.  As to whether Anderson or her counsel did in fact possess the document prior to November of 2008, this Court made no determination, noting that this remained an "open question."  (Doc. No. 113 at p. 23.)  The Court instructed Plaintiff's attorney to revisit the issue concerning the fax header with his office staff and inform the Court at a later date as to whether it remained his position that neither he nor his client had possessed the report prior to November of 2008.  (Id. at pp. 23-25.)

MTSD for evidence relating to the chronology issue raised in the Defendants' motion. (Doc. No. 199 at p. 104.)

On or around September 18, 2009, while examining the September 4, 2009 image from Anderson's laptop hard drive, Cancilla discovered that information had been deleted as the result of the partial installation of an operating system on the laptop. (Doc. No. 199 at pp. 104, 203-04; Doc. No. 109-3 at pp. 6-7, ¶¶ 33-39.)  Cancilla informed Defense Counsel that the drive characteristics of the April 2009 image were now significantly different, that thousands of files that had been present on the hard drive as of April 2009 had been deleted, and that some files had been overwritten. Cancilla further advised that someone had performed a partial installation of an operating system on the laptop and that recovery efforts would need to be undertaken to determine what files, if any, could be recovered.  Cancilla estimated that such measures would cost at least $5,000.00.  (Id. at pp. 105-06, 111-12, 167-68, 204-06; Hearing. Ex. P; Doc. No. 109-3 at pp. 6-7, ¶¶ 33-39.)

D.  Events Related to the Discovery of "Correct" Tri-State Fliers

On September 22, 2009, while reviewing emails that had been exported from Anderson's MTSD email account in March of 2007, Defense Counsel discovered two emails previously sent to Anderson in early December 2006 concerning the Tri-State seminar.  (Doc. No. 199 at p. 27; Hearing Ex. N and O.)

The first email was forwarded to Anderson on December 5, 2006 by Frank Szallay.  The original message in the string was an email from Bill McNelis of Tri-State, dated December 4, 2006, which indicated that the conference on pedophilia originally

19

scheduled for December 12, 2006 had been rescheduled for Wednesday, February 7, 2007.  Also attached to this email in Microsoft Word format was a flier and registration form indicating the conference was to take place on Wednesday, February 7, 2007.  Thus, both the text of the email from McNelis and the attached flier displayed the correct date and day of the week for the rescheduled Tri-State conference.  (Doc. No. 109-3 at pp. 4-6, ¶¶ 15-28; id. at pp. 8-23; Hearing Ex. N.)  The December 4, 2006 date of McNelis' email demonstrated that the December 12, 2006 Tri-State conference had been cancelled at least eight days in advance.

The second email was sent to Anderson on December 6, 2006 from her secretary, Roberta Spitulski.  This email string revealed that Spitulski had submitted a request to have Anderson registered for the December 12, 2006 Tri-State conference but was advised in a return email from a Tri-State representative that the conference had been moved to February 7, 2007.  Like the December 5, 2006 email string, the December 6 email string had as an attachment a Word version of a flier for the rescheduled Tri-State conference bearing the correct date and day (Wednesday, February 7, 2007).  All of this information was forwarded by Spitulski to Anderson on December 6, 2006.  (Doc. No. 109-3 at pp. 4-6, ¶¶ 15-28; id. at pp. 8-23; Doc. 199 at p. 194; Hearing Ex. O.)

The respective metadata for the December 5 and December 6 emails indicated that both emails had been opened.  (Doc. No. 199 at p. 193.)  Because Anderson's MTSD email account was a secure, password-protected account, only a person who knew Anderson's user name and password could have accessed these emails.  (Id. at pp. 197-99.)

Both emails included an attachment of the Tri-State flier in Word format. Documents in Word format can easily be saved, transferred to other media, and/or edited.  (Doc. No. 198 at p. 163; Doc. No. 199 at p. 194.)

As a result of these events, Defense Counsel maintain that they knew or had reasonable grounds to infer, as of September 22, 2009, the following:  (1) Anderson had previously testified under oath that she attended two conferences in Pittsburgh in February 2007 that she did not actually attend; (2) on two separate occasions, and from two separate sources, Anderson had received in her email account the Tri-State flier bearing the correct day and date of the rescheduled conference (Wednesday, February 7, 2007); (3) the body of the emails to which the fliers were attached similarly referenced the correct day and/or date; (4) the emails had been opened; (5) the Tri-State fliers attached to the emails were in Word format, and could therefore be easily modified or altered from their existing form; (6) Anderson's February 2007 trip to Pittsburgh involved a meeting with Buganski for personal reasons; (7) the MTSD absence request form produced by Anderson relative to the Tri-State conference contained a hand-written notation indicating that the conference had been cancelled due to weather when, in fact, the conference had been cancelled eight days before its originally scheduled date; (8) the Tri-State absence request form produced by MTSD pursuant to subpoena did not have any such notation; (9) Anderson had incurred hotel expenses for the night of February 8, 2007, paid for by MTSD, despite having claimed to have travelled to Pittsburgh to attend a Tri-State conference that she allegedly believed ran from 8:30 a.m. to 11:30 a.m. on February 8; and (10) a significant quantity of electronically stored information had been deleted from Anderson's MTSD laptop

21

computer on August 14, 2009, the last day of discovery in this case, and just one week prior to the date that she returned the laptop to MTSD.

Based upon the foregoing, Defense Counsel theorized that Anderson had submitted a falsified flier for the Tri-State conference with an altered and nonexistent day/date (i.e., Wednesday, February 8, 2007) and that an attempt had been made on August 14, 2009 to delete electronically stored information, including evidence of the alteration, from Anderson's MTSD laptop computer.

E.  Defendants File Their Joint Supplement and the Court Entertains Argument

As of September 22, 2009, discovery in the case had closed.  Defense Counsel contend that, because discovery had closed, they reasonably believed that any additional analysis of Anderson's MTSD laptop would require court oversight.  Further, Defense Counsel had been advised by their expert that further forensic examination and recovery would have to be undertaken at a substantial cost in order to determine the extent of the deletion and whether or not any of the information could be recovered. Defense Counsel took the position that this cost should be borne by the Plaintiff.

Meanwhile, argument on the Defendants' original Motion for Dismissal and/or Sanctions was scheduled to occur on October 6, 2009.  Defense Counsel insist that they filed their Joint Supplement on October 5 out of a desire to alert the Court as quickly as possible as to their concerns about the Tri-State flier and the loss of files on Plaintiff's laptop.

In submitting their Joint Supplement to the Court, Defense Counsel made the following assertions:

- "… Plaintiff literally took thousands of discoverable documents and, effectively, put them into a shredder when she and her counsel knew that she was not allowed to do so." [ ]  (Doc. No. 109 at ¶ 21, p. 4 (footnote omitted).)

- "The clear, plausible and reasonable inference to be drawn is that the Plaintiff altered this Tri-State seminar flyer some time after, at the earliest, her own deposition (but most likely after the conclusion of Dr. Cobert's deposition on August 4, 2009) in order to corroborate her own testimony that she actually went to a seminar in Pittsburgh in February 2007, and then deleted any evidence of her changes to this Microsoft Word document by overwriting her hard drive with the attempted reinstallation of the Windows XP operating system.  This way she could still claim that her trip to Pittsburgh was educationally related."  (Id. at ¶ 24(g), p. 7.)

- "In sum, there is simply no excuse as to what the Plaintiff did with the MTSD issued laptop computer, it was purposeful."  (Id. at ¶ 26, p. 7.)

- "Coupled with her other actions … this action should be dismissed."  (Id. at ¶ 27, p. 7.)

In support of their Joint Supplement, Defendants submitted the Affidavit of

Gregory Cancilla dated October 5, 2009.  In relevant part, Cancilla's affidavit stated the

following:

29. … I mirrored the hard drive from [Anderson's MTSD-issued laptop computer] on April 7, 2009, subject to all of the safeguards and redundancies outlined above.

30.  It is my understanding, upon information and belief, that the laptop assigned to Maryann Anderson was returned to her after I mirror imaged it on April 7, 2009, and that it remained in her possession until at least August 14, 2009.

31.  On September 4, 2009 at the request of the Defendants, I again mirror imaged the hard drive of that same laptop when it was made available to me at the MTSD offices.

32.  The hard drive I examined on September 4, 2009 was, physically, the same hard drive I examined on April 7, 2009.

33.  My examination of September 4, 2009 revealed that the hard drive, and the data stored on it, had been significantly altered.

34.  Specifically, my examination indicates that, between 6:00 and 6:30 a.m. on August 14, 2009, an effort was made to reinstall the operating system, Microsoft Windows XP, on the laptop belonging to Maryann Anderson.

35.  These actions are not actions that can be done accidentally.

36.  As a result of these actions, it appears that a significant amount, perhaps all, of the data on Maryann Anderson's hard drive may have been deleted, corrupted, or overwritten or made otherwise unrecoverable.

37.  A "snapshot" of the general characteristics of her laptop computer's hard drive from both April 7 and September 4, 2009 is attached as Exhibit G.  A few specific lines highlight the differences:  emails on April 7, 2009 – 11,196, compared with emails on September 4, 2009 – 0; documents on April 7, 2009 – 16,897, compared to documents on September 4, 2009 – 106.

38.  I have not yet had an opportunity to attempt any type of recovery analysis.  Any such effort, however, would be both time consuming and expensive.  I estimate a minimum cost of $5,000.

39.  There is no guarantee about how much – if any – data can be recovered from Maryann Anderson's hard drive at this time.

(Doc. No. 109-3 at ¶¶ 29-39.)

On October 6, 2009, the day originally scheduled for argument on the Defendants' Joint Motion for Dismiss and/or Sanctions, the Court took up the issues raised in that motion as well as those raised in the newly filed Joint Supplement.  During the October 6 hearing, Defense Counsel made or assented to the following assertions in response to questioning by the Court:

- "The main point is, your Honor, that we've been presented with a document that has been falsified."  (Doc. No. 116-1 at p. 1.)

- "there has been, for lack of a better term, an electronic shredding of documents." (Id. at p. 3.)

- "…somebody trashed, for lack of a better term, Dr. Anderson's laptop computer and all the data on it…"  (Id. at p. 4.)

- "Again, your Honor, we believe this further supports a dismissal of this case."  (Id. at p. 4.)

On December 15, 2009, Anderson filed her own Motion for Dismissal Pursuant to F.R.C.P. 41(b) and/or, in the alternative Motion for Sanctions Pursuant to 28 U.S.C. § 1927.  In this motion, Anderson asserted that:

> …Defendants have subverted the discovery process, willfully and vexatiously violated the Federal Rules of Civil Procedure *and* a Protective Order issued by *this Honorable Court* (a mere four days after it was issued), vexatiously multiplied proceedings in this case by causing to be filed and necessitating to be defended several Motions grounded in speculation based upon data to which Defendants should not have possession, accused Plaintiff and her counsel of perpetrating fraud on the Court and so irreparably prejudicing Plaintiff in the discovery process that nothing short of dismissal in Plaintiff's favor, together with all costs and fees associated with discovery, defending Defendants' baseless Joint Supplement and the instant Motion can repair.

(Doc. No. 137 at ¶ 7 (emphasis in the original).)

A hearing was held before this Court on March 16, 2010, at which time the issues raised in Defendants' Joint Supplement as well as Plaintiff's motion for dismissal/ sanctions were addressed.  Following extensive oral argument by the parties, the Court denied Plaintiff's motion for dismissal, finding there was "no conduct that would satisfy the extremely high requirement of vexatious or willful misconduct [on the part of Defendants] to support such sanctions."  (Doc. No. 156-1 at p. 34.)  However, the Court ordered that Defendants make available to Plaintiff certain discoverable information previously gleaned from Defendant Maynard's computer.  (Id. at pp. 36-37.)

With regard to the issues raised in the Defendants' Joint Motion for Dismissal and/or Sanctions and Joint Supplement, including the issues of suspected document falsification and spoliation of evidence, the Court concluded that there was "sufficient

smoke to justify the [D]efendants' suspicion that there was a fire." (Doc. No. 156-1 at p. 35.) At the same time, however, the Court found that the record was "somewhat under-developed" relative to the alleged spoliation of Plaintiff's laptop computer and the alleged alteration of the Tri-State flier. (Doc. No. 156-1 at p. 37.) Accordingly, the Court determined that, while the Defendants had not met their burden of establishing a basis for dismissal of the action, it was appropriate to permit Defendants an opportunity to re-depose Anderson and her husband relative to the alleged alteration and spoliation issues. (Id.)[6]

F. The Depositions of Plaintiff and Her Husband

In accordance with the Court's March 16, 2010 ruling, Anderson was re-deposed on April 6, 2010. (Doc. No. 189-10.) In response to questioning about her February 2007 Pittsburgh trip, Anderson acknowledged being aware that the AASPA conference, originally scheduled for Thursday, February 8, had been canceled; however, she stated that she nevertheless intended to travel to Pittsburgh to attend the Tri-State conference, which she believed was scheduled for February 8, and then meet with her AASPA mentor, Robert Buganski, for the remainder of that day. (Doc. No. 189-10 at pp. 23, 34-35.) The Tri-State conference was to begin at 8:30 a.m. and end at 11:30 a.m.. (Id. at p. 25.) Anderson repeatedly testified that she arrived at the William Pitt Student Union, where the Tri-State conference was to be held, at 9:00 a.m. on February 8; at that point, she discovered that the Tri-State conference had, in fact, occurred the day before. (Id. at pp. 25-28.)

---

[6] Plaintiff subsequently filed a motion for reconsideration of this Court's March 16, 2010 ruling, which was denied on January 10, 2012. (Doc. No. 237.)

In response to questioning about the Tri-State flier with the errant date, which she had produced in "pdf" form on August 5, 2009, Anderson could not state specifically how she came into possession of the document other than to say that it had just appeared on her desk and that she assumed it had been mailed to her.  (Doc. No. 189-10 at pp. 28-29.)  She did not know of any other person who had received this version of the flier.  (Id. at p. 30.)

Regarding her chronology, Anderson identified three different versions of the document, which were identified as Exhibits 220, 221/221A, and 222.  (Doc. No. 189-10 at pp. 12-13.)  She also acknowledged using a memory stick to keep and modify the chronology.  (Id. at pp. 7-8, 13.)  The document identified as Exhibit 220 is the 43-page redacted version of the chronology produced to Defense Counsel on the last day of discovery – August 14, 2009.  (Id. at pp. 5, 12-13; Doc. No. 87-6.)  The document identified as Exhibit 221/221A is a 42-page unredacted version of the chronology which Anderson brought to her April 6, 2010 deposition.  (Doc. No. 189-10 at pp. 12-13.)  The last entry set forth in Exhibits 220 and 221/221A is dated August 22, 2008.  (Doc. No. 87-6.)  The document identified as Exhibit 222 is a 50-page version of the chronology that had been emailed to the office of one of Defense Counsel that same morning. (Doc. No. 189-10 at pp. 12-13.)  The last entry set forth in Exhibit 222 is dated November 6, 2008.  (Id. at pp. 13, 17.)

During Anderson's deposition it was established that Exhibits 220 and 221/221A contain an entry for February 9, 2007 regarding the Tri-State and AASPA seminars which was not present on Exhibit 222.  (Doc. 189-10 at pp. 16-17.)  That entry reads:

> Anderson returns from Pittsburgh early (to be gone 8-9).  Tells Maynard of
> confusion with Tri-State and AASPA cancellations and rescheduled dates,
> Anderson met with presentor.  Anderson met with AASPA mentor, have
> timelines for electronic apps.  New approach to recruitment fairs.

(See Doc. 87-6 at p. 9.)  When Plaintiff was questioned about this entry, she testified

that she probably made the 2/9/07 entry that same month, meaning within the month of

February of 2007.  (Doc. No. 189-10 at pp. 16-17.)  However, Plaintiff was confronted

with the fact that the February 9, 2007 entry was missing from a version (Exhibit 222) of

the chronology ostensibly prepared more recently than the other two versions, given

that the last entry date on Exhibit 222 is November 6, 2008.  (Id. at p. 17.)  Plaintiff

could not provide any explanation for this discrepancy, suggesting to Defense Counsel

that the 2/9/07 entries present on Exhibits 220 and 221/221A were added by Plaintiff at

some point *after* November 6, 2008.  (Id. at pp. 17-18.)

Anderson was also questioned concerning her use of external memory devices

(such as external hard drives and USB devices)[7] in connection with her MTSD laptop.

Having been requested to bring to her deposition "[a]ny and all thumb drives, flash

drives or memory sticks used by [her] between 2007 and the present," Anderson

testified that she had only ever used one memory stick and that she had returned that

device to MTSD in August 2009 along with her laptop.  (Doc. No. 189-10 at pp. 4, 8, 22-

23.)  With the exception of the one memory stick and various CDs containing discovery

materials which had been provided by her attorney, Anderson denied ever using an

external storage device with the MTSD laptop.   (Id. at pp. 22-23.)

─────────────────────

[7] USB devices include "flash drives," "jump drives," or "memory sticks."

In her response to Defendants' Joint Supplement filed on November 2, 2009, Anderson addressed Defendants' allegation that electronic data on her laptop had been spoliated.  Anderson represented that her husband Dan had accidentally caused the partial installation of a Windows XP operating system on her MTSD laptop on August 14, 2009.  (Doc. No. 122 at pp. 29-34.)  She stated that she asked her husband on or around July 15, 2009 to retrieve certain documents from her laptop which she needed for her new job in Kane, Pennsylvania.  She claimed that Dan attempted to access the documents for her on August 14, 2009 but was unsuccessful because the laptop manifested problems in booting up.  She further claimed that Dan attempted to address this problem by re-booting the computer from an operating system disc but abandoned the process after becoming apprehensive about damaging the files he was attempting to retrieve.  (Id. at pp. 30-32.)

On April 9, 2010, Defendants deposed Dan Anderson concerning these matters. Dan Anderson testified to the following facts:

a. In July 2009 Anderson had asked him to "get some work files off of [her laptop computer]" (Doc. No. 189-3 at p. 11);

b. Anderson told him she was having problems with the laptop and that "she couldn't get onto her computer," which Dan understood to mean that she could not use the laptop (id. at pp. 10-11, 21);

c. Between July 2009 and August 14, 2009, Dan and Maryann Anderson had been residing in Kane, Pennsylvania (where Plaintiff was newly employed as Superintendent of the Kane Area School District), except for a couple of weekends when they had returned to Erie; during this time the laptop was in Erie at the couple's Harborcreek home (id. at pp. 12-13);

d. August 14, 2009 was the first time Dan was at the Anderson's Harborcreek home where he could access the laptop (id. at p. 12); and

29

e. August 14, 2009 was the first time he ever attempted to operate Anderson's MTSD laptop (id. at p. 10).

Concerning his actions relative to the laptop on August 14, 2009, Dan Anderson testified to the following scenario:

a. He and Plaintiff spent the night of August 13 in Kane and left for Erie at 5:00 a.m.  They arrived in Erie at 7:00 a.m. and spent about 15 minutes at their Harborcreek home, after which time Dan took Plaintiff to a 7:30 a.m. doctor appointment and then to a deposition at the Knox Firm (Doc. No. 189-3  at pp. 13, 23);

b. Dan then returned to their Harborcreek residence at approximately 10:00 a.m. (id. at pp. 13, 23);

c. Prior to August 14, 2009, Dan had never used his wife's MTSD laptop and did not even know that he needed a password to log on to her laptop (id. at pp. 10, 24);

d. Upon returning home on the morning of August 14, 2009, Dan found Plaintiff's laptop on the kitchen table plugged into a wall outlet (id. at p. 13);

e. He picked up the lid of the computer and turned it on, but the screen was black; he then hit the power button and a screen came up with a message to the effect, "No system found," and the background was black (id. at p. 13);

f. He immediately turned off the laptop and located a system disk titled "XP Professional System Disk I" (id. at p. 14);

g. It was not Dan's intent to try to install something; rather, he was trying to get the computer to operate from the Windows XP installation disk in the external drive (id. at pp. 14-15);

h. After locating the system disk, he returned to Plaintiff's MTSD laptop computer, opened the disk drive, inserted the system installation disk, closed the drive and turned on the power (id. at p. 15);

i. The computer screen read something to the effect, "Do you want to install this system?" and the choices given were to "continue" or to "cancel" (id. at p. 15-16);

j. Using the "mouse" or touchpad, he moved the cursor to highlight "cancel," removed the disk and turned the computer off (id. at pp. 15-17);

k. He was never asked for a password and did nothing further with respect to Anderson's MTSD laptop computer (id. at pp. 16-17).

G. Plaintiff's Pending Rule 11 Motion is Filed

On August 23, 2010, Plaintiff filed the pending motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  The focus of this motion is Defense Counsels' allegations of intentional spoliation of evidence relative to the MTSD laptop and averments pertaining to alleged falsification of the Tri-State flier.  Plaintiff contends that:  (1) Defense Counsels' allegations of spoliation and falsification were not formed after a reasonable inquiry; (2) the allegations were presented for improper purposes, such as sidetracking the litigation, draining Plaintiff's resources, casting Plaintiff in a negative light, and seeking to improperly influence the Court; (3) the spoliation and falsification allegations were unwarranted by existing law; and (4) these allegations were not likely to have evidentiary support after a reasonable opportunity for further investigation.

In her brief in support of the Rule 11 motion [Doc. No. 184], Plaintiff elaborates on these complaints.  She objects that, rather than asking for leave to conduct additional discovery relative to their falsification and spoliation concerns, Defendants made their allegations of misconduct in an unequivocal fashion and requested outright dismissal of the action.  She states to the fact that Defendants' unequivocal accusations were not supported by their expert, Gregory Cancilla.  She faults Defense Counsel for misleading the Court into thinking that a large amount of new and relevant electronically stored information (ESI) had been rendered unrecoverable and that this had been done

in a purposeful fashion.  Moreover, Plaintiff contends that Defense Counsel knew or could easily have discovered numerous facts which directly undermine their theories of falsification and spoliation, including the following:

- little, if any, new files or relevant evidence were created on her MTSD laptop computer after Defendants conducted their April 7, 2009 imaging of her laptop;

- virtually all of the documents alleged to have been destroyed are likely recoverable;

- Dan Anderson accidentally caused minimal alteration to the hard drive of the laptop on August 14, 2009 when he attempted to start the computer from a Windows Operating system CD in order to obtain copies of work-related documents for Plaintiff;

- Plaintiff had no motive for falsifying the Tri-State flier because she had valid business reasons for her February 2007 overnight trip to Pittsburgh;

- Plaintiff did not have the opportunity to alter the Tri-State flier during the time frame alleged by Defendants because (i) she lacked access to a computerized version of the flier during the time period in question and (ii) her laptop was not functioning properly during that timeframe;

- there were numerous other digitized iterations of the Tri-State flier created by that organization which could have accounted for the copy which Plaintiff produced on August 5, 2009 with the errant date;

- since she could not have falsified the flier on her laptop as alleged, there was no motive for her to intentionally destroy ESI on her laptop;

- Plaintiff lacked any opportunity to engage in the spoliation of ESI during the relevant timeframe, and Defendants' theory that her husband undertook such activity on her behalf is unsupportable.

Plaintiff's Rule 11 Motion has been fully briefed and the parties have submitted their respective affidavits and exhibits relative to the motion.  In addition, the Court held a three-day hearing, during which time it heard opening statements and received evidence from the Plaintiff's expert witness, Theodore Pham, and the Defendants'

expert witness, Gregory Cancilla.  Following the hearing, both sides submitted proposed findings of fact and conclusions of law.  Based on the entirety of the record now before us,[8] this Court makes the following findings of fact and conclusions of law relative to the merits of Plaintiff's Rule 11 motion.

### III.    RULE 11 FINDINGS OF FACT

A. <u>Plaintiff's February 2007 Trip to Pittsburgh</u>

As of the time they filed their Joint Supplement, Defendants had objectively reasonable grounds to believe that Plaintiff's February 2007 trip to Pittsburgh was undertaken for personal reasons unrelated to the legitimate business of the MTSD and, as such, constituted a travel abuse.

Travel abuse on the part of Plaintiff could have had substantial ramifications relative to this lawsuit, given the fact that Anderson herself purported, as part of her First Amendment and Whistleblower claims, to have reported travel abuses committed by other MTSD personnel.  An instance of travel abuse on Plaintiff's part would reflect dishonesty and, potentially, a lack of good faith relative to her own Whistleblower claims.  In addition, Anderson had complained that one act of retaliation she endured as a result of her reporting was Maynard's refusal to allow her to attend a Penn State job fair; Maynard's professed reason for doing so was his belief that Plaintiff was using the occasion to meet a fellow administrator under circumstances that were personal and

---

[8] Plaintiff asserts as one of her proposed findings that "[t]he parties in the instant case agreed and informed the Court that the proposed findings of fact be bounded by the pleadings and testimonial evidence adduced during the January 2011 hearings."  (Pl.'s Proposed Findings of Fact and Conclusions of Law [Doc. No. 202] at p. 3, ¶ 24.)  Because our Rule 11 analysis is largely an objective one that must be based on facts known at the time of the challenged filing and not on information gained in hindsight, the Court does not adopt this proposed finding and will base its ruling on any relevant facts known to the Defendants and their counsel as of the time the Joint Supplement was filed, to the extent the same is documented in the record.

thatdid not constitute a prudent expenditure of MTSD funds.  (Doc. No. 65 at ¶¶ 35-36.)

Thus, the issue of possible travel abuse by Plaintiff had potential relevance in the

context of this case.  Moreover, any abuse of MTSD's travel policies on the part of

Anderson could have resulted in professional discipline for her.

Accordingly, the record supports a reasonable inference that, if Anderson did

knowingly incur illegitimate travel expenses, such an infraction would have been

consequential enough in the context of this litigation to provide a motive for her to

conceal the misconduct and/or be untruthful about it.

As we have noted, Anderson maintains that she had a legitimate purpose for her

over-night travel to Pittsburgh.  She has stated that she was aware of the fact that the

AASPA conference scheduled for Thursday, February 8, 2007 had been cancelled but

still planned to go down to Pittsburgh that day anyway to attend the Tri-State seminar

(which, she claims, she mistakenly believed was also scheduled to take place on

Thursday, February 8) and then meet with her AASPA mentor (Buganski) for the

remainder of that day.

Given the timeline of events which unfolded during the course of discovery,

however, Defendants could reasonably have believed that, in offering this explanation,

Anderson was not being forthright about the true nature and purpose of her Pittsburgh

trip and, in fact, had committed herself to perpetrating a falsehood – namely that her

Pittsburgh excursion was a business trip.  Plaintiff's reimbursements from MTSD were

premised upon her attendance at the AASPA seminar, which Defense Counsel knew

had been cancelled.  Initially, Plaintiff testified in an unequivocal manner that she

attended the AASPA conference on Thursday, February 8, 2007 and the Tri-State

34

Conference on February 9.  After Defense Counsel revealed their awareness that the AASPA conference had been cancelled, Plaintiff issued an errata statement to her prior testimony, which indicated only that she had attended the Tri-State conference on Thursday, February 8 rather than on Friday, February 9.  No reference was made as to any confusion concerning the date of the Tri-State seminar.  Similarly, no mention had been made in any of Plaintiff's emails about the Tri-State seminar she claims to have planned to attend.  Subsequently, Plaintiff amended her explanation once again, this time stating that she had *intended* to attend the Tri-State seminar but had not actually done so due to confusion concerning the date.  These discrepancies in Plaintiff's testimony could support a reasonable inference of poor memory on Plaintiff's part. However, because these discrepancies concern important details that one might expect the Plaintiff to have remembered, they could also support a finding that Plaintiff was being untruthful.

Moreover, Anderson's explanation is seemingly at odds with other facts in the record, namely:

a. Plaintiff was not registered to attend the Tri-State seminar to be held on February 8, 2007 (Doc. No. 132-20 at p. 12, ¶ 14);

b. Although Anderson repeatedly stated during her April 6, 2010 deposition that she arrived in Pittsburgh at 9:00 a.m. on Thursday, February 8, 2007, forensic evidence shows that she had sent an email to a colleague at 8:45 a.m. on the same date (Doc. No. 189-10 at pp. 25-27, 45; Doc. No. 189-15);

c. When confronted with her MTSD Employee Absence Request Form for the Tri-State conference, Anderson could not provide an explanation as to why the Form stated, in her own handwriting, "canceled weather," when in fact the December 12, 2006 conference had been canceled at least 8 days in advance, other than to say that that was what was in her mind (Doc. No. 189-10 at pp. 32-33, 38-39);

d.   Anderson's explanation about her travel plans contradicts an email which she sent to a co-worker on February 7, 2007, just one day before the trip, in which she stated that she would be at a seminar in Pittsburgh on Thursday *and Friday* (Doc. No. 189-10 at p. 43; doc. No. 189-15);

e.   As of December 5 and 6, 2006, Plaintiff had received two separate emails notifying her of the correct date and time of the Tri-State Conference, which was to be held on Wednesday, February 7, 2007.  The metadata reports for these two emails confirm that both emails were opened and displayed on the computer screen used by someone with access to Plaintiff's password-protected email account, leading to the reasonable inference that Plaintiff personally opened these emails, viewed the information contained in them, and therefore was not confused as to the actual date of the Tri-State seminar (Doc. No. 109-3 at pp. 4-6, ¶¶ 15-27; id. at pp. 8-23).

Evidence concerning discrepancies in the various versions of Plaintiff's chronology arguably provide further support for Defendants' position.  Unlike the version of Anderson's chronology which was designated as Deposition Exhibit 220 (the one which Anderson produced on the last day of discovery and which bears a final entry date of August 22, 2008), the version designated as Deposition Exhibit 222 (bearing a final entry date of November 6, 2008) has no entry for February 8 or 9, 2007 relative to the AASPA or Tri-State conferences.  This could reasonably support an inference that the February 9, 2007 entry found on Exhibit 220 which *does* reference AASPA and Tri-State was added sometime *after* November 2008 and prior to August 14, 2009, contrary to Plaintiff's deposition testimony that the entry was added in the month of February 2007.  This in turn supports a reasonable inference that Anderson "manufactured" this evidence after the fact in order to support her story regarding her Pittsburgh trip after becoming aware of the implications this incident had relative to her own alleged "whistleblower" reports of travel abuses.

36

At the time Defendants filed their Joint Supplement, they possessed an affidavit from Chester Kent, the presenter of the Tri-State seminar, that Plaintiff had supplied on the last day of discovery.  (Doc. No. 122-16.)  Plaintiff submitted this affidavit to support her position that the flier produced on August 5, 2009 had originated from Tri-State. However, Mr. Kent's affidavit does not preclude a finding of falsification or otherwise render Defendants' theory implausible.  Mr. Kent does not state that the flier with the errant date originated with Tri-State – only that Plaintiff had "learned" that the conference would be held on Wednesday, February 8, which was "a mistake."  (Id. at p. 2, ¶ 9.)  This information can reasonably be interpreted as mere hearsay which Mr. Kent obtained from Plaintiff herself.  Mr. Kent also avers that Plaintiff subsequently called him and met with him to receive the materials (id. at ¶ 12) – conduct which could be construed as consistent either with a legitimate scheduling mistake or an attempt by Plaintiff to give her travel plans an appearance of business legitimacy.

Thus, although the record does not compel a finding that Anderson was untruthful concerning her explanation as to the nature and purpose of her Pittsburgh trip, the record could support a reasonable inference of untruthfulness on her part.

Plaintiff faults Defense Counsel for not conducting a more thorough investigation into the purpose of her trip prior to filing their Joint Supplement.  She objects that Defense Counsel did not attempt to contact Kent.  She states that, had they done so, Defense Counsel would have learned, *inter alia*, that a flier with an incorrect date but correct day of the week had been sent out for at least one Tri-State seminar.  This assertion is derived from a supplemental affidavit from Kent dated October 19, 2009. (Doc. No. 122-17 at pp. 1-7.)

However, this affidavit establishes that Tri-State conducts at least thirty seminars each year, and Kent could only remember one instance where a conference flier was sent out with the wrong day but correct date.  Kent did not state that the February 7, 2007 Tri-State seminar in Pittsburgh involved a flier with an erroneous date. (Doc. No. 122-17 at pp. 5-6, ¶¶ 34, 39.)  Thus, Kent's affidavit is of limited evidentiary value in terms of shedding light on the validity of the flier produced by Anderson on August 5, 2009.

Moreover, Kent's affidavit reaffirms the fact that Defense Counsel did attempt to gather information concerning the validity of Anderson's alleged attendance at the Tri-State seminar following her July 30, 2009 deposition.  It is undisputed that Defense Counsel contacted a Tri-State representative by the name of Diane Kirk in an (unsuccessful) attempt to gather any archived emails and attachments relative to the February 7, 2007 seminar and that Counsel obtained confirmation, based on Tri-State's then-existing records, that:  (a) Anderson was not registered for the seminar; (b) MTSD did not pay for her attendance; and (c) Anderson did not "check into" the seminar on the date it was held.  (Doc. No. 132-20 at pp. 2-3, 6, ¶¶ 7, 19-20, 44; id. at pp. 10-12, ¶¶ 4, 7-14.)  Thus, on balance, Mr. Kent's affidavit is not supportive of a finding that Defense Counsel failed to investigate the facts surrounding the Tri-State seminar.

Plaintiff also insists that Defendants could have simply confronted her with the information they felt contradicted her version of events rather than try to catch her in a lie.  However, to the extent Plaintiff was inclined to be untruthful and self-serving concerning her trip, such an approach would have allowed Plaintiff to mold her testimony as she went, thereby tainting the Defendants' investigatory process.  Because

Defense Counsels' inquiry relative to Plaintiff's travel plans involved matters concerning her knowledge and intent – i.e. facts uniquely within Plaintiff's control and not easily verifiable by independent means – Defense Counsel acted in an objectively reasonable fashion in trying to obtain an "untainted" version of her explanation for the Pittsburgh trip by withholding certain information.

Furthermore, even if Defense Counsel had been privy to Plaintiff's explanation *prior* to filing their Joint Supplement, they would not have been compelled to accept it as truthful, given the fact that Plaintiff's explanation is contradicted by other aspects of the record and given the potential motive Plaintiff would have had to be untruthful about any illegitimate travel expenses she had recouped.

B. The Alleged Alteration of the Tri-State Flier

There are numerous factual disputes in the record concerning Plaintiff's alleged motive and opportunity to falsify the Tri-State flier produced on August 5, 2009.  These disputes arise from the fact that the evidence of record allows for competing inferences concerning the issue of falsification.

As the Court has already determined, this record supports (though does not mandate) a reasonable inference that Plaintiff's February 2007 Pittsburgh trip was undertaken for personal reasons unrelated to the legitimate business needs of MTSD. The record further supports (though does not compel) a reasonable inference that Plaintiff requested and received reimbursements for that trip, knowing that she was not entitled to such reimbursements.  These inferences, if accepted, would supply a motive for Plaintiff to attempt to conceal her misconduct by seeking to portray her Pittsburgh

trip as business-related.  Accordingly, the record supplies a plausible motive for alteration of the Tri-State flier.

At the time they submitted their Joint Supplement, Defense Counsel had objectively reasonable grounds to believe that there was evidentiary support, albeit circumstantial, for their allegation that Plaintiff had altered the Tri-State flier.

At the time they filed the Joint Supplement, Defense Counsel were aware that, as of December 5 and 6, 2006, Plaintiff had had access to two separate Word versions of a Tri-State flier indicating the correct date (February 7, 2007) and time of the Tri-State seminar.  (Doc. No. 109-3 at pp. 4-6, ¶¶ 15-27; id. at pp. 8-23; Doc. No. 200 at p. 7.) These emails were discovered as the result of a mail merge performed by MTSD on March 21, 2007.  Thus, both emails were known to have resided in Plaintiff's MTSD email account at least from December 6, 2006 to March 21, 2007.  (Doc. No. 199 at pp. 126-27; Doc. No. 200 at pp. 7-8.)

The metadata from these emails indicates that both were opened by someone having access to Plaintiff's user identification and password, presumably Plaintiff herself.  (Doc. No. 198 at pp. 160-62, 167-68; Doc. No. 199 at pp. 87, 198-99; Doc. No. 200 at pp. 5-6; Hearing Ex. N, O.)  Although computer forensics cannot conclusively establish that the opened emails were read by Plaintiff, such an inference is reasonable.

Since the mail merge did not delete these emails from Plaintiff's account, the December 5 and 6 Tri-State emails would have remained in Plaintiff's account until such time as they were deleted.  (Doc. No. 200 at p. 8.)  Because the emails were not found on the image of Plaintiff's laptop that was taken on April 7, 2009, it is clear that they

were removed from her account at some point prior to that date.  (Doc. No. 198 at pp. 70-71, 122; Doc. No. 199 at p. 127.)

Nevertheless, the fact that the emails were removed from Plaintiff's MTSD email account at some point between March 21, 2007 and April 7, 2009 does not necessarily mean they were inaccessible to her thereafter.  From a forensic standpoint, there are various scenarios whereby Plaintiff would have been able to access a digitized copy of the Tri-State Word-formatted flier even after the December 5-6, 2006 emails were deleted from her MTSD email account.  For example, while the emails and their attached fliers were still present in Plaintiff's MTSD account, she could have remotely accessed them from her home computer and saved them directly to that computer or to a USB device, making them available for later use.  Alternatively, Plaintiff could have transferred the emails and/or the attached Word fliers directly to a USB device using her laptop.  (Doc. No. 199 at pp. 87-88, 194-95, 199-201.)

Plaintiff has admitted using one memory stick with her laptop computer, which she claims she returned to MTSD along with her laptop.  However, forensic analysis has revealed that she actually used at least three memory sticks.  (Doc. No. 189-6 at pp. 4, 8, 22-23; Doc. No. 190-2; Doc. No. 195 at p. 14; Doc. No. 198 at p. 101; Doc. No. 199 at p. 62; Doc. No. 200 at pp. 13-14, 30-31; Hearing Ex. T.)

Under either of the foregoing scenarios, Plaintiff would have had the Word formatted fliers available to her even after they were deleted from her MTSD email account.  (Doc. No. 199 at pp. 199-201.)  Moreover, because the fliers were in Word format, Plaintiff would have been able to easily make changes to the document within a

matter of seconds, and with just a few key strokes, once she accessed the document. (Doc. No. 198 at p. 163.)

As of the date they filed their Joint Supplement, Defendants did not know whether or not Plaintiff had undertaken measures to preserve the Word-formatted fliers in digital form.  However, their lack of certainty in this regard did not render their falsification theory totally implausible or objectively unreasonable, given that:  (i) Plaintiff's representation that she had tried unsuccessfully to attend the Tri-State seminar was at odds with other aspects of the record; (ii) Defendants had a plausible basis to believe that Plaintiff's alleged unsuccessful attempt to attend the Tri-State seminar in February 2007 was a fiction; (iii) Plaintiff could not provide any details as to how she came into possession of the flier with the errant date, other than to say it had just appeared on her desk; (iv) there is no evidence of any other person having received the flier with the errant date, expressing confusion about that particular seminar, or attempting to attend the seminar on February 8, 2007; and (v) Plaintiff undeniably had access to a digital Word version of the Tri-State flier in 2006 and 2007 and possibly in 2008 as well.

In addition, Plaintiff's August 5, 2009 production of the Tri-State flier and Defense Counsels' later discovery of the December 2006 Tri-State emails occurred in the context of other discovery anomalies.  Circumstantial factors provided grounds for Defense Counsel to reasonably believe that Plaintiff had been untruthful concerning whether she had possessed or had access to the Weichler Report prior to the date of her initial disclosures.  Similarly, Defense Counsel had reasonable grounds to suspect that Plaintiff had not been forthcoming in her production of her self-styled "chronology."

These discovery disputes provide some circumstantial support to the conclusion that Defendants were not objectively unreasonable in challenging the truthfulness of Plaintiff's account of her February 2007 trip.

Plaintiff contends, however, that Defendants' theory is undermined by the metadata for the December 2006 Tri-State emails, which indicates that there were eight digital versions of the flier.  (Hearing Ex. N and O.)  According to Plaintiff, this evidence renders Defendants' theory of falsification implausible because Defense Counsel cannot account for the other six versions of the flier.

This Court is not persuaded that the referenced metadata necessarily renders implausible Defendants' theory that the copy of the flier with the errant date originated with Plaintiff and not Tri-State.  As a matter of computer forensics, the number of revisions to a document is merely indicative of the number of times the document had been opened and saved; it does not necessarily indicate that there were multiple discreet versions of the Tri-State flier in existence or circulating in digital or hard-copy form.  (Doc. No.198 at pp. 163-64; Doc. No. 199 at pp. 85-86, 118, 194-97.)

Alternatively, Plaintiff insists that Defense Counsel did not conduct a proper investigation into their suspicions of document alteration.  Plaintiff maintains that a responsible investigation would have conclusively shown that she lacked the opportunity to alter the flier in the manner and within the timeframe alleged by Defendants (i.e. July 30 to August 5, 2009).  Specifically, Plaintiff contends that further investigation would have established the following:

- her laptop was rarely used during the summer of 2009 because it functioned poorly;

- the laptop was not operating in a Windows environment at all between July 25 and August 7, 2009, meaning that Plaintiff could not have accessed a document in Microsoft Word on the laptop during this time frame;

- after March 19, 2009 Plaintiff was not actively employed with MTSD and had no VPN access to her MTSD email account, meaning that she could not have accessed the digitized Word versions of the Tri-State flier via Microsoft Outlook during this time frame; and

- Plaintiff took new employment with the Kane Area School District as of July 15, 2009 and did not have her laptop with her, having left it at her Harborcreek home.

The Court is not persuaded that further investigation would have conclusively established the impossibility of Defense Counsel proving their alteration theory.  As we discuss below, the record adduced at the evidentiary hearing included credible evidence demonstrating that Plaintiff utilized her laptop on multiple occasions during the spring and summer of 2009.  This evidence contradicts Plaintiff's assertions that she used her laptop only sporadically due to poor functioning and/or because it was inaccessible while she was living and working in Kane, Pennsylvania.  This information, if uncovered by way of further investigation, would not have been helpful to Plaintiff.

It should be noted that further forensic investigation *does* indicate that Plaintiff's laptop was not operating in a Windows environment between July 25 and August 7, 2009, meaning that Plaintiff could not have altered the flier in Word format on her laptop computer during the timeframe July 30 to August 5, as Defense Counsel originally thought.  (Doc. No. 199 at pp. 149-154, 159.)  Plaintiff posits that Defense Counsel should have been able to discover this fact through a minimally responsible forensic investigation.

However, in order for Cancilla to have arrived at the fact that the laptop was not operating in a Windows environment during the July 25- August 7, 2009 timeframe, he would have needed to engage in what he termed "manual carving" of the hard drive. (Doc. No. 199 at pp. 154-55.)  Defense Counsel's failure to undertake such specialized forensic measures prior to filing their Joint Supplement was not objectively unreasonable because, based on information received from their expert, further data recovery analysis was projected to be both time consuming and expensive.  Defense Counsel did not believe their clients should have to bear those costs.  Plaintiff's expert acknowledges that data recovery analysis in this case could potentially cost thousands of dollars.  (Doc. No. 198 at p. 135.)  Regardless of the actual cost, however, Defense Counsel were not independently in a position to evaluate this potential expense at the time they filed their Joint Supplement and had to rely instead on the expertise of Cancilla and his estimate of the expense.

Moreover, even if this information had been uncovered by Defense Counsel prior to filing the Joint Supplement, it would not render the Defendants' document falsification theory totally implausible.  If the Word version of the flier had been saved to a USB device, Plaintiff could have used any computer at any time to edit the Tri-State flier, including during the time frame July 24 to August 7, 2009.  (Doc. No. 199 at pp. 199-201.)

Plaintiff has also asserted that her VPN access to MTSD emails was cutoff as of March 29, 2009, making her incapable of accessing the Tri-State fliers, if indeed they were still in her email account at that point.  Once again, however, Plaintiff's lack of VPN access would be irrelevant if she had saved a digitized copy of the Tri-State flier in

Word format on an external memory device.  Even if Plaintiff had accessed the flier via

a USB device in 2007 or 2008, a LNK file evidencing such action would likely have

expired by the time Plaintiff's laptop was reimaged on April 7, 2009, making it

impossible to forensically prove one way or the other whether this occurred.  (Doc. No.

198 at pp. 133-34.)

The only way for one to know whether Anderson saved the Word fliers to a

memory device is to examine the device itself.  (Doc. No. 199 at pp. 90-91, 158.)

Plaintiff's deposition testimony that she only ever used one memory stick in relation to

her MTSD laptop is contradicted by forensic evidence, showing that she used at least

three such devices.  Because Plaintiff denies the existence of multiple USB devices,

and because the one such device that Plaintiff acknowledged using has not been

produced in discovery, no expert has been able to inspect any USB device utilized by

Plaintiff for evidence of the Tri-State flier.  (Doc. No. 198 at pp. 129-31.)

Thus, further forensic investigation would not necessarily have exculpated

Plaintiff, given the material inaccuracies in her testimony concerning the number of USB

devices that she used.  These material discrepancies could support (although not

compel) a reasonable inference that Plaintiff was being untruthful.  Further, an inference

of untruthfulness would support the additional inference that Plaintiff was aware she

possessed a USB device containing evidence unfavorable to her.

Plaintiff contends that it is implausible to believe she would have saved the Tri-

State flier to a memory device in 2006 or 2007 because she would not have foreseen at

that time any need to do so.  Defendants credibly maintain, however, that there are

numerous reasons why Plaintiff could have been motivated to preserve a digitized copy of the flier in 2007 or 2008, namely:

- Plaintiff and Buganski were planning to meet in Pittsburgh even after receiving notice that the AASPA seminar had been cancelled, and saving documents regarding the Tri-State seminar could provide an explanation for the Pittsburgh trip if it were ever questioned;

- Plaintiff claims to have been investigating travel abuses by other MTSD employees in early 2007, was known to maintain a binder documenting such information, and may have saved documents related to her own travel;

- Plaintiff knew that her MTSD laptop was to be turned into the School District in mid-March 2007 to be examined in connection with an internal School Board investigation, and she may have downloaded emails and documents from her laptop at that time;

- Attorney Kuhar had met with Frank Szallay, the District's Business Manager (who also happened to be a friend and colleague of Plaintiff's) in April and May of 2007 with regards to their investigation of alleged travel abuses, and Kuhar had apparently questioned the need for Plaintiff's overnight stay during her Pittsburgh trip;

- Plaintiff was aware no later than December 2008 that Defense Counsel were questioning Plaintiff's attendance at various conferences with Buganski based upon documents subpoenaed from MTSD;

- Plaintiff had saved and produced other documents related to the AASPA conference and the Tri-State conference, such as her absence request forms, and she clearly had possessed the copy of the Tri-State flier that was produced by her attorney on August 5, 2009.

Based on the foregoing, Defendants had an objectively reasonable basis to believe, as of the time they filed their Joint Supplement, that evidentiary support existed for their theory of document alteration.

C.  The Alleged Spoliation of ESI on Plaintiff's Laptop

On September 18, 2009, Cancilla examined a forensic, bit-by-bit image of the hard drive of Plaintiff's MTSD laptop that he had taken on September 4, 2009.  Cancilla discovered that the hard drive and data stored on the hard drive had been significantly altered by virtue of a partial reinstallation of a Windows XP operating system on the laptop, that had occurred on August 14, 2009.  (Doc. 109-4 at ¶¶ 31-34; Doc. No. 199 at p. 103-06, 203-06; Hearing Ex. P.)

Cancilla reported to Defense Counsel that a significant amount (and perhaps all) of the data on the laptop hard drive may have been deleted, corrupted, overwritten, or made otherwise unrecoverable as a result of the partial installation.  To illustrate this point, Cancilla utilized a forensic tool which allowed him to compare the general characteristics of Plaintiff's laptop hard drive as it existed both in September 2009 and in the previous April 7, 2009 image (before the attempted reinstallation).  Cancilla's analysis showed that, while 11,196 emails existed on the April 7 image, no emails existed on the September 4 image.  The analysis further showed that, of the 16,897 documents which existed on the April 7 image, only 106 existed on the September 4 image.  (Doc. No. 109-4 at ¶¶ 36-38; Doc. No. 199 at pp. 104-07, 111-12, 167-70, 205-06, Hearing Ex. P.)

Cancilla concluded from this analysis that many documents had been deleted, some had been overwritten as a result of the partial installation, and some of the deleted documents might not be recoverable.  (Doc. No. 199 at pp. 205-06.)

Prior to Defendants' filing of the Joint Supplement, Cancilla advised Defense Counsel that a forensic recovery analysis would have to be performed in order to

determine what, if any, data could be recovered.  He further advised them that he could

make no guarantees about the degree to which data might be recoverable.  Finally,

Cancilla advised Defense Counsel that a recovery analysis would be both time

consuming and expensive, and he estimated the cost of such analysis to be at least

$5,000.00.  (Doc. No. 109-4, ¶¶ 38-39; Doc. No. 199 at pp. 106-07, 111-12.)

Defense Counsel instructed Cancilla not to undertake a recovery analysis

because they believed that Plaintiff should pay for such measures.  (Doc. No. 199 at pp.

111-12; Doc. No. 200 at pp. 12-13.)  Instead, Defense Counsel checked with MTSD's

information technology department to ensure that the chain of custody with respect to

Plaintiff's laptop had been secure and that no tampering had occurred while the laptop

was in MTSD's possession (Doc. No. 109-5).  Counsel then filed their Joint Supplement

in which they alleged that Plaintiff had altered the Tri-State flier and purposefully

spoliated electronically stored information on her laptop in violation of the Federal Rules

of Civil Procedure.

The inference of intentional spoliation of the laptop was not implausible under the

circumstances, given that Defendants had reasonable grounds to believe that:  (i)

Plaintiff had made non-contemporaneous edits to her chronology, particularly as it

pertained to her February 2007 Pittsburgh trip; (ii) Plaintiff had altered the Tri-State flier

so that it would comport with her explanation concerning her Pittsburgh trip; and (iii)

Plaintiff therefore would have had a motive to eliminate any evidence of the foregoing

from her laptop.

Plaintiff contends that Defense Counsel violated Rule 11 of the Federal Rules of

Civil Procedure by misrepresenting the degree of ESI potentially lost as a result of the

49

partial installation and by failing to conduct a proper investigation into the facts of

Defendants' spoliation theory.  A minimal investigation, Plaintiff says, would have

revealed to Defense Counsel that:  (a) virtually no relevant or discoverable information

had been added to the computer since its imaging on April 7, 2009; (b) any deleted files

were almost certainly capable of being recovered; (c) the partial installation of the

Windows system that occurred on August 14, 2009 was unintentional and had occurred

as a result of innocent actions by Plaintiff's husband; (d) Plaintiff was not in a position to

have caused the partial installation at the time it occurred; and (e) there was no motive

for Plaintiff to have engaged in, or directed someone else to engage in, the purposeful

spoliation of ESI.

(a)

With regard to the first point, Plaintiff maintains that, with minimal investigation,

Defense Counsel could easily have learned that virtually no new discoverable

information resided on the MTSD laptop in light of the imaging that had occurred just

five months earlier on April 7, 2009 and the fact that Plaintiff had used the laptop only

sporadically thereafter.  Plaintiff attributes her sporadic use of the laptop to the fact that:

- she experienced operational problems with it after receiving it back from the District following the April 7, 2009 imaging;

- she had been informed in March of 2009 by MTSD's new Superintended that she should not perform any more work for the District and that her future email communications would be monitored;

- the laptop remained at Plaintiff's Harborcreek residence, whereas Plaintiff primarily resided in Kane after taking up new employment there on July 15, 2009;

- Plaintiff had at her disposal a home computer for her use while she was off work from the District; and

50

-       Plaintiff did not use the laptop to open and modify her "chronology" but instead
        used a memory stick and/or her home computer.

(Doc. No. 122 at pp. 31-32.)

Defendants dispute Plaintiff's assertion that she used the laptop only sporadically after April 7, 2009 and/or that it was not operational.  The evidence presented at the evidentiary hearing supports a finding that Plaintiff actually made significant use of her computer between April 7 and August 14, 2009, having accessed a significant number of files.  (Doc. No. 200 at pp. 10-12, 28, 38-39; Hearing Ex. Q.)

Cancilla presented evidence demonstrating activity on the laptop occurring on July 21, 2009, August 12, 2009 and August 14, 2009.  The exhibits presented by Cancilla support a finding that Plaintiff was accessing documents on the laptop, using USB devices with the laptop, and accessing files with names that suggest a relationship to this litigation or to work-related documents that Plaintiff may have wanted to access in connection with her new job.  (Doc. No. 200 at pp. 28-39; Hearing Ex. Q, T, V, W, and BB.)

The forensic evidence also supports a finding that three different USB devices were plugged into Plaintiff's laptop on May 5, June 16, July 21, July 24, and August 12, 2009.  (Hearing Ex. A-2, T.)  In addition, the evidence supports a finding that substantial activity occurred on the laptop on July 13, 21, and 24 and August 12, 2009, potentially including opening a document, saving a document, deleting a document, or copying a document to a USB device or other portable storage media.  Throughout these events, the laptop was operational.  (Doc. No. 199 at pp. 31-37; Hearing Ex. A-3 through A-6.)

The evidence submitted at the evidentiary hearing supports a finding, to a reasonable degree of forensic certainty, that Plaintiff's laptop was functional during the

summer of 2009 and, indeed, was working up until August 14, 2009.  (Doc. No. 199 at

p. 37.)  In light of Dan Anderson's April 9, 2010 testimony that he did not have access to

Plaintiff's password and did not even know that her laptop required a password, it is

reasonable to infer that Plaintiff was the one operating her laptop on these occasions.

Thus, even if further forensic investigation had been undertaken by Defense

Counsel prior to filing the Joint Supplement, such an investigation would not have

demonstrated the absence of new and relevant electronic data on the laptop and,

therefore, would not have rendered the Defendants' concern about the loss of

discoverable information implausible.

(b)

Plaintiff also strongly objects to Defendants' representation in the Joint

Supplement that "thousands" of documents had been effectively "placed in a shredder"

by virtue of the partial installation which occurred on August 14, 2009.  Plaintiff notes

that the mere fact that files are "deleted" does not mean they are forever lost.  She

insists that Defendants should have undertaken data recovery measures before making

allegations that relevant electronic data had been spoliated.  Had such measures been

undertaken, Plaintiff argues, Defendants would have realized that they could not

establish any prejudice as a result of the events of August 14, 2009 and would have had

no grounds to request that the instant case be dismissed.

Here, there is no dispute that the partial installation of the Windows XP operating

system onto Plaintiff's MTSD laptop computer caused the hard drive to be reformatted.

(Doc. No, 198 at p, 168; Doc. No. 199 at pp. 7, 18, 104, 108, 169-70, 203-04.)  The

reformatting of the hard drive caused files and data to be sent to unallocated space of

the hard drive, where they could be overwritten as files were loaded during the partial

reinstallation of the Windows XP operating system.  (Doc. No. 199 at pp. 7, 12-13.)

      Cancilla expounded on these events in his November 18, 2009 affidavit:

    a. During the installation of the Windows XP operating system the installer chose to format or reformat the partition in which Windows was to be installed after being warned that formatting the hard drive would delete all files on the hard drive.

    b. The installation continued to load files to the hard drive, overwriting portions of the hard drive that cannot be recovered using industry standard computer forensic techniques.

    c. At some point during the installation the process was stopped and the operating system was not fully installed, which rendered the computer inoperable to the ordinary user.

    d. Because the partition was formatted prior to the attempted operating system installation, data on the hard drive is not recoverable without the use of specialized tools to carve deleted files from the unallocated space of the hard drive.

    e. Because the partition was formatted and the partial installation occurred, some files may not be fully recoverable to allow a complete analysis of the activity on Plaintiff's MTSD laptop computer between the April 7, 2009 image and the attempted reinstallation on August 14, 2009.

(See Doc. No. 127-13.)

      The parties' respective experts agree that the partial installation of the Windows

XP operating system on Plaintiff's laptop resulted in the previously existing files on that

computer being inaccessible to the casual user.  (Doc. No. 199 at pp. 10-13; Doc. No.

200 at pp. 20-21.)

      In addition, the evidence of record indicates that some files that were placed on

Plaintiff's laptop between April 7, 2009 and August 14, 2009 had been overwritten as a

result of the partial installation and are therefore unrecoverable.  Among the items

overwritten was a file labeled "Outlook.pst," which contained emails, attachments to emails, contacts and calendar information.  (Doc. No. 198 at pp. 63, 136-37, 145; Doc. No. 199 at pp. 12-13, 19-22, 171, 205-06.)

As a result of the partial installation of the Windows XP operating system on the laptop, there is no way to definitively determine from a computer forensics standpoint whether documents or other files existed or were created, deleted, or accessed on Plaintiff's laptop computer between April 7 and August 14, 2009.  Forensic recovery efforts would have been required in order to determine which files, if any, could be recovered following the partial installation of the Windows XP operating system.  (Doc. No. 199 at pp. 63, 106-07, 111-12.)  Plaintiff's expert agreed that it would have been impossible to know precisely what files were overwritten on Plaintiff's laptop and that additional, time-consuming and expensive forensic analysis would have been necessary to explore those issues.  (Doc. No. 199 at pp. 19, 63, 106-07, 111-12.)  While diagnostic measures could have been undertaken to obtain a preliminary determination of the number of files that might be recoverable, such measures would not have been able to identify the validity of the files, as some files may have been damaged.  (Doc. No. 199 at pp. 107-08.)

In sum, Defendant's attorney may well have overstated the degree of lost electronic data when he stated that "thousands" of documents had effectively been "shredded" by virtue of the partial installation of the Windows XP operating system onto the laptop computer.  However, this does not preclude a reasonable possibility that prejudice could be inferred as a result of the events of August 14, 2009.  Moreover, regardless of the extent to which electronic data could ultimately be recovered, the

apparent attempt at spoliation (even if ultimately unsuccessful) still legitimately raised spoliation concerns.

(c)

Plaintiff also contends that Defense Counsel unreasonably failed to ascertain that she could not have engaged in the partial installation which occurred on August 14, 2009 because she spent the morning travelling to Erie, attending a doctor's appointment, and attending a deposition.

Evidence adduced at the hearing suggests that the partial installation of the Windows XP operating system most likely commenced at 10:06 a.m. on August 14, 2009 and was terminated around 10:25 to 10:30 a.m.  (Doc. No. 200 at pp. 112-18.) However, based on evidence available to him at the time the Joint Supplement was filed, Cancilla had initially concluded that the effort to reinstall the Windows XP operating system had occurred between 6:00 and 6:30 in the morning.  (Doc. No. 109-4 at ¶ 34; Doc. No. 200 at pp. 114-15.)  Defense Counsel did not act unreasonably in relying on Cancilla's original time estimate, as the matter involved specialized forensic expertise which Defense Counsel did not personally possess.

According to Plaintiff's account of her activities on the morning of August 14, she would have been traveling from Kane to Erie during the time when the partial installation was originally thought to have occurred.  Plaintiff has maintained that she attended a Kane School Board meeting on August 13 which lasted until approximately 11:00 p.m., then retired to bed and awoke at 4:30 a.m. the next morning in order to make her prescheduled doctor appointment at 8:00 a.m. on August 14.  (Doc. no. 122 at p. 30.)

55

However, based upon the minutes from the school board meeting which Plaintiff

had submitted (which indicated that the Board meeting had adjourned around 8:45 p.m.

on the 13th), Defendants inferred that Plaintiff and her husband could plausibly have

traveled to Erie that same night and arrived at a reasonable hour, thus placing Plaintiff

in Erie at 6:00 a.m. on the morning of August 14 when the partial installation was

believed to have occurred.   (Doc. No. 189 at p. 22, n. 9; Doc. No. 122-22 at p. 8.)

Consequently, Defendants had a reasonable basis to believe that Plaintiff and/or her

husband would have had access to the laptop at the time the partial installation was

thought to have occurred.

(d)

Plaintiff maintains that a proper investigation would have also demonstrated to

Defendants that the partial installation was not purposeful but, rather, the accidental

result of innocent actions on the part of her husband as he attempted to access files

from the computer which Plaintiff required in her new job.  Thus, Plaintiff posits, a

properly conducted investigation would have established there was no basis to believe

Plaintiff was in a conspiracy with her husband to intentionally destroy ESI.

Defendants maintain that many of the representations made by Plaintiff or her

husband relative to the events of August 14, 2009 are contradicted by the forensic

evidence developed by the parties' respective experts.  One such representation relates

to the functionality of the laptop in the spring and summer of 2009.  Plaintiff has

asserted that the reason her husband was using the laptop on August 14, 2009 was that

she had asked him in mid-July to retrieve school-related files for her use in her new

position as Superintendent of the Kane Area School District.  Plaintiff maintains that she needed Dan to do this for her because the laptop no longer functioned properly after she received it back from MTSD in April of that year.  Dan Anderson corroborated this explanation in his own deposition testimony given on April 9, 2010.  (Doc. No. 122 at p. 32; Doc. No. 124 at pp. 32-34; Doc. No. 200 at pp. 25-28; Hearing Ex. S.)

As we have previously discussed, however, the forensic evidence supports a finding that Plaintiff's laptop was utilized on numerous occasions in the summer of 2009 by someone (presumably Plaintiff) who had access to Plaintiff's password.  (Doc. No. 199 at p. 37; Doc. No. 200 at pp. 28-29; Hearing Ex. Q, V, W, BB.)  Thus, the forensic evidence can reasonably be viewed as contradicting Plaintiff's assertions that her laptop computer was inoperable or of limited use during the summer of 2009 and that she needed her husband to try and download documents for her due to those operational problems.

In addition, assuming that the partial installation began at approximately 10:06 a.m. on August 14, 2009, as Plaintiff's expert believes, forensic analysis shows that someone was operating the laptop that same morning several hours prior to 10:00 a.m. Specifically, the files recovered and the event log manually recovered by Plaintiff's expert demonstrate that the laptop was being operated beginning at 6:49 a.m. on August 14.  The forensic evidence also shows that someone using Plaintiff's "SID Number"[9] was operating the laptop at 7:25 and 7:31 a.m.  (Doc. No. 200 at p. 52-56; Hearing Ex. 5, Z, BB.) Again, because Plaintiff's laptop was password protected,

---

[9] A SID Number is a unique identification number assigned to a particular user.  (Doc. No. 199 at pp. 4-5; Doc. No. 200 at pp. 53-54; Hearing Ex. 5, Z.)

anyone logging on with her credentials would had to have known her user name and password.  (Doc. No. 199 at pp. 6, 54-55, 197-98; Doc. No. 200 at pp. 55, 94, 104; Hearing Ex. 5.)  However, Dan Anderson has claimed that he did not know his wife's password and did not even know that a password was needed for the laptop.

Forensic evidence similarly indicates that there was activity on Plaintiff's MTSD laptop computer and that files were being accessed between 7:36 and 9:35 on the morning of August 14, 2009.  (Doc. No. 200 at pp. 57-59; Hearing Ex. 5, BB.)  The Event Log confirms that there was activity on the laptop up to about 20 or 30 minutes before the partial installation began (approximately 9:30 a.m.) and that the computer had been booted and was operable.  (Doc. No. 199 at p. 31.)  The Event Log also shows repeated instances of codes "6005," "6006" and "6009," which indicate user-initiated actions; thus, an operator had to be sitting at the computer on the morning of August 14, 2009, taking the actions necessary to cause these events to occur.  (Doc. No. 200 at pp. 80-81,86-87, 90.)  Accordingly, credible forensic evidence rebuts Plaintiff's account of the events.

There is no dispute that someone initiated a partial installation of a Windows XP operating system on August 14, 2009, causing the computer's hard drive to be reformatted.  (Doc. No. 198 at p. 168; Doc. No. 199 at pp. 7, 108, 169-70.)  When reformatting occurs, the existing partition in the hard drive is destroyed, a new partition is created, and new files are copied to the hard drive, resulting in the new files overwriting existing files or file fragments.  (Doc. No. 199 at pp. 15-19; Hearing Ex. X.)  However, reformatting does not begin immediately upon insertion of the operating system disk into the computer.  Rather, it occurs if the operator makes a series of

affirmative choices.  (Doc. No. 199 at pp. 15-19; Hearing Ex. X.)  Thus, the actions

taken relative to Plaintiff's MTSD laptop on August 14, 2009 required intentional,

volitional and affirmative actions by the operator.  (Doc. No. 199 at pp. 26-29, 49-60;

Doc. No. 200 at pp. 5, 39-51.)  In other words, in order for the partial installation to have

proceeded as far as it did on August 14, 2009, the operator would have confronted one

or more screens warning the operator that proceeding further will result in the deletion

of files or data.  The forensic evidence in this case establishes that the operator who

conducted the partial installation on August 14, 2009 had taken affirmative action to

proceed past one or more of the aforementioned warning screens.  (Doc. No. 199 at pp.

28-29, 49-62; Doc. No. 200 at pp. 39-47, 136-37; Hearing Ex. D, F, G, H, I, J, K, L, X.)

　　　　Defense Counsel reasonably posit that, if Dan Anderson had attempted to boot

his wife's MTSD laptop computer from the Windows XP installation disk as he claimed,

he would have been confronted with a series of screens and prompts and the system

would have gone through a step where it inspected the configuration, after which the

user would have been presented with a screen that read, "Welcome to set up."

(Hearing Ex. X.)  During his deposition, Dan Anderson was presented with an exhibit

depicting this process as well as with images of other screens that Defendants suggest

Dan would have seen.  However, Dan Anderson testified that he had never seen these

screens before.  (Doc. No. 189-3 at pp. 43-44, 50-56; Hearing Ex. X.)

　　　　Based on the foregoing, the record supports a reasonable inference that the

process by which the Windows XP operating system was partially installed on the laptop

could not have happened as described by Dan Anderson.  Accordingly, Plaintiff has not

shown that further forensic investigation would have revealed the plausibility of Defendants' spoliation theory.

(e)

Finally, Plaintiff insists that, with the benefit of an appropriate investigation, Defense Counsel could have adduced facts establishing that Plaintiff had no motive to destroy information on her laptop computer.  Specifically, Plaintiff states that she lacked any motive to destroy ESI because:  she did not know when she turned her computer back over to the District on August 21, 2009 that it would be re-imaged by Cancilla; she did not use the laptop to directly open and modify the chronology or to alter the Tri-State flier; and she did not have the "track edits" feature activated on her laptop, meaning that Defendants would not have been able in any case to audit the changes to her chronology.

As we have noted, however, the evidence adduced at the hearing supports a finding that Plaintiff's proffered explanation as to how the partial installation occurred and the reason her husband was operating the laptop on August 14, 2009 in the first place was materially inaccurate.  This finding in turn supports (though it does not compel) a reasonable inference that Plaintiff proffered an inaccurate explanation in order to conceal the fact that her husband was trying to eliminate electronic data on Plaintiff's laptop as it existed on August 14, 2009.

## IV.    CONCLUSIONS OF LAW

In this case, Defense Counsel sought sanctions in connection with alleged document falsification and spoliation of ESI.  A decision whether or not to award

sanctions rests in the sound decision of the Court.  *Dunn v. Mercedes Benz of Ft. Washington, Inc.*, 2012 WL 424984 at *4 (E.D. Pa. Feb. 10, 2012) (*citing Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994)).  Where evidence has been spoliated, potential sanctions may include dismissal of a claim or granting judgment in favor of a prejudiced party, suppression of evidence, an adverse inference, fines, and attorneys' fees and costs.  *Mosaid Techs. Inc. v. Samsung Elecs. Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004); Ogin v. Ahmed, 563 F.Supp.2d 539, 545 (M.D. Pa. 2008)*.

Courts apply a two-part test to determine whether to impose spoliation sanctions. Initially, the court must decide if the conduct at issue constitutes spoliation of evidence by asking four questions: (1) Was the evidence in the party's control?; (2) Was the withheld or lost evidence relevant to the claims or defenses in the case?; (3) Has there been actual suppression or intentional withholding of evidence?; and, (4) Was there a reasonably foreseeable duty to preserve the evidence at the time it was destroyed? *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012); *see also, Ogin*, 563 F.Supp.2d at 543.  If these questions are answered in the affirmative, the court then must go on to decide the appropriate sanction to be imposed, considering (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and deter similar conduct by others in the future.  *Bull,* 665 F.3d at 74 n.5; *Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994).

In asserting their request for spoliation sanctions in their Joint Supplement, Defense Counsel did not violate Rule 11 by failing to conduct a reasonable investigation

into the underlying facts.  The sufficiency of an investigation is informed by consideration of such factors as the amount of time the signing attorney had to conduct an independent investigation, the need to rely on the client for information as to the facts, and whether the signer had to rely on prior counsel or another member of the bar. *Ellis v. Beemiller, Inc.,* 287 F.R.D. 326, 329 (W.D. Pa. 2012) (citing authority).

Here, Defense Counsel believed, not unreasonably, that time was of the essence in bringing the alleged discovery violations before the Court because (a) discovery had already closed after several extensions; (b) further extension of discovery would require leave of Court and, potentially, Court oversight; and (c) argument was set to occur on October 6, 2009 relative to Defendants' original Joint Motion for Dismissal and/or Sanctions.  Defense Counsel had already consulted their computer forensics expert concerning the preliminary results of his September 18, 2009 examination of the laptop computer, and they reasonably understood that data recovery efforts would be both time consuming and expensive.  To the extent further investigation would have entailed consulting Plaintiff concerning facts uniquely within her own knowledge and control, Defense Counsel did not violate Rule 11 by failing to simply inquire into, and accept at face value, her version of events.  This is particularly true given the tortured history of this litigation, the uncommon degree of acrimony between the parties, and Defense Counsel's objectively plausible belief that Plaintiff had not been completely forthright during the discovery process.

This was not a situation where Defense Counsel needed to rely on their client or prior counsel for relevant information bearing on the allegations in the Joint Supplement. However, there was a need for Defense Counsel to rely heavily on the expertise of Mr.

Cancilla, given the degree to which the Defendants' concerns about falsification and spoliation revolved around electronically stored data and the forensic analysis thereof. Here, Defense Counsel did not violate the mandates of Rule 11 by relying on their expert's conclusions as set forth in Mr. Cancilla's affidavit of October 5, 2009.

To the extent Plaintiff faults Mr. Cancilla for not conducting the type of data recovery analysis undertaken by Mr. Pham, we conclude that no Rule 11 violation has been established.  Counsel was entitled to rely on Mr. Cancilla's estimate as to the likely cost of meaningful data recovery, which was projected to be substantial, and Counsel was not objectively unreasonable in seeking to have the Plaintiff assume those costs. Similarly, to the extent the record reveals disputes between Mr. Pham and Mr. Cancilla concerning highly technical matters, Defense Counsel cannot be faulted for relying on the opinions espoused by their own expert, as the subject matter of the experts' respective analyses was well beyond a lay person's ken.

Defense Counsel did not make factual contentions in support of their Joint Supplement that were unlikely to have evidentiary support after a reasonable opportunity for investigation or discovery.  While the record here would not have compelled an award of sanctions, Defendant Counsel had an objectively reasonable basis for believing that they could support their allegations of document alteration and spoliation of ESI with competent, albeit circumstantial, evidence.

Defense Counsel had an objectively plausible basis for establishing Plaintiff's control over the Tri-State flier and her MTSD laptop at the time the discovery violations were alleged to have occurred.

Defense Counsel had an objectively plausible basis for establishing the

relevance of the allegedly altered Tri-State flier, as the flier was an important piece of

evidence relating to Plaintiff's February 2007 Pittsburgh trip, and the trip pertained to

one aspect of Maynard's defense to the Plaintiff's claim of retaliation.  Defense Counsel

also had an objectively reasonable basis for believing, as of the time they filed their

Joint Supplement, that Plaintiff had orchestrated the intentional deletion of ESI from her

laptop under circumstances where the laptop may have harbored evidence of document

alteration of other discovery violations.  Such evidence would have had relevance

inasmuch as this Court has an inherent interest in ensuring that discovery is conducted

fairly and in accordance with the Federal Rules of Civil Procedure.

Defense Counsel had a reasonably objective basis for believing that Plaintiff had

a duty to preserve the ESI on her MTSD laptop, notwithstanding the fact that discovery

was supposed to have closed on the date of the alleged spoliation.  As of August 14,

2009, the litigation was still pending and discovery had been extended several times. It

was conceivable that any ESI created on Plaintiff's laptop after the April 7, 2009 imaging

might remain relevant, or at least potentially discoverable, given the nature of the

discovery disputes that were still ongoing.

Although Defense Counsel may have overstated their case for spoliation

sanctions by implying that thousands of electronic files had been irreparably lost, the

Court is not persuaded that this conduct now warrants an imposition of sanctions under

Rule 11.  Whether spoliated evidence could be recovered is a relevant consideration,

but not the sole consideration.  *See Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d

863, 868 (3d Cir. 1984).  Other relevant factors of concern would have included the

extent of the Plaintiff's own personal responsibility relative to the alleged document falsification and spoliation, the history of alleged misconduct, whether the alleged misconduct was willful or in bad faith, the effectiveness of sanctions other than dismissal, and the meritoriousness of the parties' claims or defenses. *Id.*

Here, for all of the reasons set forth above in the Court's findings of fact, we conclude that Defense Counsel had an objectively reasonable basis to believe that the assertions contained in the Joint Supplement (and/or the verbal assertions made in support thereof) were well-grounded in fact. This is not to say that Defendants would ultimately have persuaded this Court that document falsification and/or spoliation of ESI in fact occurred in this case. The Court need not, and will not, decide that issue today. For present purposes, it is sufficient to conclude that Defense Counsels' theories, as set forth in the Joint Supplement and oral argument, were at least plausible based on the evidence initially known to them and subsequently developed by way of additional investigation.

The Court is not persuaded that Defense Counsels' allegations in the Joint Supplement were made for an improper purpose in violation of Rule 11. To be sure, this litigation has been uncommonly acrimonious, as the Court has already observed. Nevertheless, the fact that Defense Counsels' theories were plausible supports the conclusion that the attorneys' allegations were not motivated by improper purpose, such as to drain Plaintiff's resources, or sidetrack the litigation with irrelevant collateral issues.

Defense Counsel did not violate Rule 11 by making legal contentions that were unwarranted by existing law. Defendants reasonably asserted in their Joint Supplement

65

that Plaintiff had a continuing obligation under the Federal Rules of Civil Procedure and interpreting case law to preserve ESI on her laptop, and that any information added by Plaintiff to the laptop after April 7, 2009 was discoverable.  Even if Plaintiff was the individual who conducted the partial installation of the Windows XP operating system on August 14, 2009, she could be held responsible if her husband acted at her direction and, thus, as her agent.

Based on this Court's review of the record, including all of the material circumstances surrounding the filing of the Joint Supplement, the Court concludes that Defense Counsels' conduct relative to the Joint Supplement and/or the October 6, 2009 oral argument was objectively reasonable.

In sum, the present case does not present the type of "exceptional circumstance" where the Defendants' Joint Motion was so "patently unmeritorious or frivolous" as to merit an award of sanctions.  *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account,* 618 F.3d 277, 297 (3d Cir. 2010) (citation omitted). Consequently, this Court concludes that Plaintiff has failed to satisfy her burden of proving that Defendants or their counsel violated Rule 11.

## V.   CONCLUSION

In light of the foregoing findings of fact and conclusions of law, Plaintiff's motion for sanctions under Rule 11 of the Federal Rules of Civil Procedure will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARYANN ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  1:07-cv-111-SJM |
| v. | ) | |
| | ) | |
| BOARD OF SCHOOL DIRECTORS | ) | |
| OF THE MILLCREEK TOWNSHIP | ) | |
| SCHOOL DISTRICT, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

AND NOW, to wit, this 16th Day of August, 2013, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law,

IT IS ORDERED that Plaintiff's Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11(b) shall be, and hereby is, DENIED.

s/     Sean J. McLaughlin

Sean J. McLaughlin
Chief United States District Judge

cc:     All counsel of record.

67