IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MARYANN ANDERSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-111-SJM |
| | ) | |
| SUSAN SULLIVAN, DEAN | ) | |
| MAYNARD and REBECCA | ) | |
| MANCINI, | ) | |
| Defendants. | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW


McLAUGHLIN, SEAN J., Chief District Judge

This matter is before the Court upon Plaintiff MaryAnn Anderson's ("Anderson") motion for spoliation sanctions against Defendant Maynard and/or his counsel, and/or third-party Millcreek Township School District's ("MTSD," "the District" or "the School District") counsel.  [Doc. No. 233].  An evidentiary hearing was held on this motion on April 10-13, 2012 and May 1-3, 2012.  Although this Court has entered summary judgment in favor of all Defendants, we specifically retained ancillary jurisdiction to adjudicate the instant motion for sanctions. [Doc. No. 286 at p. 69-71].

In the underlying lawsuit, Anderson alleged that she was retaliated against by officials employed by, or associated with, the Millcreek Township School District ("MTSD," "the District" or "the School District") because she made several whistleblower reports against the District and its top administrators.   Her claims against Susan Sullivan (a former member of the MTSD School Board), Dean Maynard (MTSD's former Superintendent)

("Maynard"), and Rebecca Mancini (a former fellow administrator) ("Mancini") for violation of her First Amendment rights and the Pennsylvania Whistleblower Act ("PWA") remained potentially viable when summary judgment motions were filed. [Doc. No. 286 at p. 1 & n.1]. This Court's memorandum opinion granting Defendants' motion for summary judgment contains an extensive and detailed summary of the factual background of this case. [Id. at p. 3-29].   We will presume the reader's familiarity with those facts, will reiterate only those matters relevant to the pending motion, and will discuss facts relevant to a particular piece of allegedly spoliated evidence in context.

The following constitutes the Court's Findings of Fact and Conclusions of Law.

I.    FINDINGS OF FACT

A.  Background Facts: The Anonymous Letter Investigation and Anderson's Lawsuit

FOF 1)     Defendant Mancini was hired to replace Anderson as MTSD's Supervisor of Special Education and Student Services in August of 2006, at which time Anderson assumed the position of Director of Personnel for the District. [Doc. No. 286 at p. 3].

FOF 2)     Shortly after being hired, Mancini raised concerns regarding how a federal reimbursement program for Medicaid-eligible special education students, referred to as ACCESS, had been administered during Anderson's tenure. [Id. at p. 4-6].

FOF 3)     Problems relating to MTSD's past administration of the ACCESS program led to an internal investigation by the District's Solicitor, and eventually, referral to, and investigation by, various Federal and Commonwealth agencies and offices. [Id. at p.

8-20].

FOF 4)     Due to Mancini's inquiries regarding and challenges to Anderson's past administration of the ACCESS program, the working relationship between Mancini and Anderson quickly became antagonistic.

FOF 5)     By the end of 2006 both Mancini and Anderson had contacted their supervisor, Defendant Maynard, MTSD's Superintendent, to seek his assistance in resolving the resulting workplace conflict. [Id. at p. 7-8].

FOF 6)     Around the same time, another chain of events began that involved both Anderson and Maynard.   In January of 2007, Maynard inadvertently sent an email to an MTSD teacher, instead of to the intended recipient. [Id. at p. 20].

FOF 7)     The email was notable in that it allegedly revealed previously undisclosed personal relationships that Maynard had with two people he had recommended for employment with the District. [Id.].

FOF 8)     Shortly after this misdirected email was sent, Maynard received an anonymous letter at his home regarding the contents of the email which threatened to accuse Maynard of various things if he did not resign as Superintendent. [MTSD Ex. #2; Doc. No. 286 at p. 20].

FOF 9)     A similar letter was received, around the same time, by the presidents and vice-presidents of MTSD's Parent Teacher Student Associations, as well as the building presidents. [MTSD Ex. #3; Doc. No. 254 (Hearing Transcript ("H.T.") Vol. II) at p. 459-60; Doc. No. 259 (H.T. Vol. V) at p. 1140].

FOF 10)     Maynard made the MTSD School Board aware of this anonymous letter  during an executive session held in the evening on March 12, 2007, and also

notified the local police about the threat. [Doc. No. 286 at p. 21; Doc. No. 254 (H.T. Vol. II) at p. 324-25, 328, 331-33; Doc. No. 256 (H.T. Vol. IV) at p. 736-40; Doc. No. 259 (H.T. Vol. V) at 1051-52; Doc. No. 261 (H.T. Vol. VII) at p. 1470-74, 1508].

FOF 11)     The School Board initiated an investigation into the source of the letter, which included a directive that the MTSD-issued computers of certain individuals, including Maynard and Anderson, be searched for evidence that one of them had authored the anonymous letter. [Doc. No. 286 at p. 21; Doc. No. 254 (H.T. Vol. II) at p. 326-27; Doc. No. 259 (H.T. Vol. V) at p. 1074].

FOF 12)     The anonymous letter investigation intersects with this lawsuit because Anderson alleged that she made her first of three whistleblower reports when she surrendered her computer to the District for such examination.

FOF 13)     Although Maynard called Anderson while she was out of the office on March 16, 2007 and instructed her to deliver her laptop to him personally the following day, which was a Saturday, Anderson refused. [Doc. No. 286 at p. 22; Doc. No. 254 (H.T. Vol. II) at p. 345-46; Doc. No. 261 (H.T. Vol. VII) at p. 1523-24].

FOF 14)     Instead, she contacted the District's Solicitor in order to make arrangements to deliver the computer to him directly. [Doc. No. 286 at p. 22; Doc. No. 261 (H.T. Vol. VII) at p. 1523-27].

FOF 15)     When Anderson met the Solicitor at a gas station in the evening on March 16, 2007 to do so, she told him that she was refusing to deliver the laptop directly to Maynard because Anderson feared that Maynard would tamper with it.   [Doc. No. 286 at p. 22; Doc. No. 256 (H.T. Vol. IV) at p. 742-43, 762-63, 779-81; Doc. No. 259 (H.T. Vol. V) at p. 977-78; Doc. No. 261 (H.T. Vol. VII) at p. 1525-27].

4

FOF 16)     Although Anderson alleged that these statements constituted whistleblower reports, at summary judgment this Court concluded that these statements made by Anderson to the Solicitor were not constitutionally protected speech because they were made in her capacity as a public employee of MTSD rather than as a private citizen, and did not qualify as whistleblower reports under the PWA because they did not disclose any non-technical violation of law. [Doc. No. 286 at p. 34, 47].

FOF 17)     This Court similarly found that Anderson's second alleged whistleblower report, i.e., a March 28, 2007 letter from her attorney to MTSD's Solicitor, was not constitutionally protected speech for the same reason and did not qualify as a report of waste or wrongdoing under the PWA.   [Id. at p. 37-41, 51-53].

FOF 18)     Finally, this Court held that Anderson's last alleged whistleblower report, i.e., a document hand delivered by Anderson to the District's solicitor on April 19, 2007, did not constitute constitutionally protected speech for the same reason, and was not actionable under the PWA because no retaliation post-dated it.   [Id. at p. 41-43, 53-54].

FOF 19)     On this same date, April 19, 2007, Anderson filed her writ of summons in state court.   She filed her complaint in federal court on May 11, 2007.

B.  <u>General Facts Applicable to Anderson's Motion</u>

FOF 20)     In her motion for sanctions, Anderson accuses Maynard and/or his counsel, and/or the District's counsel of destroying various pieces of evidence.   [Doc. No. 286 at p. 70-71; <u>see</u> <u>generally</u>, Doc. No. 233].[1]

FOF 21)     Notably, most of this allegedly-destroyed evidence related to the anonymous letter investigation.

FOF 22)     First, Anderson contends that Maynard destroyed the hard drive that was originally installed in his MTSD-issued laptop computer ("Seagate #1") after it was removed so that the District could not analyze it for traces of the anonymous letter during the District's internal anonymous letter investigation. [Doc. No. 265 at ¶ 122].

FOF 23)     Second, Anderson contends that Maynard rendered the hard drive that was put into his MTSD-issued laptop when Seagate #1 was removed during the anonymous letter investigation ("the Hitachi") unrecoverable by purposefully employing some type of scrambling or wiping software. [<u>Id</u>. at ¶ 282].

FOF 24)     Third, Anderson alleges that Maynard, having allegedly destroyed both of his laptop hard drives, also destroyed copies of emails found on MTSD's centralized servers for the time period between March and December of 2007. [<u>Id</u>. at ¶ 271].

---

[1] It is not always clear which allegations of spoliation Anderson is making against which accused party. Therefore, unless the identity of the accused party is material to the legal analysis, or unless Anderson is clear in her papers, we will consider each of Anderson's spoliation claims as having been made against Maynard, his counsel and the District's counsel, and will refer to them collectively as "Maynard."  Even though MTSD is a non-party the distinction is legally inconsequential for purposes of this opinion.  The standard of proof for Anderson to obtain attorneys' fees or fines from MTSD, or its attorneys, would be as high, if not higher, under either section 1927 or our inherent powers, as it would be to impose spoliation sanctions against Maynard, or his attorneys under the spoliation test.   For this reason, if Anderson cannot satisfy her burden of proving that Maynard acted in bad faith, it follows that she would be unable to prove that MTSD's conduct was vexatious, willful, oppressive or egregious.

FOF 25)     And lastly, Anderson accuses an attorney at the law firm of Knox McLaughlin Gornall & Sennett, P.C. ("Knox"), which represents MTSD, of purposefully removing 44 pages from a 10,000 page production in response to a third party subpoena issued to the District by Defendant Mancini on October 27, 2008 ("the October 2008 Subpoena") in order to conceal the fact that the District was unable to analyze Seagate #1 during the anonymous letter investigation. [Id. at ¶ 248].

II.     LEGAL AUTHORITY

     A.     Spoliation of Evidence

     The decision to sanction parties rests in the sound discretion of the District Court.     Dunn v. Mercedes Benz of Ft. Washington, Inc., 2012 WL 424984, at *4 (E.D. Pa. Feb. 10, 2012) (citing Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994)).   The burden of proof on a spoliation claim lies with the party asserting that spoliation of evidence has taken place.   Byrnie v. Town of Cromwell, Bd. of Ed., 243 F.3d 93, 107–08 (3d Cir. 2001); Williams v. Klem, 2010 WL 3812350 (M.D. Pa. Sep. 22, 2010).

     Where evidence has been spoliated, potential sanctions include: (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs.   Mosaid Techs. Inc. v. Samsung Elecs. Co., 348 F. Supp. 2d 332, 335 (D.N.J. 2004); Ogin v. Ahmed, 563 F.Supp.2d 539, 545 (M.D. Pa. 2008).   Here, because judgment as a matter of law has already been entered and this case has been closed, the only possibly available sanctions are fines, attorneys' fees and costs.

Courts apply a two-part test to determine whether to impose spoliation sanctions. First, a court must decide if the conduct at issue constitutes spoliation of evidence by asking four questions: (1) Was the evidence in the party's control?; (2) Was the withheld or lost evidence relevant to the claims or defenses in the case?; (3) Has there been actual suppression or intentional withholding of evidence?; and, (4) Was there a reasonably foreseeable duty to preserve the evidence at the time it was destroyed? Bull, 665 F.3d at 73; see also, Ogin, 563 F.Supp.2d at 543. As to the second question, evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. FED. R. EVID. 401. As to the third question, our Court of Appeals has recently emphasized that there can be no spoliation of evidence without "bad faith conduct" or "intentional misrepresentation." Bull v. United Parcel Serv., Inc., 665 F.3d 68, 76-77, 79 (3d Cir. 2012). As to the fourth question, a litigant is under a duty to preserve what it knows, or reasonably should know, will likely be requested in either pending, or reasonably foreseeable, litigation. Mosiad, 348 F. Supp.2d at 336. When litigation is reasonably foreseeable is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry. Bull, 665 F.3d at 77-78. When litigation is reasonably foreseeable is a question of fact, which is evaluated objectively. Id. at 78.

Only if these four questions are answered in the affirmative should the court go on to decide the second part of the two-part test: the appropriate type of sanction to be imposed. Bull, 665 F.3d at 74 n.5. In doing so, a court is to consider three factors: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of

prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. Schmid, 13 F.3d at 79.

      B. The Power to Sanction Non-Parties

        1. Rule 45(e)

Rule 45(e) provides the primary mechanism by which a court can enforce a subpoena by holding a non-party in contempt. FED.R.CIV.P. 45(e); Beruashvili v. Hobart Corp., 2006 WL 2289199, at *1 (E.D.N.Y. Aug. 8, 2006)). A party seeking a civil contempt order must establish that: (1) a valid order, or subpoena, existed; (2) the accused individual had knowledge of the order; and (3) he or she disobeyed the order. Harris v. City of Philadelphia, 47 F.3d 1342, 1349 (3d Cir. 1995); see Casabona Properties, LLC v. Convire, Inc., 2010 WL 331346 (D.N.J. Jan. 20, 2010) (finding a contempt order unwarranted because subpoena was defective). These elements must be proven by "clear and convincing" evidence and ambiguities must be resolved in favor of the accused individual. Robin Woods, Inc. v. Woods, 28 F.3d 396, 398–99 (3d Cir. 1995). Thus, "[a] contempt citation should not be granted if there is ground to doubt the wrongfulness of the [party's] conduct." Harris, 47 F.3d at 1326 (citations omitted). Whether to hold a nonparty in contempt under Rule 45(e) is "within the discretion of the court." Barnes Foundation v. Township of Lower Merion, 1997 WL 169442, at *5 (E.D. Pa. Apr. 7, 1997).

2.  <u>Section 1927</u>

Pursuant to 28 U.S.C. § 1927, a federal court has the authority to require attorneys to pay costs and fees associated with unreasonable and vexatious conduct that "multiplies the proceedings." 28 U.S.C. § 1927.   However, the statute is to be construed narrowly and applied with great caution "only in instances of a serious and studied disregard for the orderly process of justice."   <u>LaSalle Nat'l Bank v. First. Conn. Holding Grp.</u>, 287 F.3d 279, 288, 289 (3d Cir. 2002) (internal quotation and editorial marks omitted).   The Court of Appeals for the Third Circuit has mandated that sanctions may not be imposed under section 1927 absent a finding of willful bad faith.   <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 278 F.3d 175, 188 (3d Cir. 2002).

3.  <u>Inherent Powers</u>

"[F]ederal courts have the inherent power 'to fashion an appropriate sanction for conduct which abuses the judicial process.'"   <u>Scott v. IBM Corp.</u>, 196 F.R.D. 233, 248 (D.N.J. 2000) (quoting <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44–45 (1991)). "Because of their very potency, inherent powers must be exercised with restraint and discretion" and only in the case of bad faith, vexatious, wanton or oppressive conduct. <u>Chambers</u>, 501 U.S. at 44, 45-46.   Generally, a court's inherent powers should be reserved for those cases in which conduct is egregious and no other basis for sanctions exists.   <u>Martin v. Brown</u>, 63 F.3d 1252, 1265 (3d Cir. 1995).

III.   <u>SPOLIATION OF SEAGATE #1</u>

A.   <u>Findings of Fact – Seagate #1</u>

FOF 26)   An attorney at the Knox law firm, Richard Perhacs, was placed in charge of the anonymous letter investigation. [Doc. No. 256 (H.T. Vol. IV) at p. 737-38, 753; Doc. No. 259 (H.T. Vol. V) at p. 1050-51; Doc. No. 261 (H.T. Vol. VII) at p. 1482].

FOF 27)   Perhacs retained Karen Panighetti, a computer forensic expert, to examine certain employees' computers in an attempt to identify the source of the anonymous letter.   [Doc. No. 253 (H.T. Vol. I) at p. 74-75; Doc. No. 260 (H.T. Vol. VI) at p. 1214; Doc. No. 261 (H.T. Vol. VII) at p. 1470-73, 1482, 1490-92].

FOF 28)   Both Anderson's MTSD-issued laptop computer and Maynard's MTSD-issued laptop computer were to be examined as part of the anonymous letter investigation. [Doc. No. 286 at p. 21; Doc. No. 254 (H.T. Vol. II) at p. 326-27; Doc. No. 259 (H.T. Vol. V) at p. 1074; Doc. No. 261 (H.T. Vol. VII) at p. 1470-73].

FOF 29)   To enable this examination, MTSD's Information Technology ("IT") Department planned to remove the original hard drives from the targeted employees' computers, replace them with a new hard drive onto which the employee's active files would be copied so that the laptop would function without interruption, and retain the original hard drives which would be transferred to Panighetti for analysis.   [Plain. Ex. #2; Doc. No. 253 (H.T. Vol. I) at p. 76, 105-07, 125; Doc. No. 254 (H.T. Vol. II) at p. 246, 335; Doc. No. 259 (H.T. Vol. V) at p. 1068-69].

FOF 30)   The copy of the employee's active files was not made for forensic purposes, but only so that active data could be immediately reinstalled onto the employee's

new replacement hard drive so that he or she could continue working.

FOF 31)    Although Panighetti received Anderson's original hard drive, she obtained a copy only of the active files found on Maynard's original hard drive. [MTSD Ex. #1 at p. 1, 4, Plain. Ex. #9 at p. 12].

FOF 32)    The circumstances surrounding the whereabouts of Maynard's original hard drive (Seagate #1) are the basis of Anderson's first spoliation contention.

FOF 33)    Anderson's contention that Maynard nefariously ordered that Seagate #1 be returned to service, or destroyed, so that Anderson could not gain access to its contents for purposes of this litigation is not supported by the record.

FOF 34)    Panighetti was engaged to investigate the source of the anonymous letter and did not have, and has never had, any involvement with or responsibilities regarding Anderson's lawsuit.   In fact, this litigation was not yet pending at the time Panighetti was hired to examine Seagate #1.   [Doc. No. 253 (H.T. Vol. I) at p. 74-75; Doc. No. 260 (H.T. Vol. VI) at p. 12-14].

FOF 35)    When Maynard and co-defendant Sullivan issued a third-party subpoena to MTSD in February of 2009 for, among other things, Seagate #1, Anderson moved to quash it, arguing that the subpoena sought irrelevant information. [MTSD Ex. #4 at ¶2-3, 12, and exhibit].

FOF 36)    Anderson never issued her own discovery request or subpoena seeking production of Seagate #1 during the discovery period of this case.   [Docket, July 29, 2008 text entry and June 30, 2009 text entry; MTSD Ex. #4 at ¶¶ 2-3, 12, and exhibit thereto; doc. no. 256 (H.T. Vol. IV) at p. 884].

FOF 37)      There is no forensic or physical evidence indicating what ultimately happened to Seagate #1 after it was removed from Maynard's MTSD-issued laptop computer.

FOF 38)      Forensic evidence indicates that March 15, 2007 is the last date on which Seagate #1 can be accounted for.

FOF 39)      On that date, a copy of the allocated, or active, space of Seagate #1 was made by using a software program called Ghost. [Doc. No. 254 (H.T. Vol. II) at p. 461; Doc. No. 255 (H.T. Vol. III) at p. 646-57, 664].

FOF 40)      Although the Ghost software has a setting that would enable the copying of a hard drive's unallocated space, where recently deleted items would be found, the MTSD IT Department did not have the knowledge or skills needed to enable such settings. [Doc. No. 253 (H.T. Vol. I) at p. 77-78, 82, 100-02, 114-18, 167; Doc. No. 260 (H.T. Vol. VI) at p. 1342-43; Doc. No. 261 (H.T. Vol. VII) at p. 1438, 1456-57].

FOF 41)      In addition, the Ghost copy was being made, not for forensic purposes, but only so that the employee's active files could be immediately copied to a replacement hard drive, allowing the user to continue working with minimal interruption, making it unnecessary to copy the unallocated space.

FOF 42)      Panighetti went to the administrative offices of MTSD on March 26, 2007, at approximately 8:15 a.m., to collect various hard drives as part of her investigation, and was given Anderson's laptop computer at that time.   [Doc. No. 254 (H.T. Vol. II) at p. 241-45].

FOF 43)      She did not obtain Maynard's hard drive until she returned to the building at 2:00 p.m., when she obtained a laptop with a "cloned image" of Maynard's hard

drive inside.   [MTSD Ex. #1 at p. 4; Plain. Ex. #9 at p. 12; Doc. No. 253 (H.T. Vol. I) at p. 75-76, 80-81, 84, 105, 157; Doc. No. 254 (H.T. Vol. II) at p.252-55; Doc. No. 255 (H.T. Vol. III) at p. 704-08 ].

FOF 44)      Forensic evidence establishes that between Panighetti's two visits to MTSD on March 26, 2007 a second copy was made of the March 15, 2007-created Ghost image of Seagate #1.   [Doc. No. 255 (H.T. Vol. III) at p. 522-23, 558, 573-77, 655-57].

FOF 45)      There is no dispute that the copy was made from the Ghost image that was created on March 15, 2007, and not from Seagate #1. [Id. at p. 523-24].

FOF 46)      The second copy of the Ghost image of Seagate #1 was placed on a hard drive located in Tom DelFratte's laptop, and the entire laptop was given to Panighetti. [Doc. No. 253 (H.T. Vol. I) at 84-85].

FOF 47)      Therefore, the hard drive given to Panighetti contained a copy of Maynard's active, or allocated, space, and DelFratte's unallocated space. [Id.].

FOF 48)      Maynard's unallocated space was not provided to Panighetti, and, presumably, could only have been found on Seagate #1, which Panighetti never obtained. [Id. at p. 85-86, 89, 100-01].

FOF 49)      When Panighetti was given this second copy of the Ghost image in the afternoon of March 26, 2007, Jim Lockhart, an MTSD IT Department employee, told her that it "was the best they could do" because "they mistakenly thought the exam on Maynard's computer was cancelled and that that hard drive [Seagate #1] was put back into circulation" and was untraceable. [Plain. Ex. #2; Doc. No. 253 (H.T. Vol. I) at p. 78-79, 81-84, 110; Doc. No. 255 (H.T. Vol. III) at p. 646-657, 664].

FOF 50)      There is no forensic or physical evidence as to the whereabouts or existence of Seagate #1 after March 15, 2007.

FOF 51)      There is no forensic or physical evidence as to when or why Seagate #1 became unavailable. [Doc. No. 255 (H.T. Vol. III) at p. 526-28, 716-17].

FOF 52)      Testimonial evidence on this issue, which was received by this Court five years after the operative events, was muddled and inconclusive.

FOF 53)      At best, there was an imprecise recollection that Seagate #1 was mistakenly returned to service, making its location untraceable. [Doc. No. 255 (H.T. Vol. III) at p. 653].

FOF 54)      Although several technicians from MTSD's IT Department, as well as the director of that Department, testified at the hearing, none had any specific recollection of physically making either the original Ghost copy of Seagate #1 on March 15, 2007, or the second copy on March 26, 2007. [Doc. No. 253 (H.T. Vol. I) at p. 159-60, 162-69, 172-73, 207-09; Doc. No. 254 (H.T. Vol. II) at p. 263, 280, 287-88, 293-94; Doc. No. 260 (H.T. Vol. VI) at p. 1343, 1346-47, 1377, 1384-85, 1406-09, 1415-16; Doc. No. 261 (H.T. Vol. VII) at p. 1448-49].

FOF 55)      Thomas DelFratte, MTSD's IT Director, did testify that he believes that he personally took Maynard's laptop from his office, then likely directed Lockhart to remove Maynard's hard drive from his laptop computer, deliver the original hard drive to him (DelFratte) and reinstall a copy of Maynard's active files onto a replacement hard drive so that Maynard could continue using his laptop, and then would have likely placed Seagate #1 in his office to await Panighetti's arrival to collect it. [Doc. No. 253 (H.T. Vol. I) at p. 190-91, 195-99; Doc. No. 254 (H.T. Vol. II) at p. 297-98].   However, DelFratte had no

15

specific recollection of any of these events.   Nor did Lockhart.

FOF 56)      No one from the District's IT Department testified as to having a personal recollection of placing Seagate #1 back into service, or of being told to do so, or of telling anyone else to do so. [Doc. No. 253 (H.T. Vol. I) at p. 221-26; Doc. No. 254 (H.T. Vol. II) at p. 259, 283-84, 287, 301, 313-14, 444; Doc. No. 260 (H.T. Vol. VI) at p. 1252; Doc. No. 261 (H.T. Vol. VII) at p. 1474-75].

FOF 57)      The Knox firm's notes, memos, and emails do not support the inference advanced by Anderson that Maynard purposefully destroyed Seagate #1.

FOF 58)      Instead, the most reasonable inference to be drawn from the documents identified by Anderson is that a miscommunication occurred during an ongoing, evolving and fast-paced internal investigation involving threats to the personal privacy of a high-ranking District employee.

FOF 59)      The documents identified by Anderson reflect that Maynard had a conversation with a School Board member, Terry Scutella, about the anonymous letter investigation, which Maynard interpreted as indicating that a review of his laptop computer was not necessary, but which Scutella interpreted as indicating that a review of Maynard's laptop computer was not a priority, but was still necessary.   [MTSD Exs. #7, #33; Plain. Ex. #38; Doc. No. 254 (H.T. Vol. II) at p. 336-38; Doc. No. 260 (H.T. Vol. VI) at p. 1263-65].

FOF 60)      Acting on his personal interpretation of this conversation, and his belief that the anonymous letter investigation was causing stress within the District, Maynard believes that he told DelFratte that a review of his laptop hard drive was no longer needed. [MTSD Exs. #7, #33; Doc. No. 260 (H.T. Vol. VI) at p. 1263-65].

16

FOF 61)      The record supports an inference that, at this point, Seagate #1 was returned to service.

B.      Conclusions of Law – Seagate #1

COL 1)      Seagate #1 was within Maynard's control.   The record establishes that after MTSD's IT Department removed Seagate #1 from Maynard's MTSD-issued laptop computer it was retained by the IT Department, whether it be in a locked cabinet or not.   Even though Seagate #1 was not retained in the physical possession of Maynard, we will interpret this record as supporting a finding that it was, at least, within Maynard's, or his counsel's or the District's counsel's constructive control, as they had the authority to issue instructions to the IT Department regarding Seagate #1.

COL 2)      Seagate #1 did not contain evidence relevant to Anderson's First Amendment/PWA claims.   The only thing that Seagate #1 would have that the Ghost image did not have is a copy of the unallocated space, or recently deleted items, on Maynard's hard drive as of March 15, 2007. [Doc. No. 253 (H.T. Vol. I) at p. 72-73].   As such, the inability to locate Seagate #1 resulted in the loss of only a subset of the evidence ever located on Maynard's laptop computer. Notably, Seagate #1 was collected as part of the anonymous letter investigation and not in connection with Anderson's lawsuit.   During discovery, Anderson never issued a discovery request or subpoena for Seagate #1 and, when opposing parties did so, she moved to quash the subpoena on the ground that it sought irrelevant evidence.

COL 3)      The irrelevance of the evidence lost from Seagate #1 is further demonstrated by the fact that this Court has already entered judgment as a matter of law on

17

the ground that Anderson's claims were legally, not factually, insufficient.   No type or amount of evidence that might be found in the unallocated space of Seagate #1 would change the fact that Anderson could not prevail on her First Amendment claims because she spoke in her capacity as a public employee, not a private citizen.   Similarly, no type or amount of evidence that might be found in the unallocated space of Seagate #1 would change the fact that Anderson could not prevail on her PWA claims because she failed to make a qualifying report of waste or wrongdoing, and did not suffer retaliation after any qualifying report was made.   To put a finer point on it, even if a deleted copy of the anonymous letter or a list of all the personal friends that Maynard planned to get jobs for within the District were found in the unallocated space of Seagate #1, Anderson's First Amendment and PWA claims would not thereby become legally viable.

COL 4)      Maynard did not actually suppress or intentionally withhold Seagate #1.

COL 5)      As the Court of Appeals recently reiterated in <u>Bull</u>, if Anderson cannot satisfy her burden of proving that Maynard engaged in bad faith conduct in connection with the failure to produce Seagate #1, she is not entitled to any spoliation sanctions.   <u>Bull</u>, 665 F.3d at 77, 79.   Although circumstantial evidence may suffice to make out this element, Anderson still must present some evidence to support a reasonable inference that Maynard acted in bad faith with the intent to destroy the evidence.

COL 6)      The record before me does not compel such an inference.   On the contrary, the record supports the conclusion that, after a discussion with one member of the School Board, Maynard heard one thing (the District does not need your hard drive any longer) while the Board Member heard another (the District does not consider your hard

drive to be a priority), resulting in an instruction from Maynard to remove Seagate #1 from the IT Department and place it back into service.   Even if Maynard were mistaken, I am not persuaded that he acted in bad faith with the intention to prevent Anderson from gaining access to the unallocated space of Seagate #1.

COL 7)        Moreover, the Court of Appeals in <u>Bull</u> also placed significant weight when considering the bad faith factor on the fact that the party moving for sanctions had never made a formal discovery request for the allegedly withheld evidence.   <u>Bull</u>, 665 F.3d at 74-75.   Here, Anderson never submitted a discovery request or third-party subpoena seeking production of Seagate #1 and, in fact, resisted her opposing parties' attempts to gain access to it on the ground that it was irrelevant.

COL 8)        Maynard did not have a reasonably foreseeable duty to preserve Seagate #1.   The only reasonable inference to draw from this record is that Seagate #1 became untraceable sometime prior to March 26, 2007, when Panighetti arrived to collect the hard drives.   As of that date, Anderson had not filed a writ of summons in state court or a complaint in federal court.

COL 9)        In fact, as of March 26, 2007 only two things had happened that could have had any possible connection to this lawsuit: first, on March 16, 2007, Anderson told the School District's Solicitor that she was refusing to give her laptop computer to Maynard because she thought he might tamper with it; second, on March 19, 2007, Anderson's attorney had written a letter to the School District's Solicitor indicating that Anderson believed that Maynard was treating her unfairly by refusing to allow her to attend meetings and job fairs. [Plain. Ex. #30; Doc. No. 286 at p. 22; Doc. No. 256 (H.T. Vol. IV) at p. 742-43, 762-63, 779-81; Doc. No. 259 (H.T. Vol. V) at p. 977-78; Doc. No. 261 (H.T. Vol. VII) at p.

1525-27].   Neither of these incidents was sufficient to put Maynard on notice of the potential for this lawsuit to be filed.

COL 10)       With respect to Anderson's March 16, 2007 statement, this Court has already concluded that the statement was neither protected speech under the First Amendment nor a report of "wrongdoing" within the meaning of the Pennsylvania Whistleblower Law.      [Doc. No. 286 at p. 34, 47].   As we have previously explained, Anderson's comments on that day were nothing more than one employee's explanation to her employer's attorney as to why she refused a superior's directive.   The comments evidenced workplace conflict and also personal distrust or disdain; however, there was nothing particularly incendiary or legally consequential about them.

COL 11)       Similarly, Anderson's letter of March 19, 2007 did not trigger any foreseeable duty on the part of Maynard to preserve Seagate #1.   The fact that the letter was authored by Anderson's attorney did not necessarily indicate that litigation was imminent, as Anderson's attorney had been retained months earlier when the School District's investigation into her operation of the ACCESS program began.

COL 12)       Nor would the content of the March 19, 2007 letter have led a reasonable reader to believe that litigation was imminent.   The letter was written to express Anderson's dissatisfaction with Maynard's decisions pertaining to her attendance at certain off-site events as well an internal team meeting.   Such routine employee complaints are not reasonably associated with litigation.   Moreover, Anderson's counsel had expressly stated in his letter that Anderson did not wish to enter into a confrontation with the District.   [Plain. Ex. #30; Doc. No. 256 (H.T. Vol. IV) at p. 775-76; Doc. No. 261 (H.T. Vol. VII) at p. 1530-31, 1535-36].   The District's attorneys credibly testified that they

considered this letter to be in reference to an administrative dispute between Anderson and Maynard and, based on their past experience with such matters, did not anticipate that it would lead to litigation.   [Doc. No. 256 (H.T. Vol. IV) at p. 760-61].   Thus, the March 19th letter cannot reasonably and objectively be construed as a "threat to sue" letter or an indication of impending litigation as would have triggered a reasonably foreseeable duty on the part of Maynard to preserve Seagate #1

COL 13)      Nor did Maynard have a reasonably foreseeable duty to preserve Seagate #1 based on the fact that the School District had hired a computer forensic expert to study Seagate #1.   Panighetti was retained by MTSD in furtherance of its internal investigation into the source of the anonymous letter, and the existence of that investigation did not make Anderson's retaliation lawsuit reasonably foreseeable.

COL 14)      Anderson has failed to satisfy her burden of proving that spoliation of Seagate #1 took place because, although Maynard retained control over Seagate #1, it could not have contained relevant evidence, Maynard did not actually suppress or intentionally withhold Seagate #1, and Maynard had no reasonably foreseeable duty to preserve Seagate #1.   Byrnie, 243 F.3d at 107-08.

COL 15)      Because there was no spoliation of evidence, we need not go on to the second part of the test and determine what type of sanction would be appropriate under the circumstances.

COL 16)      Given these findings and conclusions, the record does not support a finding of either willful bad faith in multiplying the proceedings or egregious abuse of the judicial process, making sanctions against either Maynard's or MTSD's attorneys pursuant to §1927 or our inherent authority unwarranted.

IV.    SPOLIATION OF THE HITACHI

A.    Findings of Fact – The Hitachi

FOF 62)    When Seagate #1 was removed from Maynard's MTSD-issued laptop computer on March 15, 2007, the District's IT Department presumably replaced it with a Hitachi brand hard drive. [Doc. No. 255 (H.T. Vol. III) at p. 516-17, 657, 680-81, 698-99].

FOF 63)    This Hitachi hard drive remained in Maynard's computer until Maynard returned the laptop to the School District in August of 2009.   [Doc. No. 254 (H.T. Vol. II) at p. 382-83, 448-49].

FOF 64)    Maynard returned the laptop in response to an August 6, 2009 email sent by the District's attorney to Maynard's attorney asking that the computer be given back to the District so that it could be returned to service. [MTSD Ex. #8; Doc. No. 256 (H.T. Vol. IV) at p. 919-21].

FOF 65)    At the time the District made this request, Maynard had not been an employee of MTSD for six months.   [Doc. No. 254 (H.T. Vol. II) at p. 312-13, 322-23, 370; Doc. No. 259 (H.T. Vol. V) at p. 1022].

FOF 66)    The District made the same request, via the same email, to Anderson's counsel because Anderson had also retained her MTSD-issued laptop computer even though she was also no longer employed by the District.   [MTSD Ex. #8; Doc. No. 286 at p. 3].

FOF 67)    Although discovery in this case had been pending for more than a year at the time MTSD asked Maynard to return his laptop to MTSD, Anderson had not issued any discovery requests or subpoenas for this item. [Doc. No. 256 (H.T. Vol. IV) at p. 921-24].

FOF 68)     Moreover, even though the email that requested the return of both Maynard's and Anderson's laptop computers explicitly stated that it was the District's intent to "put them back into service," Anderson did not object, did not ask that the laptop be preserved, and did not seek to examine the computer before it was assigned to another employee.   [Id.].

FOF 69)     Maynard delivered his laptop computer to the Knox firm in August of 2009 and the firm promptly delivered it to MTSD's IT Department. [Doc. No. 256 (H.T. Vol. IV) at p. 922-24].

FOF 70)     On the advice of the District's attorneys, Maynard's laptop was not returned to service, and instead remained in the IT Department.   [Id. at p. 924].

FOF 71)     Anderson's computer expert did not conduct any review of Maynard's laptop until almost two years after Maynard returned it to the District. [Doc. No. 255 (H.T. Vol. III) at p. 579, 586].

FOF 72)     When Anderson's expert attempted to image the Hitachi in June 2011 and July 2011, the hard drive did not contain any human readable text and was "scrambled."   [Plain. Ex. #23; Doc. No. 255 (H.T. Vol. III) at p. 528, 579-81, 583-87, 659-60].

FOF 73)     In Anderson's expert's opinion, the only explanation for the condition of the Hitachi in 2011 is that software was used to make the original data on the drive unrecoverable.   [Doc. No. 255 (H.T. Vol. III) at p. 590].

FOF 74)     There is no evidence in the record as to what software was used to destroy the hard drive, when it was used or by whom it was used.

FOF 75)     Additionally, Anderson's expert could not opine as to the intent of the

user of that software, and acknowledged that the user could have installed it accidentally, or without understanding what might result by doing so.   [Doc. No. 255 (H.T. Vol. III) at p. 683-84].

FOF 76)      Anderson explicitly accuses Maynard of "utilizing software specifically designed for wiping the contents of a drive with random characters to render the Hitachi scrambled." [Doc. No. 265 at ¶ 282].

FOF 77)      According to Maynard, the laptop was operational when he returned it to MTSD.   [Doc. No. 254 (H.T. Vol. II) at p. 382-83, 449-50]. I credit this testimony.

FOF 78)      There is also no evidence, forensic or otherwise, which establishes the software that was used to render the Hitachi unrecoverable.

FOF 79)      There is no evidence, forensic or otherwise, establishing who scrambled the Hitachi.

FOF 80)      There is no evidence, forensic or otherwise, to establish whether use of the software was purposeful or accidental.

B.      Conclusions of Law – The Hitachi

COL 17)      The Hitachi was within Maynard's control from between March 15, 2007 and August of 2009.

COL 18)      The Hitachi did not contain evidence relevant to Anderson's First Amendment/PWA claims.   Anderson's only contention in regards to this point is that, if she had been able to access the Hitachi, she might have had access to a local archive copy of Maynard's emails and documents drafted by Maynard related to this case and, therefore, she may have been able to produce more facts in support of her First Amendment and

24

PWA claims.   [See Doc. No. 265 at ¶¶ 308-09].   Even accepting this contention as true, it is without legal consequence inasmuch as this Court entered judgment as a matter of law on the ground that Anderson's claims were legally, not factually, insufficient, making it impossible for more factual support for her claims to cure their inherent legal deficiencies. The irrelevance of the Hitachi data is further evidenced by the fact that Anderson never requested permission to examine Maynard's MTSD-issued laptop computer in discovery, even when she was informed near the close of the discovery period that Maynard's laptop, like her laptop, would be returned to service.

COL 19)     The record does not support the conclusion that Maynard actually suppressed or intentionally withheld electronically stored information on the Hitachi. Anderson argues that, because Maynard once had possession of the Hitachi and it is now scrambled, Maynard therefore must have taken the affirmative act of using software to destroy the Hitachi before he returned it to the District in August of 2009.   However, as previously indicated, I credit Maynard's testimony that the Hitachi was operational when he returned it to the District.   There is no evidence, either direct or circumstantial, to establish that the Hitachi was scrambled prior to August 2009 when Maynard relinquished control of the Hitachi to the District.

COL 20)     The record does not support the conclusion that Maynard had a reasonably foreseeable duty to preserve the Hitachi.   At the time Maynard returned his laptop to MTSD in August of 2009, fact discovery in this case had been going on for more than a year, and was scheduled to close that same month; standing alone, this would indicate that Maynard had a duty to preserve the Hitachi.   However, Anderson had never issued a request for production or third-party subpoena to gain access to that piece of

25

evidence, nor did she seek preservation of Maynard's laptop even when she was informed that Maynard's laptop would be returned to service.   Although a laptop computer might, as a general matter, be an item a litigant would be charged with knowing to preserve during the pendency of a lawsuit, under these circumstances Maynard did not have a duty to preserve the Hitachi, a piece of evidence that Anderson expressed no interest in examining.

COL 21)      Anderson has failed to satisfy her burden of proving that spoliation of the Hitachi took place because, although Maynard retained control over the Hitachi prior to August of 2009, the record does not indicate when the Hitachi was rendered unrecoverable, the Hitachi could not have contained relevant evidence, Maynard did not actually suppress or intentionally withhold the Hitachi, and Maynard had no reasonably foreseeable duty to preserve the Hitachi.   Byrnie, 243 F.3d at 107-08.

COL 22)      Because there was no spoliation of evidence, we need not go on to the second part of the test and determine what type of sanction would be appropriate under the circumstances.

COL 23)      Given these findings, the record does not support a finding of either willful bad faith in multiplying the proceedings or egregious abuse of the judicial process, making sanctions against either Maynard's or MTSD's attorneys pursuant to §1927 or our inherent authority unwarranted.

V.      SPOLIATION OF SERVER COPIES OF MAYNARD'S EMAILS

   A.      Findings of Fact – Server Copies of Maynard's Emails

FOF 86)      Anderson contends that Maynard deleted from the District's centralized email server copies of emails sent by him, and to him, between March and

26

December of 2007.

FOF 87)        Anderson gained access during litigation to Maynard's emails from two different sources: the local copy of emails found on the second Ghost copy of Seagate #1 (local file; copy made on March 16, 2007), and the copy kept on the District's central server (server file; copy made in April of 2009). [Plain. Ex. #25; Doc. No. 255 (H.T. Vol. III) at p. 592-93, 670-72].

FOF 88)        Anderson contends that the pattern reflected in the number of emails found in these two places leads to the conclusion that Maynard purposefully deleted emails sent to him, and received by him, between March and December of 2007.   The record does not support Anderson's contention.

FOF 89)        Anderson filed this federal lawsuit on May 11, 2007, alleging that she made constitutionally and statutorily protected whistleblower reports in March and April of 2007.

FOF 90)        Anderson alleged that, as a result of these reports, she suffered specific retaliatory acts in March through May of 2007.

FOF 91)        Anderson also claimed that the entire ACCESS investigation, which began in late 2006, and did not ultimately conclude until 2012, was a retaliatory act.

FOF 92)        The discovery period relative to her claims opened in July of 2008 and, after four extensions, closed in August of 2009.

FOF 93)        Maynard left the employ of MTSD in April of 2008.   [Doc. No. 254 (H.T. Vol. II) at p. 322-23].

FOF 94)        Anderson left the employ of MTSD in July of 2009. [Doc. No. 286 at p. 3].

FOF 95)     Anderson made no request for Electronically Stored Information ("ESI") during the discovery period. [Doc. No. 255 (H.T. Vol. III) at p. 666-70].

FOF 96)     Knox never issued a litigation hold to its client, MTSD, to suspend routine electronic document deletion practices, or to specifically maintain or preserve certain emails for this case. [Doc. No. 254 (H.T. Vol. II) at p. 311-12, 319-21, 381; Doc. No. 256 (H.T. Vol. IV) at p. 759-60].

FOF 97)     Maynard credibly denied engaging in targeted deletion of emails, or having any knowledge of the condition of the District's servers.   [Doc. No. 254 (H.T. Vol. II) at p. 451-53, 456-57].

FOF 98)     No one discovered that Maynard's server emails were missing until 2011, well after discovery closed in this case, and four years after this case was filed. [Maynard Ex. #1].

FOF 99)     The data found on the exhibit used by Anderson's computer expert, Theodore Pham, to support his conclusion that the pattern of available emails proves that Maynard engaged in targeted deletion of emails from the District's servers is taken from two different sources: the local file found on Maynard's MTSD-issued laptop computer, which was made on March 15, 2007, and a copy of the District's centralized server file, which was made in April 2009.   [Doc. No. 255 (H.T. Vol. III) at p. 517, 592-93, 595-98, 601].

FOF 100)     Although the data demonstrates a gap in emails between March and December of 2007, the data reflects a similar drop off in the number of emails sent and received prior to December of 2006.   [Doc. No. 255 (H.T. Vol. I) at p. 186-89; Doc. No. 255 (H.T. Vol. III) at p. 672-73].

FOF 101)     The record also reflects that, when the District discovered in 2011 that

28

the April 2009 copy of the centralized server file reflected a gap in emails sent and received by Maynard between March and December of 2007, it offered to attempt to obtain archived copies of emails using the Barracuda Archival System. [Maynard Ex. #1; Doc. No. 255 (H.T. Vol. I) at 203-05; Doc. No. 255 (H.T. Vol. III) at p. 694-95, Doc. No. 256 (H.T. Vol. IV) at p. 901-11].

FOF 102)   Even though the District's counsel advised Anderson that a test search revealed that such emails did exist, Anderson never asked the District to retrieve any data using the Barracuda System.   [Maynard Ex. #1; Maynard Ex. #2].


B.   <u>Conclusions of Law – Server Copies of Maynard's Emails</u>

COL 24)   There is no dispute that emails sent and received by Maynard, a District employee, through the District's email system were within the control of Maynard and/or MTSD inasmuch as the District would have copies of the emails on its server and Maynard would have had copies on the computers assigned to him by the District.   Thus, the record establishes that server copies of Maynard's emails were within Maynard's control.

COL 25)   Nevertheless, server copies of Maynard's emails were not relevant to Anderson's First Amendment/ PWA claims.   As we have previously discussed, this Court granted Defendants' motions for summary judgment on the grounds that Anderson's First Amendment/PWA claims were legally insufficient; the Court's ruling was not premised upon the claims being factually unsupported.   Thus, any additional evidence regarding Maynard's activities which Anderson might have been able to obtain from server copies of Maynard's emails is of no legal moment.   The irrelevant of the emails is further evidenced

29

by the fact that, when the District offered the Barracuda Archival System as a way to obtain server copies of emails, Anderson did not even express interest in it.

COL 26)    Maynard did not actually suppress or intentionally withhold server copies of his emails.   Anderson contends that the only reasonable inference to be drawn from the fact that the copy of the server file shows an absence of Maynard emails between March and December of 2007 is that Maynard purposefully deleted emails created between those dates from MTSD's servers in order to withhold evidence relevant to this case.   The Court does not agree with Anderson's contention.   Here, the purported deletion of emails that were sent or received by Maynard between only March and December of 2007 appears random in the context of this lawsuit.   If Maynard had in fact attempted to destroy evidence relevant to this case, one would expect that the deletion would have started at an earlier date and ended at a later one, would have involved the local and server files of many more employees' email accounts, and would have also destroyed copies on the Barracuda System.

COL 27)    Because Anderson's only evidence in support of a finding of bad faith conduct is that an inference of purposeful deletion is compelled based on the gap in emails found on the centralized server, and because we have found that such an inference is not dictated by this record, Anderson cannot make the "pivotal" bad faith showing that justifies a spoliation determination.   Bull, 665 F.3d at 79.

COL 28)    Maynard had a reasonably foreseeable duty to preserve server copies of emails.   There is no reasonable dispute that, as of April 19, 2007, which is when Anderson filed a writ of summons in state court, the District and Maynard had a duty to preserve possibly relevant evidence.   Even though Anderson had not yet requested any

30

ESI, counsel arguably should have anticipated such a request and instituted a litigation hold, but did not.   Although, at some point, Anderson's lack of interest in pursuing such evidence would have relieved counsel and their client of the duty to continue preserving such evidence, at the time the copy was made of the centralized server file, i.e., April 2009, discovery was ongoing and such ESI could have still been requested.

COL 29)    Anderson has failed to satisfy her burden of proving that spoliation of server copies of Maynard's emails took place because, although Maynard retained control over the emails and had a reasonably foreseeable duty to preserve them, those emails could not have contained relevant evidence and the evidence does not support a reasonable inference that Maynard actually suppressed or intentionally withheld the emails.   Byrnie, 243 F.3d at 107-08.

COL 30)    Because there was no spoliation of evidence, we need not go on to the second part of the test and determine what type of sanction would be appropriate under the circumstances.

COL 31)    Given these findings, the record does not support a finding of either willful bad faith in multiplying the proceedings or egregious abuse of the judicial process, making sanctions against either Maynard's or MTSD's attorneys pursuant to §1927 or our inherent authority unwarranted.


VI.    KNOX'S SUPPLEMENTAL PRODUCTION

   A.  Findings of Fact – Knox's Supplemental Production

FOF 103)    During discovery Defendant Mancini issued a third-party subpoena to MTSD on October 27, 2008. [Plain. Ex. #34; Doc. No. 260 (H.T. Vol. VI) at p. 1242].

31

FOF 104)     Mancini demanded a fast response to the subpoena because she had scheduled various depositions in the near future. [Doc. No. 256 (H.T. Vol. IV) at p. 816-19; Doc. No. 259 (H.T. Vol. V) at p. 1014-15].

FOF 105)     Timothy Sennett, an attorney at Knox, undertook the task of responding to this subpoena on behalf of his client, MTSD. [Doc. No. 256 (H.T. Vol. IV) at p. 816-19; Doc. No. 259 (H.T. Vol. V) at p. 959-60, 962].

FOF 106)     He did so by contacting District employees and members of the Knox firm who would be likely to have files responsive to the subpoena and asking for their files. [Doc. No. 259 (H.T. Vol. V) at p. 959-60, 962, 982-87, 996-97, 1012-15, 1123-25; Doc. No. 260 (H.T. Vol. VI) at p. 1304, 1306-09; Doc. No. 261 (H.T. Vol. VII) at p. 1578-80].

FOF 107)     Sennett produced the files provided to him in their entirety. [Doc. No. 259 (H.T. Vol. V) at p. 962, 984-87].

FOF 108)     The attorneys who provided their files did not remove any documents from them before giving them to Sennett to be produced. [Doc. No. 259 (H.T. Vol. V) at p. 987-88, 1017-21].

FOF 109)     By January of 2009, Sennett had produced more than 10,000 pages of documents in response to the October 2008 subpoena. [Doc. No. 256 (H.T. Vol. IV) at p. 817-19, 893, 898; Doc. No 259 (H.T. Vol. V) at p. 963].

FOF 110)     After making this production, the District responded to a follow-up request from Mancini and to a formal subpoena from Maynard and Sullivan issued in February of 2009. [MTSD Ex. #4; Doc. No. 256 (H.T. Vol. IV) at p. 817-18].

FOF 111)     Anderson never issued a subpoena to the District and, in fact, moved

to quash Maynard and Sullivan's February 2009 subpoena, which specifically sought Seagate #1, on the ground that the subpoena sought irrelevant evidence. [Doc. No. 71; Plain. Ex. #36; MTSD Ex. #4 at ¶ 16; Doc. No. 256 (H.T. Vol. IV) at p. 839-43, 884-85; Doc. No. 259 (H.T. Vol. V) at p. 1011].

FOF 112)    Yet, on September 14, 2011, Anderson asked MTSD for a clean copy of a document that the District had previously produced in response to Mancini's October 2008 subpoena because the document had taken on "new meaning" after the close of fact discovery and appeared to have been miscopied. [Plain. Ex. #32; MTSD Ex. #7; Doc. No. 256 (H.T. Vol. IV) at p. 796-99, 858-61, 910-14].

FOF 113)    Between Sennett's original production in late 2008 and early 2009, and this request in 2011, the Anderson matter went from an internal investigation to litigation in federal court, which caused the files to be transferred to the litigators, and then to an inactive matter after the firm's client had been dismissed from this lawsuit, which caused the files to be sent off-site for long term storage. [Doc. No. 260 (H.T. Vol. VI) at p. 1237-39, 1245-46; Doc. No. 261 (H.T. Vol. VII) at p. 1578-84, 1590, 1596].

FOF 114)    In response, Knox attorney Neal Devlin reviewed nine or ten boxes of inactive files for a clean copy of the document identified by Anderson, and upon finding that one was not available, located documents regarding similar or related issues that might shed light on the document Anderson identified as illegible. [Doc. No. 256 (H.T. Vol. IV) at p. 857-62, 910-18; 1582-83; Doc. No. 259 (H.T. Vol. V) at p. 1125-26].

FOF 115)    Devlin's efforts resulted in the production of a packet of seven documents to Anderson's counsel. [Plain. Ex. #38; Doc. No. 256 (H.T. Vol. IV) at p. 857-60, 1005-06)].

FOF 116)      According to Anderson, five of those seven documents had not been previously produced in response to the October 2008 subpoena, and four of them prove that Knox purposefully withheld documents when it responded to that subpoena. [Doc. No. 259 (H.T. Vol. V) at p. 992-93].

FOF 117)      Attorney Devlin exhibited good faith and professional courtesies in attempting to locate documents that might assist Anderson with assigning "new meaning" to a document that was produced two years earlier in response to Mancini's October 2008 subpoena.

FOF 118)      Anderson contends that one attorney at Knox, Richard Perhacs, removed specific documents from his files in order to hide the fact that Seagate #1 went missing during the anonymous letter investigation.   Her theory is that Perhacs did this because Maynard, and presumably Perhacs, knew that (a) Seagate #1 would prove that Maynard wrote the anonymous letter to himself, and (b) Maynard used his MTSD-issued laptop computer to access pornography, which would have led to Maynard's termination. [Doc. No. 265 at ¶ 221].   The record does not support Anderson's theory.

FOF 119)      The four specific documents that allegedly prove Anderson's theory are an April 5, 2007 email between MTSD's attorney and Panighetti, April 4, 2007 and April 5, 2007 telephone conference notes written by Perhacs, and an April 11, 2007 memo to file drafted by Perhacs. [Plain. Ex. #38; Doc. No. 253 (H.T. Vol. I) at p. 91; Doc. No. 259 (H.T. Vol. V) at p. 1003-10].

FOF 120)      These four documents do not prove Anderson's theory as to Perhacs' motivation to withhold documents in response to the October 2008 subpoena.

FOF 121)      Several attorneys from the Knox firm explicitly testified that they did

34

not remove any documents from any files during the original response to Mancini's October 2008 subpoena.   [Doc. No. 259 (H.T. Vol. V) at p. 1017-18, 1153-54, 1162; Doc. No. 260 (H.T. Vol. V) at p. 1233].   I credit their testimony.

FOF 122)   Knox had produced other documents that contained equivalent information regarding the fate of Seagate #1 during the anonymous letter investigation. [Plain. Exs. #32 and #47; Doc. No. 256 (H.T. Vol. IV) at p. 793; 863-64, 890-98; 801-03; Doc. No. 260 (H.T. Vol. VI) at p. 1321, 1330; Doc. No. 261 (H.T. Vol. VII) at p. 1569-70, 1572-73].

B.  Conclusions of Law – Knox's Supplemental Production

COL 32)   District courts are to exercise their "inherent authority" to protect the integrity of the court only as a last resort where no other power to penalize exists.

COL 33)   We conclude that Anderson's request that we apply the two-part spoliation test and then exercise our inherent authority to punish Knox for its belated production of documents in response to the October 2008 subpoena is improper.

COL 34)   In this instance, because Anderson claims that MTSD, a non-party, failed to adequately respond to a subpoena issued by Mancini pursuant to Federal Rule of Civil Procedure 45, our authority to act comes from that rule.

COL 35)   Under Rule 45(e), we may hold any person in contempt who fails to obey a duly issued subpoena if, by clear and convincing evidence, it is established that: (1) the subpoena was valid; (2) the person had notice of it; (3) and the person disobeyed it. Harris, 47 F.3d at 1349; Robin Woods, 28 F.3d at 398–99.

COL 36)   In this case, there is no dispute that the October 2008 subpoena was

35

valid and MTSD, and its counsel, had notice of it.   However, because the record does not support a finding that Knox disobeyed the subpoena, monetary sanctions against that law firm are not warranted.

COL 37)      Anderson's theory that Perhacs disobeyed the subpoena by removing 44 pages from a 10,000 page production in order to protect Maynard's job is not support by the record because, at the time the original production was made, Maynard had already left the employ of the District. [Doc. No. 254 (H.T. Vol. II) at p. 313, 370].

COL 38)      Anderson's theory that Perhacs disobeyed the subpoena is based on her contention that Knox was unable to offer a viable explanation for why those documents were not included in the original production.   This theory is not supported by the record because Knox did offer a viable explanation for why these documents were not originally produced:   Devlin reviewed nine or ten boxes of inactive, or closed, files at an off-site facility years after the firm's client had been dismissed from this lawsuit, while Sennett gathered the active, working files of several different attorneys at his law firm within months of the firm's client being dismissed from this case, and while internal investigations were still ongoing.   In the interim, the Anderson matter went from an internal investigation to litigation in federal court, which caused the files to be transferred to the litigators.

COL 39)      Several Knox attorneys, including Perhacs, explicitly testified that they did not remove any documents from any files during the original response to Mancini's October 2008 subpoena.   In order to conclude that Anderson has satisfied her burden to prove by clear and convincing evidence that Knox disobeyed the subpoena, we would have to first find that one or more of these officers of the Court testified inaccurately and/or untruthfully.   This record does not justify such a finding.   Rather, the record supports a

finding that Attorney Devlin exhibited good faith and professional courtesies in attempting to locate documents that might assist Anderson in her attempt to assign "new meaning" to a document that had been produced two years earlier.

COL 40)     Anderson was not prejudiced by not having received these documents in 2009 because, at that time, Knox had produced other documents that contained equivalent information regarding the fate of Seagate #1.   As such, Anderson had ample opportunity to explore this facet of the case and to request additional information on the issue if she chose to do so.

COL 41)     A contempt order against the District and/or Knox is not warranted under these circumstances.   In so concluding, we are guided by two directives: first, we should not issue a contempt citation if there is any doubt that MTSD or its attorneys acted wrongfully in responding to Mancini's October 2008 subpoena; second, whether to hold a nonparty in contempt under Rule 45(e) is within our discretion.   Harris, 47 F.3d at 1326; Barnes Foundation, 1997 WL 169442, at *5.

COL 42)     Here, there is much doubt that Knox acted wrongfully when responding to the October 2008 subpoena; thus, Anderson has failed to satisfy her burden to prove wrongdoing by clear and convincing evidence.   Here, the record reflects that MTSD and Knox produced a vast amount of information in short order, answered follow up inquires, and even assisted non-requesting counsel who asked, two years after the production, for a better copy of a document that was a produced two years previously to the requesting party.

COL 43)     These are not circumstances in which we will exercise our discretion to inflict penalties on a litigant or its lawyers.

37

VII.   <u>CONCLUSION</u>

      For the foregoing reasons, we find that no sanctions are warranted in this case.   An appropriate order will be filed contemporaneously with these findings.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MARYANN ANDERSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-111-SJM |
| | ) | |
| SUSAN SULLIVAN, DEAN | ) | |
| MAYNARD and REBECCA | ) | |
| MANCINI, | ) | |
| Defendants. | ) | |
| | ) | |

## O R D E R

AND NOW, this 16th day of August, 2013, for the reasons set forth in this Court's accompanying Findings of Fact and Conclusions of Law,

IT IS ORDERED that Plaintiff Maryann Anderson's motion for spoliation sanctions [Doc. No. 233] shall be, and hereby is, DENIED.

s/    Sean J. McLaughlin

SEAN J. McLAUGHLIN
Chief U.S. District Judge

cc:    All counsel of record.